THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
CASE NO. *18 CV80200 BLOOM/HOPKINS*

UNITED STATES, *ex. rel.* .

ELMER MOSLEY, PH.D., R. PH.

    Plaintiff/Relator

v.

WALGREEN CO.,

    Defendant.

_____/

FILED by ___ D.C.

FEB 20 2018

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D of FLA - W.P.B.

**FILED UNDER SEAL**

## COMPLAINT

The Relator, Elmer Mosley, Ph.D., R. Ph., files this action in the name of the United States against Walgreen Co. ("Walgreens"), and states as follows:

### INTRODUCTION

1.    The Relator, Elmer Mosley, Pharm. D., R. Ph. ("Dr. Mosley" or "Relator") files this Complaint pursuant to the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, and alleges two fraudulent schemes by Walgreen Co. ("Walgreens") to commit violations of the False Claims Act:

    (1)    Walgreens knowingly and intentionally accepted manufacturer coupons for pharmaceuticals that were clearly marked as ineligible for Medicare patients. This practice, which results in increased profits for Walgreens, constitutes an illegal inducement to Medicare patients to buy name-brand pharmaceuticals rather than less expensive competing brands or generic versions, and has been condemned as a kickback by HHS-OIG.

    (2)    Walgreens caused false claims to be submitted on behalf of Medicare patients for sham Medication Therapy Management or "MTM" services. These services are supposed to provide Medicare beneficiaries with important counseling services regarding their medications. Walgreens performs these services in such a sham manner, however, the services are "worthless" within the meaning of the False Claims Act.

## JURISDICTION AND VENUE

3.      This action arises under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*  This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. §§ 3732(a) and (b) and 28 U.S.C. §§ 1331 & 1367(a).

4.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) and (c), and under 31 U.S.C. § 3732(a) because Walgreens transacts business within the district, and some of the acts proscribed by the False Claims Act occurred within this district.

## THE FALSE CLAIMS ACT

5.      The False Claims Act ("FCA") provides for the award of treble damages and civil penalties for, *inter alia*, knowingly submitting, or causing the submission of, false or fraudulent claims for payment to the United States government.  31 U.S.C. § 3729(a)(1).

6.      The FCA provides, in pertinent part, that a person who:

> (a)(1)(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (a)(1)(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
> . . .
>
> (a)(1)(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government; . . .
>
> is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 2015 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains. . . .

31  U.S.C. § 3729.
32

7.    For purposes of the FCA.

the terms "knowing" and "knowingly" (A) mean that a person, with respect to information (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud.

31 U.S.C. § 3729(b).

THE PARTIES

**A.    Dr. Mosley**

8.    Dr. Mosley is a resident of Palm Beach County and is a duly licensed pharmacist in Florida.  Dr. Mosley has 42 years of experience in the pharmacy industry, all with Walgreens. He is planning to retire from Walgreens on or about March 30, 2018.  Dr. Mosley's knowledge of the pharmacy industry includes retail practice, pharmacy store management, district pharmacy management, regional consulting, and pharmacy consulting specialty.

9.    After receiving his Doctor of Pharmacy from Florida A&M University in 1972, Dr. Mosley spent two years as an intern with Walgreens, learning pharmacy management as a pharmacy manager at a store in Chicago, Illinois.  In 1974, Walgreens transferred Dr. Mosley within the company to the Coconut Grove, Florida store to serve as its pharmacy manager.

10.    Shortly after the transfer, Walgreens promoted Dr. Mosley to the dual role of pharmacy manager and executive assistant manager out of a store in Davie, Florida.  In these dual roles, Dr. Mosley was responsible for the oversight, supervision and operation of eight (8) Walgreens pharmacies in the greater Davie and Fort Lauderdale areas.  He also was responsible for scouting potential locations to lease additional stores.

11.     Dr. Mosley maintained these responsibilities until 1992, when Walgreens promoted him to Pharmacy Manager/District Manager Trainee for the Miami North area.  In this new role, Dr. Mosley was responsible for identifying sites for additional stores.

12.     In 1997, Walgreens again promoted Dr. Mosley, transferring him to the northwestern United States as a District Manager.  With this promotion, Walgreens assigned Dr. Mosley the responsibility of identifying prospective lease sites for 35-40 stores throughout Washington, Oregon, Northern California and Colorado.  Dr. Mosley's responsibilities continued to include expanding Walgreens stores in these markets.

13.     In 1998, Walgreens transferred Dr. Mosley to Memphis, Tennessee, as a District Manager, making him responsible for supervising and identifying prospective sites for 42 Walgreens stores in Tennessee, Arkansas, Mississippi, and Southern Illinois.  His responsibilities included training pharmacists who worked in these stores.

14.     In 2000, as a District Manager in Memphis, Dr. Mosley began training other pharmacy managers and store managers in the Atlanta, Georgia and Birmingham, Alabama markets.  He remained in this role until 2007.

15.     From 2007 until his recent retirement, Dr. Mosley has worked as a Consultant Pharmacy Specialist for Walgreens in critical areas such as HIV and oncology.  He also has mentored pharmacy interns and pharmacy school graduates for Walgreens and has served as a diversity recruiter for the company.

**B.     Walgreens**

16.     Walgreens is incorporated in Delaware and maintains its headquarters in Deerfield, Illinois.  Across all 50 states, Walgreens operates 8,177 stores and has over 245,000

employees.  Its employees include more than 76,000 pharmacists, pharmacy technicians and nurse practitioners.

17.    In 2014, Walgreens merged with Boots Alliance and Walgreens became a subsidiary of the merged entity, Walgreens Boots Alliance Company.    After the merger, upon information and belief, Walgreens has remained the billing entity that submits claims to Medicare.  Hence, Walgreens is the named defendant in this case.

MEDICARE PART D

**A.    The Medicare Modernization Act of 2003**

18.    In 2003, Congress passed the Medicare Prescription Drug, Improvement, and Modernization Act ("MMA"), Pub. L. 108-173, 117 Stat. 2066, which established a voluntary prescription drug benefit program for Medicare enrollees known as Medicare Part D. An individual is eligible to enroll in Part D if the individual lives in the service area of a Part D plan and is entitled to Medicare benefits under Part A or is enrolled under Part B.  *See* 42 U.S.C. § 1395w-101(a)(3)(A); 42 C.F.R. § 423.30(a).

19.    Prior to passage of the Act, with a few limited exceptions, Medicare did not cover outpatient prescription drugs.  The new Medicare prescription drug benefits program became effective January 1, 2006.  *See* 42 U.S.C. § 1395w-101(a)(2).  Unlike coverage in Medicare Parts A and B, Part D coverage is not provided within the traditional Medicare program.  Instead, Medicare Part D is based on a private market model.  Medicare contracts with private entities, typically insurance companies, known as Part D Plan "Sponsors" to administer prescription drug plans.  Part D benefits are delivered by a Part D Sponsor, which is normally a Part D prescription drug plan or a Medicare Advantage prescription drug plan.

**B.    Part D Sponsors Regularly Submit "Prescription Drug Event" Data to CMS**

20.    When a pharmacy such as Walgreens dispenses a drug to a Medicare beneficiary, it submits an electronic claim to the beneficiary's Part D Sponsor and receives reimbursement from the Part D Sponsor for the costs not paid by the beneficiary.  The Part D Sponsor then notifies CMS that a drug has been purchased and dispensed through a document called a "Prescription Drug Event" or "PDE" record, which includes data elements about the drug dispensed, the prescription, and the payment to the pharmacy. The PDE includes 37 separate fields of data, including information on the service provider of the drug (fields 10 and 11), the prescriber of the drug (fields 13 and 14), the quantity dispensed and days' supply of the drug (fields 18 and 19), and whether or not the drug is covered under the Medicare Part D benefit (field 22).

21.    Payments to a Part D Sponsor are conditioned on the provision of information to CMS that is necessary for CMS to administer the Part D program and make payments to Part D Sponsors for qualified prescription drug coverage. *See* 42 C.F.R. § 423.322.  CMS's instructions for the submission of PDE claims data state that "information . . . necessary to carry out this subpart" includes the data elements of a PDE.   *See* Exhibit 1, Updated Instructions: Requirements for Submitting Prescription Drug Event Data (PDE) (April 27, 2006).

22.    PDE records are an integral part of the process that enables CMS to administer the Part D benefit.  CMS relies on the information in all 37 data fields of a PDE record to process payments and to validate claims. *See* Exhibit 1.

23.    Each PDE that is submitted to CMS is a summary record that documents the final adjudication of a dispensing event based upon claims received from pharmacies and serves as the request for payment for each individual prescription submitted to Medicare under the Part D

program.  The data contained in PDEs are data related to the payment of claims.  In addition, CMS uses the information in the PDE at the end of the payment year to reconcile its advance payments to the sponsor with actual costs the sponsor incurred.  *See* Exhibit 1.

**C.**    **CMS Reimburses Part D Sponsors Based on the PDE Data**

24.    Throughout the year, CMS makes prospective payments to Part D Sponsors for three subsidies based on the Sponsors' approved bids: (1) the direct subsidy designed to cover the Sponsor's cost of providing the benefits; (2) the low-income cost-sharing subsidy; and (3) the reinsurance subsidy.

25.    The direct subsidy (a monthly capitated payment) is paid to the Part D Sponsor in the form of advance monthly payments equal to the Part D Plan's standardized bid, risk adjusted for health status as provided in 42 C.F.R. § 423.329(b), minus a monthly beneficiary premium as determined in 42 C.F.R. § 423.315(b).  In other words, CMS pays a monthly sum to the Part D Sponsor for each Part D beneficiary enrolled in the plan.

26.    CMS also makes payments to the Part D Sponsor for premium and cost sharing subsidies on behalf of certain subsidy-eligible individuals as provided in 42 C.F.R. § 423.780 and 42 C.F.R. § 423.782.  Cost-sharing subsidies for qualifying low-income individuals are called Low-Income Cost Sharing Subsidies ("LICS") and are documented and reconciled using PDE data submitted to CMS.

27.    The reinsurance subsidy is paid to the Part D Sponsor to cover the Government's share of drug costs above an enrollee's catastrophic threshold.  Part D Sponsors who fail to submit required claims-level information contained in the PDE to CMS risk having to return monthly payments to CMS during reconciliation.  *See* 42 C.F.R. § 423.343(b), (c)(2) and (d)(2). In addition, Part D Sponsors are responsible for correcting submitted PDE data it determines

erroneous.  *See* "Updated Instructions: Requirements for Submitting Prescription Drug Event Data (PDE)" at 4 (April 27, 2006).

28.     After the close of the plan year, CMS is responsible for reconciling the prospective payments to the Part D Sponsor's actual allowable costs to calculate final payments and risk sharing amounts. CMS determines the Sponsor's actual allowable costs by relying upon data elements submitted by Sponsors in their PDE records.

**D.      Part D Sponsors and Pharmacies Must Certify Compliance with all Applicable Federal Laws, Regulations and CMS Instructions**

29.     In order to receive Part D funds from CMS, Part D Sponsors, their authorized agents, employees, and contractors (including pharmacies) are required to comply with all applicable federal laws, regulations, as well as CMS instructions.  By statute, all contracts between a Part D Sponsor and the Department of Health and Human Services must include a provision whereby the Part D Sponsor agrees to comply with the applicable requirements and standards of the Part D program, as well as the terms and conditions of payment governing the Part D program.  *See* 42 U.S.C. § 1395w-112.

30.     Part D Plan Sponsors must also certify in their contracts with CMS that they agree to comply with all federal laws and regulations designed to prevent fraud, waste, and abuse. 42 C.F.R. § 423.505(h)(1).  CMS regulations require that all subcontracts between Part D Sponsors and downstream entities, such as pharmacies, contain language obligating the pharmacy to comply with all applicable federal laws, regulations, and CMS instructions.   *See* 42 C.F.R. § 423.505(i)(4)(iv).

31.     Walgreens, as a subcontractor for Part D Sponsors, is required to comply with all applicable federal laws, regulations, and CMS instructions designed to prevent fraud, waste and

abuse, including but not limited to the False Claims Act (31 U.S.C. ' 3729 *et seq.*) and the anti-

kickback statute (section 1128B(b) of the Social Security Act) .*See* 42 C.F.R. § 423.505(h)1.

32.     A Part D Sponsor is required by federal regulation to certify to the accuracy,

completeness and truthfulness of all data related to the payment.   This provision, entitled

"Certification of data that determine payments," provides in relevant part, as follows:

> (1) General Rule. As a condition for receiving a monthly payment . . .
> the Part D Plan sponsor agrees that its chief executive officer (CEO),
> chief financial officer (CFO), or an individual delegated the authority to
> sign on behalf of one of these officers, and who reports directly to the
> officer, must request payment under the contract on a document that
> certifies (based on best knowledge, information and belief) the accuracy,
> completeness, and truthfulness of all data related to payment. The data
> may include specified enrollment information, claims data, bid
> submission data, and other data that CMS specifies.
>
> …
>
> (3) Part D Sponsor Certification of Claims Data: The CEO, CFO, or an
> individual delegated with the authority to sign on behalf of one of these
> officers, and who reports directly to the officer, must certify (based on
> best knowledge, information and belief) that the claims data it submits
> under § 423.329(b)(3) (or for fallback entities, under § 423.871(f)) are
> accurate, complete and truthful and acknowledge that the claims data
> will be used for the purpose of obtaining Federal reimbursement.

*See* 42 C.F.R. § 423.505(k)(1) & (3).

33.     All approved Part D Sponsors who received payment under Medicare Part D must

submit the required attestations for data submitted that related to payment.  *See* 42 C.F.R. §

423.505(k).  The "Certification of data that determine payments" provision of the applicable

regulation further provides: "[i]f the claims data are generated by a related entity, contractor, or

subcontractor of a Part D plan sponsor, the entity, contractor, or subcontractor must similarly

certify (based on best knowledge, information, and belief) the accuracy, completeness, and

truthfulness of the data and acknowledge that the claims data will be used for the purposes of obtaining Federal reimbursement." *See* 42 C.F.R. § 423.505(k)(3).

## THE FRAUDULENT SCHEMES

35.     Walgreens has engaged in two (2) illegal schemes that have caused tens of millions of dollars of false claims to be submitted to the Government by way of the Part D Medicare program.

**A.      Scheme 1: Walgreens Knowingly and Intentionally Accepted Manufacturers' Coupons That Resulted in Kickbacks to Medicare Beneficiaries**

**1.      Drug Makers Commonly Use Coupons and Coupon Programs to Promote Sales of Their Drugs**

36.     Most purchasers of prescription pharmaceuticals in America today purchase their medications through some form of insurance.  Typically, insurance policies cover only a portion of the cost of the medication, leaving the remainder to be paid by the patient at the point of sale. The patient's portion, known as the "copayment" or "copay", can be expensive.  Moreover, different medications carry different copay obligations, with many name-brand pharmaceuticals carrying higher copay obligations than competing brands or generic equivalents.

37.     Manufacturers of name-brand drugs recognize the financial disincentives created by copay obligations. To overcome these disincentives, many drug makers offer coupon programs to patients.  The purpose of the coupon program is to eliminate or reduce the copay obligation at the point of sale.  Thus, a patient with insurance who uses a coupon might avoid any out-of-pocket expense when purchasing a drug.

38.     As an example, Relator has attached hereto a promotion for a coupon program offered by Janssen, the manufacturer of Xarelto, a medication used to reduce the risk of strokes and blood clots. *See* Exhibit 2.  As advertised by Janssen, "eligible patients pay $0 co-pay every

month." *Id.* Other manufacturers offer similar programs. Relator has attached hereto as Exhibit 3 a promotion for a coupon program offered for patients who take Vascepa, a drug that reduces triglyceride levels. Relator also has attached hereto as Exhibit 4 a coupon promotion for patients to take Crestor, a drug that treats high cholesterol.

### 2.    Pharmacies Process Coupons Electronically Through Switch Vendors

39.    In the United States today, almost all billing for prescription medications takes place through a company known as a "switch vendor" or a "switch." A switch vendor is an intermediary company that operates a computer platform to allow electronic billing between pharmacies, on the one hand, and third-party payers, on the other hand. These third-party payers include private insurance companies, pharmacy benefit managers, and Part D Sponsors, among others.

40.    When a customer presents himself or herself at the counter of a Walgreens with a prescription, the following typically takes place. A pharmacy employee enters the customer's primary insurance information and information related to the prescription into a computer terminal that is connected to the switch. The switch stands as an intermediary between the pharmacy and the insurance company, PBM, or other company that will pay for the medication. When the pharmacist submits a claim into the switch, the switch "adjudicates" the claim and sends a message back to the pharmacy regarding the claim. As an example, the switch might send a message that the prescription is covered, is not covered, or it might send a message as to the amount of the copay to be collected from the customer.

41.    If a copay is due, the pharmacy must collect these funds at the counter. The pharmacy then receives the bulk of its payment from the insurance company or other third-party

payer after the transaction has been completed, by way of the transaction adjudicated through the switch.

42.     Often, patients will have two layers of insurance, a primary insurance and a secondary insurance.   In that case, the pharmacy first submits and adjudicates a claim using the primary insurance.   If a copay remains to be collected, the pharmacy submits and adjudicates a second claim using the secondary insurance, to pay for the copay.   In such cases, the pharmacy receives payment at some later date from the primary insurer and the secondary insurer.

43.     Pharmacies adjudicate coupon claims through the switch much like they adjudicate secondary insurance claims.   That is to say, a customer with a coupon would present himself or herself at the pharmacy counter with two cards, one for the primary insurance and one for the coupon.   The pharmacy first submits and adjudicates the primary insurance claim through the switch.   If a copay remains to be collected, the pharmacy submits and adjudicates the coupon claim through the switch, using numbers and other data identified on the coupon itself.   In such cases, the pharmacy receives payment for the prescription from two (2) sources.   First, it receives payment from the insurance carrier on the primary claim.   Second, it receives payment from the drug manufacturer (or a third-party vendor working for the drug manufacturer) on the coupon claim.

### 3.     Medicare Beneficiaries Cannot Use Coupons

44.     Pharmaceutical coupons are commonplace with customers using private insurance, but are strictly forbidden to be used by customers with Government sponsored insurance, such as Medicare Parts C or D, or Medicaid.    Indeed, in September 2014, the U.S. Department of Health and Human Services, Office of Inspector General ("OIG"), issued a

Special Advisory Bulletin regarding "Pharmaceutical Manufacturer Copayment Coupons." The

Bulletin provides that:

> Pharmaceutical manufacturers offer copayment coupons to insured patients to reduce or eliminate the cost of their out-of-pocket copayments for specific brand-name drugs. These coupons constitute remuneration offered to consumers to induce the purchase of specific items.
>
> When the item in question is one for which payment may be made, in whole or in part, under a Federal health program (including Medicare Part D), the anti-kickback statute is implicated . . . Where remuneration is paid purposefully to induce or reward referrals of items or services payable by a Federal health care program, the anti-kickback statute is violated.
>
> A claim that includes items or services resulting from a violation of the anti-kickback statutes constitutes a false or fraudulent claim for purposes of the False Claims Act.
>
> …
>
> The pharmaceutical industry is aware of the anti-kickback statute and its application to copayment coupons. Copayment coupons typically bear a statement that the coupon may not be used by beneficiaries of Federal health care programs.

A copy of the Bulletin is attached as Exhibit 5.

     44.     The Bulletin makes clear that pharmaceutical coupons constitute a kickback in

violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(1),(2). Moreover, liability

extends not only to drug makers that produce the coupons, but also to pharmacies that accept the

coupons. The Bulletin explains that "pharmacies that accept manufacturers['] coupons in

connection with the copayment coupons they offer for copayments owed by Federal health care

program beneficiaries also may be subject to sanctions under the anti-kickback statute, the

beneficiary inducement CMP [Civil Monetary Penalty Law], and the False Claims Act." *See*

Bulletin, Exhibit 5, n. 6.

     45.     In September 2014, OIG issued a report entitled Manufacturer Safeguards May

Not Prevent Copayment Coupon Use for Part D Drugs." In the report, OIG determined:

In manufacturer coupons encourage Medicare beneficiaries to obtain more expensive brand-name drugs when lower cost alternatives are available, the coupon may reduce individual beneficiaries' immediate out-of-pocket costs but Part D plans' and the Part D program's costs may increase, ultimately increasing costs to taxpayers.

…

Pharmaceutical manufacturers typically offer copayment coupons to insured patients to reduce or eliminate patients' out-of-pocket costs for specific brand-name drugs . . . A manufacturer may offer a coupon for a brand-name drug that reduces the copayment for that drug and makes it cheaper than the copayment for a competitor drug.

…

In addition to potentially implicating the anti-kickback statute, manufacturers' use of coupons to reduce the cost-sharing obligations for drugs paid for by Medicare Part D could impost costs on Part D plans, on the Part D program, and ultimately on Part D beneficiaries. While coupons provide an immediate financial benefit to beneficiaries by reducing their out-of-pocket costs, they may increase the cost of prescription drugs for Part D plans. Coupons may increase costs for Part D plans because they may encourage the purchase of more expensive brand-name drugs instead of less expensive alternative treatments, such as generic drugs.

A copy of the OIG September 2014 Report is attached as Exhibit 6, at 2, 4 and 22, respectively.

46.     Drug manufacturers are fully aware that their coupon programs can be deemed a kickback scheme if they are used by Medicare beneficiaries.  For this reasons, drug makers go to great lengths to advise Medicare beneficiaries not to use their coupons, and to advise pharmacies not to accept these coupons from Medicare beneficiaries.

47.     For example, the Xarelto promotion attached as Exhibit 2, contains the following disclaimer on the face of the coupon:  "Not valid for patients using Medicare, Medicare Part D, or Medicaid.  Eligibility requirements apply."

48.     Likewise, the Vascepa promotion, attached as Exhibit 3, contains the following disclaimer on the face of the coupon:  "Pharmacy and beneficiary: when you use this card you

are certifying that you have not submitted and will not submitted a claim for reimbursement under any federal, state, or other government programs for this prescription."

49.     Similarly, in 2015, AstraZeneca offer discount cards for the cholesterol drug, Crestor.  The face of the card provides as follows:

> Patients who are enrolled in a state or federally funded prescription insurance program are not eligible for this offer. This includes patients enrolled in Medicare Part D, Medicaid, Medigap, Veterans Affairs (VA), Department of Defense (DOD) programs or TriCare, and patients who are Medicare eligible and enrolled in an employer-sponsored group waiver health plan or government-subsidized prescription drug benefit program for retirees. If you are enrolled in a state or federally funded prescription insurance program, you may not use this Savings Card even if you elect to be processed as an uninsured (cash-paying) patient. (emphasis in original).

*See* Exhibit 4.

### 4.     Walgreens Routinely Accepted Illegal Drug Coupons

50.     Notwithstanding the illegality of accepting copay coupons from Medicare patients, Walgreens consistently pressured its pharmacy managers to accept these coupons throughout Relator's tenure with the company.  As a long-time employee at Walgreens, Relator knows of hundreds of occasions where Walgreens pharmacists knowingly accepted pharmacy coupons when they were not supposed to do so.

51.     In or around 2017, while Relator was working at store number 10576 in Palm Beach Gardens, Relator's District Manager, Brian Lorenz, reprimanded Relator for not accepting a pharmacy coupon from a Part D customer after Relator refused to do so.  When the customer presented the coupon to the Relator at the pharmacy, Relator advised the customer she could not use the coupon given that she was on Medicare.  The customer responded by calling the store manager and complaining that Walgreens always had accepted the coupon in the past.  The store manager apparently informed Mr. Lorenz of Relator's refusal, and Mr. Lorenz came to the store

to reprimand Relator.  After his reprimand, Relator checked the customer's history and saw that the coupon ultimately was accepted by a different pharmacist at the store during another shift.

52.     Walgreens regularly accepts coupons for Medicare beneficiaries for two reasons. First, Walgreens wants to keep its customers happy and doing business with Walgreens.  If a customer complains about a pharmacist's unwillingness to accept a coupon, Walgreens management routinely pressures pharmacists to process the coupon through the switch. Secondly, Walgreens encourages pharmacists to use these coupons to increase business.  In particular, Walgreens does not want to lose business to other pharmacies that will accept these coupons in violation of the Anti-Kickback Statute.

### 5.    Representative Examples of Kickbacks

53.     From at least February 2012 through the present, Walgreens knowingly and intentionally caused kickback-tainted claims to be submitted to Government healthcare programs.  Relator has assembled the following representative examples of occasions where Walgreens illegally accepted and used drug manufacturer's copay coupons for Medicare patients. These examples include the following:

### Example #1

54.     On or about May 2, 2017, a Medicare customer purchased Xarelto at Store #10791 in Boynton Beach.  The drug costs $1038.43 for 90 tablets and the required copay was $108.  Walgreens accepted the manufacturer's coupon to cover the copayment.  On information and belief, the coupon card presented by the customer clearly stated that it was not eligible to be used by Medicare patients. Moreover, the customer's insurance coverage was through a Medicare Part D Plan, "AARPMPD", which is the abbreviation for American Association of Retired Persons Medicare Part D Plan.

## Example #2

55.     On or about March 3, 2017, a customer purchased Medicare customer purchased Xarelto at Store #10791 in Boynton Beach.    The drug costs $351.46 for 30 tablets and the required copayment was $36.    Walgreens accepted the manufacturer's coupon for the copayment. On information and belief, the coupon card presented by the customer clearly stated that it was not eligible to be used by Medicare patients.    Further, the customer's insurance plan was through AARPMPD.

## Example #3

56.     On or about August 26, 2016, a Medicare customer purchased Xarelto tablets at Store #10791 in Boynton Beach.    The drug costs $323.17 for 30 tablets and the required copayment was $36. Walgreens accepted the manufacturer's copayment coupon in lieu of taking the copayment. On information and belief, the coupon card presented by the customer clearly stated that it was not eligible to be used by Medicare patients.    The customer's insurance coverage also was through AARPMPD.

## Example #4

57.     On or about September 8, 2016, a Medicare customer purchased Crestor tablets at Store #1214 in New York City.    The drug costs $403.96 for 90 tablets and the required copayment was $330.52. Walgreens accepted the manufacturer's coupon, discounting the customer's copayment to $3.    On information and belief, the coupon card present by the customer clearly stated that it was not eligible to be used by Medicare patients.    The customer's insurance coverage also was through AARPMPD.

### Example #5

58.     On May 11, 2017, a Medicare customer purchased Vascepa capsules at a Store #5078 in Lake Worth, Florida.  The drug costs $190.85 for 12 tablets and the required copay was $63.62.  Walgreens accepted the manufacturer's coupon, discounting the copayment to $9.  On information and belief, the coupon card present by the customer clearly stated that it was not eligible to be used by Medicare patients.   Moreover, the customer's insurance coverage was through "PERXMPD," which is an abbreviation for Express Scripts Medicare Part D Plan.

### Other Examples

59.     Based upon the above and additional information that Relator has in his possession, Relator submits that Walgreens consistently has engaged in a pattern and practice of accepting copayment coupons for Medicare beneficiaries over many years.  This conduct took place from at least February 2012 until June 2017.  According to Relator, in or around July 2017, Walgreens and/or the switch vendor used by Walgreens instituted measures to automatically block coupon claims for Medicare Part D and Medicare Advantage Plans.  Prior to these measures, Walgreens caused millions of dollars of kickback-tainted claims to be presented to Government healthcare programs.

**B.     Scheme 2:   Walgreens Performed and Billed for Sham, Worthless Medication Therapy Management Services**

60.     Walgreens has caused false claims to be submitted to Medicare for sham, worthless Medication Therapy Management ("MTM") services, as set forth below.

#### 1.     Part D Requires MTM Services as a Mandatory Benefit

61.     When Congress enacted the Medicare Part D program in 2003, it represented the greatest expansion of Medicare since 1965.  Because of this, Congress sought to impose certain safeguards to ensure that Part D beneficiaries used their medications safely and effectively, in the

manner that best improved health outcomes, and with the least overall cost.   Accordingly, Congress required that all Part D Sponsors, as a mandatory part of coverage, offer MTM services.  The MTM services must be delivered by a pharmacist, or other qualified provider, to certain "targeted beneficiaries."  *See* 42 C.F.R. '423.153(d)(1)(iii).   The targeted beneficiaries include those with multiple chronic conditions, such as diabetes, asthma, hypertension, hyperlipidemia, and congestive heart failure, those who take multiple medications, or those who are likely to incur annual medication costs above a predetermined cost "threshold." By statute, CMS adjusts this cost threshold annually, and the current cost threshold as of 2018 is $3,967.

62.    The Medicare website describes MTM services this way:

The Medicare website describes MTM services this way:

> You may be eligible to get services, at no cost to you, through a Medication Therapy Management (MTM) program if these apply:
>
> - You're in a Medicare drug plan.
>
> - You take medications for different medical conditions.
>
> This program helps you and your doctor make sure that your medications are working to improve your health. A pharmacist or other health professional will give you a comprehensive review of all your medications and talk with you about:
>
> - How well your medications are working
>
> - Whether your medications have side effects
>
> - If there might be interactions between the drugs you're taking
>
> - Whether your costs can be lowered
>
> - Other problems you're having
>
> You'll get a written summary of this discussion, including an action plan that recommends what you can do to make the best use of your medications. There will be space for you to take notes or write down any

follow-up questions. You'll also get a personal medication list that will include all the medications you're taking and why you take them.

It's a good idea to schedule your medication review before your yearly wellness visit, so you can talk to your doctor about your action plan and medication list. Bring your action plan and medication list with you to your visit or anytime you talk with your doctors, pharmacists, and other health care providers. Also, take your medication list with you if you go to the hospital or emergency room.

*See* Exhibit 7.

63.     CMS has developed a set of regulations to cover how Part D Sponsors provide MTMs.  *See* 42 CFR § 423.153(d).  These regulations divide MTMs into two types, annual reviews also called Comprehensive Medication Reviews or "CMRs, and Targeted Medication Reviews or "TMRs."  *Id.*  As to CMRs, Part D Sponsors must offer an annual review that includes "an interactive, person-to-person, or telehealth consultation performed by a pharmacist or other qualified for barter provider."  *Id.* at § 423.153 (d)(1)(vii)(B).  As to both the CMR and the TMR, the Part D Sponsor must utilize "standardized action plans and summaries that comply with requirements as specified by CMS for the standardized format."  *Id.* at § 423.153(d)(1)(vii)(D).

64.     CMS has promulgated this standardized format by way of the Chapter 7 of The Prescription Drug Benefit Manual and a document titled Medicare Part D Medication Therapy Management Program Standardized Format.  The Prescription Drug Benefit Manual reiterates the overall goal of the MTM program: to ensure that covered drugs are appropriately used to optimize therapeutic outcomes, and to reduce the risk of adverse events, including adverse drug interactions for targeted beneficiaries.  *See* Exhibit 8, at § 30.1.

65.     The Part D Sponsor must deliver three (3) documents with a standardized format to each beneficiary who receives a CMR:

- CMR Cover Letter;

- Medication Action Plan;

- Personal Medication List.

66.     Part D Sponsors must use this standardized format and can make no changes, as illustrated by answers to Frequently Asked Questions published by Medicare:

> **Question:** Can Part D plans change the layout of the Standardized Format as long as the required content is included, such as using a landscape orientation or one row for each item rather than stacked columns?

> **Answer:** No, the current layout of the Standardized Format is designed to make the documents more accessible to Medicare beneficiaries. During consumer testing, beneficiaries preferred the portrait layout and the structure of the tables.

67.     The form CMR Cover Letter provides the following mandatory language:

> Thank you for talking with me on [insert date of service] about your health and medications. Medicare's MTM (Medication Therapy Management) program helps you make sure that your medications are working.

> Along with this letter are an action plan (Medication Action Plan) and a medication list (Personal Medication List). The action plan has steps you should take to help you get the best results from your medications. The medication list will help you keep track of your medications and how to use them the right way.

This language contemplates that the pharmacist and the beneficiary have had a meaningful conversation and have discussed a plan for the use of the beneficiary's medications.

68.     As to the Medication Action Plan, CMS mandates a precise format in order to provide the beneficiary with a written document that summarizes the topics discussed and the plan going forward. The standardized format requires specific sections for the topics such as "What We Talked About," and "What I Need To Do." The format also requires the Action Plan to include a box titled "What I Did and When I Did It." This is meant to allow space for the

beneficiary to write follow-up items as he or she executes the plan.  Of great significance to this case, although CMS mandates that the Part D Sponsor follow a strict format, the contents of the Action Plan itself must be *tailored to the individual beneficiary.*

69.     Thus, CMS provides samples of properly completed Medication Action Plans as follows:

---

**MEDICATION ACTION PLAN FOR**  Mr. John Smith, DOB: 07/04/1940

Have this action plan with you when you talk with your doctors, pharmacists, and other healthcare providers.  Share this with your family or caregivers too.

**DATE PREPARED:** 01/14/2013

| What we talked about: | |
|---|---|
| • High Cholesterol | |
| **What I need to do:** | **What I did and when I did it:** |
| • Monitor diet; eat fewer high cholesterol foods (see dietary handout for healthier options).<br>• Get your cholesterol checked. | |

| What we talked about: | |
|---|---|
| • High Blood Pressure - at visit on 1/14/2013 it was 154/92 mmHg | |
| **What I need to do:** | **What I did and when I did it:** |
| • Check blood pressure at least 3 times a week and record on log.<br>• Maintain blood pressure less than 130/80 mmHg.<br>• Monitor salt in my diet and increase daily exercise.<br>• Make an appointment with physician to have blood pressure rechecked and share log. | |

My follow-up plan (add notes about next steps):

70. Finally, CMS mandates that the Part D Sponsor give the beneficiary a Personal Medication List, which consists of an individualized list of medications being taken by the beneficiary, along with relevant, tailored information.  CMS provides a sample as follows:

**PERSONAL MEDICATION LIST FOR** Mr. John Smith, DOB: 07/04/1940

If you go to the hospital or emergency room, take this list with you.  Share this with your family or caregivers too.

**DATE PREPARED:** 01/14/2013

**Allergies or side effects:** Penicillin - hives and difficulty swallowing

| Medication: Simvastatin 20 mg tablet | |
|---|---|
| How I use it: Take one tablet (20 mg) by mouth every night | |
| Why I use it: High Cholesterol | Prescriber: Dr. Joe Anne |
| Goals: <ul><li>LDL (Low Density Lipoproteins) < 100 mg/dL</li><li>HDL (High Density Lipoproteins) > 40 mg/dL</li></ul> | |
| Date I started using it: January 2009 | Date I stopped using it: |
| Why I stopped using it: | |

| Medication: Glipizide XL (Glucotrol XL) 5 mg tablet | |
|---|---|
| How I use it: Take one tablet (5mg) by mouth once daily | |
| Why I use it: Type 2 Diabetes | Prescriber: Dr. Joe Anne |
| Date I started using it: June 2010 | Date I stopped using it: |
| Why I stopped using it: | |

| Medication: Acetaminophen 325 mg tablet | |
|---|---|
| How I use it: Take one tablet (325 mg) by mouth as needed for pain (3-4 tablets usually each day) | |
| Why I use it: Knee Pain | Prescriber: Self |
| Reminder: <ul><li>Taking more than 3000mg of Acetaminophen a day can increase your chance of liver toxicity.</li><li>Do not drink alcohol with this medication, it can increase your risk of liver problems.</li></ul> | |
| Date I started using it: | Date I stopped using it: |
| Why I stopped using it: | |

| Medication: Albuterol Sulfate Inhalation Solution (Ventolin HFA) | |
|---|---|
| How I use it: Use 2 puffs every 6 hours as needed for shortness of breath | |
| Why I use it: Breathing | Prescriber: Dr. Joe Anne |
| Reminder:<br>• Refer to leaflet on proper technique.<br>• Keep with you at all times - "rescue inhaler." | |
| Date I started using it: Early 2011 | Date I stopped using it: |
| Why I stopped using it: | |

## 2.     Part D Sponsors Deliver MTMs Through Downstream Vendors

71.    Part D Sponsors do not typically deliver MTM services through their own personnel.   Instead, Part D Sponsors enter into contracts with vendors, known as "downstream vendors," to provide those services on behalf of the Sponsor.   Currently, two major vendors in the United States provide the majority of MTM services for Part D Sponsors: Mirixa Corporation, a company based in Virginia, and Outcomes, Inc., a company based in Iowa.

72.    Mirixa and Outcomes, in turn, work with pharmacies, including Walgreens to provide MTM services to beneficiaries.   Both Mirixa and Outcomes have created nationwide software platforms that assist pharmacists in delivering MTM services.   A pharmacist working at Walgreens can access Mirixa and Outcomes from a computer terminal in the pharmacy.   Using either platform, the pharmacist can complete the paperwork necessary to perform MTM services, including the CMR Cover Letter, the Medication Action Plan, and the Personal Medication List.

73.    Both vendors have developed computer programs that automatically identify Medicare beneficiaries who are eligible for CMRs and TMRs based on the annual CMS cost threshold and other criteria for MTM services.   Once a beneficiary becomes eligible for MTM services, the computer program moves that beneficiary's name into a "queue" that appears in a database visible to Walgreens and other pharmacies using the vendor's platform.

74.     These computer platforms even target specific pharmacy locations.   As an example, the Mirixa or Outcomes software might alert a particular Walgreens store that a particular Medicare Part D beneficiary who lives within the service area of the store has become eligible for MTM services.   On a daily basis, therefore, each Walgreens pharmacy and its staff have a list of Medicare beneficiaries who are eligible for MTM services.

75.     Walgreens cannot perform MTM services without the consent of the beneficiary. As further set forth below, Walgreens pressures its pharmacists to monitor the Mirixa and Outcomes databases and to contact Medicare beneficiaries by telephone to persuade them to agree to MTM services.   Once Walgreens performs a particular MTM service and completes all of the necessary paperwork through the vendor's platform, Walgreens submits a bill to the vendor for the MTM service.   MTM services range anywhere from $50-$100 per service per beneficiary.   The vendor, either Mirixa or Outcomes, pays Walgreens using funds provided by the Part D Sponsor, which funds have, in turn, been provided by the Government.

### 3.     MTM Services Require a Great Deal of Time and Effort to Complete

76.     Properly performing MTM services, especially CMRs, takes a great deal of time and effort.   The pharmacy industry has published two documents that demonstrate the industry standard in this area. First, the American Pharmacists Association and the National Association of Chain Drug Stores Foundation, published a document in March 2008 titled *Medication Therapy Management in Pharmacy Practice: Core Elements of an MTM Service Model, Version 2.0,* attached hereto as Exhibit 9 (hereafter "Core Elements").   Next, the American Pharmacists Association has also published a document titled *How To Conduct a Comprehensive Medication Review: A Guidebook For Pharmacists*, published in 2014, attached hereto as Exhibit 10 (hereafter the "Guidebook").

77.     These documents describe the steps that pharmacists should take to deliver MTM services that match the industry standard of care.  Both documents agree that MTM services require at least three (3) crucial steps:  (1) preparation work, typically prior to the patient encounter; (2) the patient encounter itself; and (3) post encounter documentation and follow-up. *See* Exhibit 10, at 9-10; Exhibit 9, at 5.

78.     As to the preparation work, the Guidebook recommends the following steps:

> review available information (*e.g.* medical and prescription claims, prior progress notes, <u>laboratory/physical assessment data if indicated</u>)
>
> request missing information pertinent to the review
>
> …
>
> Generate a list of questions specific to the patient's medications and conditions to complete the history and gather subjective data.

*See* Exhibit 10, at 11 (emphasis added).

78.     Of great importance, the pharmacists should obtain the patient's laboratory blood work as part of the CMR:

> Ideally, a prescription medication claims history is available, along with <u>laboratory data</u> and medical provider's progress notes. If it is not readily available, this information can be requested, either in advance of the patient encounter or afterward, from the patient [or] the physician….

*See* Exhibit 10, at 11 (emphasis added); *see also* Exhibit 9, at 5 ("Depending on its scope, the MTR may include the following: … Interpreting, monitoring, and assessing patients' laboratory results").  A CMR can be meaningless without this vital information.

79.     To obtain the patient's blood work, the pharmacist must normally contact the patient's doctor.  Indeed, Medicare contemplates that pharmacists will contact the beneficiary's doctor as an essential part of the CMR and has issued guidance to doctors on this very topic, urging them to cooperate with pharmacists who are performing MTM services.  As pointed out

in the Core Elements document, communication between the pharmacist and the physician, "including consultation on the selection of medications [and] suggestions to address medication problems," is "integral" to the MTM service model." *See* Exhibit 9, at 9.

80.     As part of the preparation work, the pharmacist should accumulate notes, documents or other paperwork. Indeed, the Mirixa computer platform contemplates that pharmacists will takes notes prior to the encounter and includes an entire field of information on its platform titled "Worksheet." In this space, a diligent pharmacist can insert bloodwork or other significant information learned prior to the patient encounter itself. According to Relator, the time required to properly complete this work varies from patient to patient, but should take one hour at a minimum.

81.     As to the encounter itself, the Guidebook recognizes that "For Medicare Part D patients, CMS requires this CMR to be a person-to-person consultation, which can be conducted face-to-face, by telephone or through technology such as videoconferencing." *See* Exhibit 10, at 14. During the encounter, the patient should present all current medications to the pharmacist, including all prescription and nonprescription medications, as well as other products and other dietary supplements. *See* Exhibit 9, at 5. The pharmacist should ask open-ended questions to gather information, identify problems and potential solutions. *Id.*

82.     Since medication related problems lead to significant morbidity and mortality, pharmacists should focus their MTM encounters on medication use to identify and prioritize medication problems. *See* Exhibit 10, at 16. And of course, the pharmacist should focus on discussing plans with the beneficiary to resolve his or her medication related problems. *See* Exhibit 9, at 6 (CMR should develop "a plan for resolving each medication related problem identified").

83.     There is no strict requirement as to the amount of time the patient encounter should take.   Patient encounters will necessarily vary from one another.   The Guidebook offers the following estimates:

**Approximate Times Required For MTM Patient Encounters**

Comprehensive Medication Review – New Patient                          30–60 Minutes

Annual Comprehensive Medication Review – Established Patient   30–45 Minutes

*See* Exhibit 10, at 7.

84.     Following the patient encounter, the pharmacist must prepare the necessary follow-up documents mandated by CMS, *i.e.*, the CMR Cover Letter, the Personal Medication List, and the Medication Action Plan.   While the first two of these documents can be populated by computer software, the Action Plan takes individual time and effort by the pharmacist.   As previously explained, it must be tailored to the patient and include specific action items. The plan must include "specific recommendations" for "managing problems identified during the CMR." *See* Exhibit 10, at 24

#### 4.     Walgreens Performed and Billed Part D for Sham MTM Services

85.     Walgreens recognizes the substantial revenue to be made from performing MTM services.   Indeed, in 2016 and 2017, Walgreens generated revenue of $7.5 million and $9.8 million, respectively, from MTM services billed to Part D. *See* Exhibit 11, at 13-14.   According to Relator, much of these MTM services were a sham with little to no preparation work. The services were followed by a perfunctory patient encounter and a worthless Medication Action Plan that is completely blank or consists of generic, non-tailored "cut and paste" statements from other Action Plans.   According to Relator, these sham services are endemic at Walgreens, resulting from substantial sales pressure.

## Sales Pressure

86.     The normal duties of pharmacists and pharmacy staff within a Walgreens leave little time for performing MTM services properly.   Pharmacists can rarely carve out of their schedules the hours necessary to perform the preparation work, the patient encounter and the post-encounter work required for MTM services.   Despite this, Walgreens places immense pressure upon pharmacists and pharmacy staff to perform MTM services.

87.     Walgreens applies this pressure through several means, including quotas.   For fiscal year September 1, 2017 through August 31, 2018, district managers within the Walgreens system imposed MTM quotas and financial-performance benchmarks upon pharmacists to meet certain goals in the sales of MTM services.

88.     Walgreens also uses a variety of incentives to increase MTM services.   As an example, Walgreens conducted an "MTM March Madness" contest between stores in Palm Beach County in March 2014.   During the contest, Walgreens' district management encouraged stores to compete with one another in selling MTM services.

89.     Walgreens also created sales incentives for pharmacy staff to sell MTM services by offering pizza parties, paid time off, and "Jeans Days" for stores performing the most MTM services.   On December 8, 2017, Walgreens district manager Gina Harper reminded all pharmacists in her Palm Beach County district that district stores were behind schedule in achieving MTM sales goal for the year.   In her e-mail, Ms. Harper stated:

> As a reminder, each store is expected to complete $200 in claims per month . . .
> For the month of December, we will be having a contest to see if all the store[s] in
> the district can meet their $200 goal.  If ALL stores meet the goal, we will have a
> pharmacy staff Jeans Day on Friday, January 12. We can't achieve this unless
> everyone does their part! . . . As of 12/6, the following stores have submitted
> MTM claims: 3110, 3828, 4804 5255, 5465, 6832, 7330, 11305 and 12302 . . . .
> Thank you!

### Inadequate Instruction

90.     Since at least 2007, Walgreens has encouraged pharmacists to advise beneficiaries that the patient encounter will take only 15-20 minutes.  It provides:

> Hi, may I please speak to (patient's name).  My name is (your name).  I am calling from the Walgreens pharmacy where you currently get your prescriptions filled.  I'm calling about a benefit included in your insurance plan through (patient's insurance plan). Your insurance offers a free appointment with a pharmacist to discuss your medications and health concerns.
>
> It only takes about 15 to 20 minutes.
>
> …
>
> Would you like to schedule an appointment with your pharmacist?

In reality, the patient encounter should take 45 to 60 minutes, if performed properly.

91.     Walgreens even encourages its pharmacists to perform surprise "in-line" CMRs when a beneficiary appears at the store to pick up a prescription as follows:

**Types of CMR Workflow**

Traditional CMRs

> Workup done after scheduling the CMR with the patient

In-Line CMRs

> Workup done prior to offering the CMR to the patient
> Offer to do the CMR at point-of-sale…

*See* Exhibit 12 (emphasis added).

92.     These surprise, in-line CMRs are problematic for two reasons.  First, a pharmacist cannot perform a proper CMR with an in-line patient, while other patients wait anxiously behind him or her to have their own prescriptions filled.  Second, pharmacists cannot be expected to do all of the necessary preparation work for a surprise CMR that might not happen.  In practice,

Walgreens' pharmacists do no preparation work for these in-line CMRs. Instead, they simply offer the CMR and, if the patient agrees, they have a rudimentary conversation with the patient, followed by a generic, cut-and-paste Medication Action Plan that gives little advice other than "take your medication as directed." Walgreens even conducts, on occasion, such in-line CMRs on patients at the drive-through window.

93.     Relator is also aware of one example in 2016 in which a Walgreens' pharmacist, Asif Rahman, whose nickname at Walgreens is "Dr. MTM," billed for an MTM service allegedly performed on a beneficiary at a store in Riviera Beach, Florida (Store #4675). The claim, however, was fraudulent because the beneficiary actually had died several weeks before the MTM service was allegedly performed.

### 5.     Representative Examples of Worthless MTMs

94.     From at least February 2012 and continuing to the present, Walgreens regularly performed and billed for MTM services that did not provide any tailored assessment of the beneficiaries' circumstances; instead, these MTM services repeated generic, cut-and-paste form language that provided no benefit to the beneficiary. These examples include the following:

### Example #1

95.     On or about August 14, 2017, Walgreens performed an alleged MTM service on Patient D.C. from Miramar, Florida. Using the Outcomes platform, Walgreens billed $50 for this CMR. As part of its service, Walgreens issued a CMR Cover Letter that stated, "This letter includes an action plan (Medication Action Plan) and medication list (Personal Medication list). **The action plan has steps you should take to help you get the best results from your medications . . . ."** (Emphasis in original).

96.     The Medication Action Plan was not tailored to patient D.C. but instead consisted of a single generic cut-and-paste statement:

> **What I need to do:**
>
> It is important to take your medications as directed to get the most from them.  Talk to your pharmacist if there are changes to your medicines or if you have questions.

This is the one and only to-do item of the Action Plan.  This language does nothing but repeat the same boilerplate advice that Walgreens gives on every prescription bottle.

### Example #2

97.     On August 13, 2016, Walgreens performed an alleged MTM service on patient H.L. from Miami Gardens, Florida.  Using the Outcomes platform, Walgreens billed $50 for this CMR.  As part of its service, Walgreens issued the form CMR Cover Letter that stated, "This letter includes an action plan (Medication Action Plan) and medication list (Personal Medication list).  **The action plan has steps you should take to help you get the best results from your medications . . . .**" (Emphasis in original).

98.     The Medication Action Plan was not tailored to patient H.L. but instead consisted of a single generic cut-and-paste statement:

> **What I need to do:**
>
> It is important to take your medications as directed to get the most from them.  Talk to your pharmacist if there are changes to your medicines or if you have questions.

This is the one and only to-do item of the Action Plan.  This language does nothing but repeat the same boilerplate advice that Walgreens gives on every prescription bottle.

### Example #3

99.     On December 15, 2015, Walgreens performed an MTM service on patient M.K. from Miramar, Florida. Using the Outcomes platform, Walgreens billed $50 for this CMR.  As part of its service, Walgreens issued the form CMR Cover Letter that stated, "This letter includes an action plan (Medication Action Plan) and medication list (Personal Medication list).  **The action plan has steps you should take to help you get the best results from your medications** . . . ." (Emphasis in original).

100.    The Medication Action Plan was not tailored to patient M.K. but instead consisted of a single generic cut-and-paste statement:

> **What I need to do:**
>
> Take your medications as directed to get the most from them.  Please contact your pharmacist if there are changes to your medicines or if you have questions.

This is the one and only to-do item of the Action Plan.  This language does nothing but repeat the same boilerplate advice that Walgreens gives on every prescription bottle.

### Example #4

101.    On January 29, 2016, Walgreens performed an MTM service on patient J.C. Using the Mirexa platform, Walgreens issued the CMR Cover Letter that stated, "This letter includes an action plan (Medication Action Plan) and medication list (Personal Medication list). **The action plan has steps you should take to help you get the best results from your medications** . . . ." (Emphasis in original).

102.    The Medication Action Plan was not tailored to patient J.C. but instead consisted of a single generic cut-and-paste statement:

> **What I need to do:**
>
> It is important to take your medications as directed to get the most from them.  Talk to your pharmacist if there are changes to your medicines or if you have questions.

This is the one and only to-do item of the Action Plan.  This language does nothing but repeat the same boilerplate advice that Walgreens gives on every prescription bottle.

<strong>Example #5</strong>

103.    On August 29, 2017, Walgreens performed an alleged MTM service on patient H.M. from Miami Gardens, Florida.  Using the Outcomes platform, Walgreens billed and the Part D plan paid Walgreens $50 for this CMR.  As part of its service, Walgreens issued the SMR Cover Letter that stated, "This letter includes an action plan (Medication Action Plan) and medication list (Personal Medication list).  **The action plan has steps you should take to help you get the best results from your medications . . . .**"  (Emphasis in original).

104.    The Medication Action Plan was not tailored to patient H.M. but instead consisted of a single generic cut-and-paste statement:

> **What I need to do:**
> It is important to take your medications as directed to get the most from them.  Talk to your pharmacist if there are changes to your medicines or if you have questions.

This is the one and only to-do item of the Action Plan.  This language does nothing but repeat the same boilerplate advice that Walgreens gives on every prescription bottle.

<strong>Example #6</strong>

105.    On January 23, 2017, Walgreens performed an MTM service on patient G.W. from Pembroke Pines, Florida.  Using the Mirexa platform, Walgreens billed for this service and completed the fields of information as follows:

| | |
|---|---|
| Worksheet | Nothing. completely blank |

| Assessments and Plans | Nothing, completely blank |
| What we talked about | Nothing, completely blank |

In sum, there was no plan.

### Example #7

106.     On March 18, 2017, Walgreens performed an MTM service on patient A.B. of Opa Locka, Florida.  Using the Mirexa platform, Walgreens billed for this service and completed the fields of information as follows:

| Worksheet | Nothing, completely blank |
| Assessments and Plans | Nothing, completely blank |
| What we talked about | Nothing, completely blank |

Again, there was no action plan.

## COUNT 1
## 31 U.S.C. § 3729(A)(1)(A)

107.     The Relator, Dr. Mosley, realleges the allegations made in Paragraphs 1 through 106.

108.     This is a claim for treble damages and forfeitures under the False Claims Act, 31 U.S.C. §§ 3729-32, as amended.

109.     Through the acts described above, Walgreens and its agents and employees knowingly presented and caused to be presented to the Government or its intermediaries, false or fraudulent claims.

110.     The Government, or its intermediaries, unaware of the falsity of the claims made or caused to be made by the Walgreens, approved, paid, and participated in payments made by the Government's fiscal intermediaries for claims that otherwise would not have been allowed.

111.     By reason of these payments and approvals, the Government has been damaged

and continues to be damaged, in an amount yet to be determined.

**COUNT II**
**31 U.S.C. § 3729(A)(1)(B)**

112.    The Relator, Dr. Mosley, realleges the allegations made in Paragraphs 1 through 106.

113.    This is a claim for treble damages and penalties under the False Claims Act. 31 U.S.C. §§ 3729 *et seq.*

114.    Through the acts described above, Walgreens knowingly made, used and caused to be used false records and statements material to get false or fraudulent claims paid or approved by the Government.

115.    The Government was unaware of the falsity of the records, statements, and claims submitted by Walgreens and its agents, principals, employees, and contractors for claims that would not have been paid had the truth been known.

116.    By reason of the Walgreens' false records, statements, and claims, the Government has been damaged, in an amount yet to be determined.

**RELIEF REQUESTED AS TO COUNTS I AND II**

WHEREFORE, the Relator, Dr. Mosley, requests that judgment be entered against Walgreens and provides as follows:

a.    Walgreens cease and desist from violating the False Claims Act, 31 U.S.C. § 3729 *et seq.*;

b.    Walgreens pay an amount equal to three times the amount of damages the Government has sustained because of Walgreens' actions, plus a civil penalty against Defendant of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

c.    Relator be awarded the maximum amount allowed pursuant to § 3730(d) of the

False Claims Act;

      d.     Relator be awarded all costs of this action, including attorneys' fees and expenses;

and

      e.     Relator recovers such other relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, the Relator demands a trial by jury.

February 20, 2018.

ADAM T. RABIN
Florida Bar No. 985635
RYON M. MCCABE
Florida Bar No. 09075
E-mail:
arabin@mccaberabin.com
rmccabe@mccaberabin.com
e-filing@mccaberabin.com

McCabe Rabin, P.A.
1601 Forum Place, Suite 505
West Palm Beach, FL 33401
Telephone: (561) 659-7878
Co-Counsel for Relator


/s/ Rosalyn Sia Baker-Barnes
ROSALYN SIA BAKER-BARNES
Florida Bar No.: 327920
E-mail:
rsb@searcylaw.com
baker-barnesteam@searcylaw.com
jef@searcylaw.com
tat@searcylaw.com

Searcy Denney Scarola Barnhart & Shipley, P.A.
2139 Palm Beach Lakes Boulevard
West Palm Beach, Florida 33409
Telephone:    (561) 686-6300
Co-Counsel for Relator