UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. 18-CV-80200-BLOOM

UNITED STATES OF AMERICA ex rel.
ELMER MOSLEY, PHARM. D., R. PH. and
PHARMALETA, LLC,

               Plaintiffs/Relators,

v.

WALGREEN CO.,

               Defendant.

_____

**DEFENDANT WALGREEN CO.'S MOTION TO DISMISS THE FIRST
AMENDED COMPLAINT AND MEMORANDUM OF LAW IN SUPPORT THEREOF**

## **<u>TABLE OF CONTENTS</u>**

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ...................................................................................................................... 2

    A.    MCS Claims............................................................................................................ 2

        1.    Manufacturers, Not Pharmacies, Issue MCs ............................................. 2

        2.    Relators' Allegations Regarding Walgreens' Acceptance of MCs............ 3

        3.    Prior Cases and News Media Disclosed the Alleged MCS ....................... 4

    B.    MTMS Claims ....................................................................................................... 5

        1.    Background on MTM Services ................................................................... 5

        2.    Relators' Allegations Regarding MTM Services....................................... 6

    C.    Procedural History ................................................................................................ 6

LEGAL STANDARD............................................................................................................... 7

ARGUMENT .......................................................................................................................... 7

I.    THE MCS CLAIMS MUST BE DISMISSED................................................................ 7

    A.    The MCS Claims Are Barred by the Public Disclosure Bar.................................. 8

        1.    *Hammoud* and Related News Coverage Publicly Disclosed the MCS ....... 8

        2.    The Allegations in the Complaint are Substantially the Same as Those in *Hammoud* and the Related News Coverage............................................... 9

        3.    Relators Are Not "Original Sources"........................................................ 11

    B.    The MCS Claims Are Barred by the FTF Bar ..................................................... 12

    C.    The Complaint Fails to Adequately Allege a Violation of the FCA..................... 13

        1.    Relators Fail to Adequately Allege Falsity ............................................. 13

            a.    Relators Do Not Adequately Allege a Kickback Scheme ........... 14

            b.    The Bulletin Does Not Support Relators' Claims........................ 15

        2.    Relators Fail to Adequately Allege Scienter ............................................ 16

            a.    The Allegations About Various Employees' Knowledge Fail to Demonstrate Scienter ............................................................... 17

            b.    The "Representative Examples" Do Not Establish Scienter......... 20

        3.    Relators Fail to Adequately Allege Causation.......................................... 21

    D.    Relators Fail to Adequately Allege a Nationwide Scheme.................................. 22

    E.    Relators Fail to Adequately Allege a Violation of 31 U.S.C. § 3729(a)(1)(B) .... 23

II.     THE MTMS CLAIMS MUST BE DISMISSED ............................................................ 23

    A.     Relators Fail to Adequately Allege That MTM Services Were "Worthless" ....... 23

        1.     Relators Rely on and Mischaracterize Nonbinding Guidance .................. 24

        2.     The Allegations Concerning "Sales Pressure" Fail ................................. 25

        3.     The Allegations Concerning "Inadequate Instruction" Fail...................... 25

        4.     The "Representative Examples" Do Not Establish Worthlessness........... 26

    B.     Relators Fail to Adequately Allege That Any Claims for "Worthless" MTM
           Services Were Paid by the Government ............................................................. 27

    C.     Relators' Allegations Concerning Walgreens' Knowledge of the MTMS Fail.... 28

    D.     Relators Fail to Adequately Allege Materiality .................................................. 29

    E.     Relators Fail to Adequately Allege a Nationwide Scheme.................................. 30

    F.     Relators Fail to Adequately Allege a Violation of 31 U.S.C. § 3729(a)(1)(B) .... 30

CONCLUSION.................................................................................................................. 30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*U.S. ex rel. Absher v. Momence Meadows Nursing Ctr., Inc.*,
    764 F.3d 699 (7th Cir. 2014) .....................................................................................24

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...................................................................................................7

*U.S. ex rel. Atkins v. McInteer*,
    470 F.3d 1350 (11th Cir. 2006) .................................................................................7

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)...................................................................................................7

*United States ex rel. Bernier v. InfiLaw Corp.*,
    311 F. Supp. 3d 1288 (M.D. Fla. 2018).................................................................9, 12

*United States ex rel. Brown v. BankUnited Tr. 2005-1*,
    235 F. Supp. 3d 1343 (S.D. Fla. 2017) ......................................................................8

*Bryan v. United States*,
    524 U.S. 184 (1998).................................................................................................17

*United States ex rel. Buth v. Walmart Inc.*,
    2021 WL 424160 (E.D. Wis. Feb. 8, 2021)..............................................................23

*United States ex rel. Cairns v. D.S. Med. LLC*,
    42 F.4th 828 (8th Cir. 2022) ...............................................................................21, 22

*Carrel v. AIDS Healthcare Found., Inc.*,
    898 F.3d 1267 (11th Cir. 2018) ...............................................................................21

*Christensen v. Harris Cnty.*,
    529 U.S. 576 (2000)..................................................................................................16

*Cho on behalf of States v. Surgery Partners, Inc.*,
    30 F.4th 1035 (11th Cir. 2022) .......................................................................9, 12, 13

*Cooper v. Blue Cross & Blue Shield of Fla., Inc.*,
    19 F.3d 562 (11th Cir. 1994) ...........................................................................8, 9, 11

*Corsello v. Lincare, Inc.*,
    428 F.3d 1008 (11th Cir. 2005) .................................................................................7

*U.S. ex rel. Fox Rx, Inc. v. Omnicare, Inc.*,
 2013 WL 2303768 (N.D. Ga. May 17, 2013) ...........................................................................23

*United States ex rel. Fzco v. Supreme Foodservice GmbH*,
 2020 WL 4579458 (E.D. Va. July 8, 2020) .............................................................................28

*United States ex rel. Gilbert v. Virginia Coll., LLC*,
 305 F. Supp. 3d 1315 (N.D. Ala. 2018).............................................................................9, 12

*United States ex rel. Hanlon v. Columbine Mgmt. Servs., Inc.*,
 676 F. App'x 787 (10th Cir. 2017) .........................................................................................16

*United States ex rel. Hefner v. Hackensack Univ. Med. Ctr.*,
 495 F.3d 103 (3d Cir. 2007).....................................................................................................20

*U.S., ex rel. Jamison v. McKesson Corp.*,
 784 F. Supp. 2d 664 (N.D. Miss. 2011) ..................................................................................16

*U.S. ex rel. Keeler v. Eisai, Inc.*,
 568 F. App'x 783 (11th Cir. 2014) ..........................................................................................14

*United States ex rel. Lewis v. Cmty. Health Sys., Inc.*,
 2020 WL 3103994 (S.D. Fla. June 11, 2020) .........................................................................14

*United States ex rel. May v. Purdue Pharma L.P.*,
 811 F.3d 636 (4th Cir. 2016) ........................................................................................4, 16, 24

*United States ex rel. Musachia v. Pernix Therapeutics, LLC*,
 2021 WL 2826429 (N.D. Ala. July 7, 2021) .....................................................................14, 15

*U.S. ex rel. Osheroff v. Humana Inc.*,
 776 F.3d 805 (11th Cir. 2015) ........................................................................................8, 9, 12

*Paul v. Biotronik, Inc.*,
 2020 WL 13369048 (M.D. Fla. Oct. 16, 2020) .......................................................................28

*United States ex rel. Phalp v. Lincare Holdings, Inc.*,
 857 F.3d 1148 (11th Cir. 2017) ...............................................................................................16

*United States ex. rel. Ruscher v. Omnicare, Inc.*,
 2015 WL 5178074 (S.D. Tex. Sept. 3, 2015) ..........................................................................18

*U.S. ex rel. Saldivar v. Fresenius Med. Care Holdings, Inc.*,
 906 F. Supp. 2d 1264 (N.D. Ga. 2012)....................................................................................22

*United States ex rel. Schagrin v. LDR Indus., LLC*,
 2018 WL 6064699 (N.D. Ill. Nov. 20, 2018) ..........................................................................28

iv

*Schindler Elevator Corp. v. United States ex rel. Kirk*,
   563 U.S. 401 (2011) .................................................................................................8

*United States ex rel. Sedona Partners LLC v. Able Moving & Storage, Inc.*,
   2022 WL 178225 (S.D. Fla. Jan. 20, 2022) ..........................................................12

*Sledge v. Goodyear Dunlop Tires N. Am., Ltd.*,
   275 F.3d 1014 (11th Cir. 2001) .............................................................................15

*United States ex rel. Stepe v. RS Compounding LLC*,
   304 F. Supp. 3d 1216 (M.D. Fla. 2018) ..........................................................23, 30

*U.S. ex rel. Thomas v. Bailey*,
   2008 WL 4853630 (E.D. Ark. Nov. 6, 2008) .......................................................22

*United States v. All Children's Health Sys., Inc.*,
   2013 WL 1651811 (M.D. Fla. Apr. 16, 2013) .................................................18, 30

*United States v. Houser*,
   754 F.3d 1335 (11th Cir. 2014) .........................................................................24, 27

*United States v. Joel Kennedy Constructing Corp.*,
   584 F. Supp. 3d 595 (N.D. Ill. 2022) ....................................................................29

*United States v. Shah*,
   981 F.3d 920 (11th Cir. 2020) ...............................................................................15

*United States v. Starks*,
   157 F.3d 833 (11th Cir. 1998) .........................................................................17, 18

*United States v. Team Fin., L.L.C.*,
   2019 WL 3943958 (E.D. Tex. Aug. 21, 2019) ....................................................22

*United States v. Vernon*,
   723 F.3d 1234 (11th Cir. 2013) .............................................................................14

*Universal Health Servs., Inc. v. United States*,
   579 U.S. 176 (2016) ..........................................................................................7, 16

*United States ex rel. Urquilla-Diaz v. Kaplan Univ.*,
   2017 WL 2992197 (S.D. Fla. July 13, 2017) .......................................................12

*Urquilla-Diaz v. Kaplan Univ.*,
   780 F.3d 1039 (11th Cir. 2015) .............................................................................19

*U.S. ex rel. Woods v. SouthernCare, Inc.*,
   2013 WL 1339375 (S.D. Miss. Mar. 30, 2013) ...................................................22

*United States ex rel. Zafirov v. Fla. Med. Assocs. LLC*,
   2021 WL 4443119 (M.D. Fla. Sept. 28, 2021) ...........................................................9, 11, 12

**Statutes**

31 U.S.C. § 3729.................................................................................................2, 16, 23, 27, 30

31 U.S.C. § 3730...........................................................................................................8, 11, 12

42 U.S.C. § 1320a–7b...............................................................................................1, 14, 17, 21

**Other Authorities**

42 CFR § 423.153(d) .................................................................................5, 6, 25, 29, 30

87 Fed. Reg. 79452 (Dec. 27, 2022) ............................................................................25, 28

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendant Walgreen Co. ("Walgreens") moves to dismiss the First Amended Complaint (the "Complaint" or "Compl.").

## PRELIMINARY STATEMENT

Former Walgreens pharmacist Elmer Mosley has joined forces with Pharmaleta, LLC (together, "Relators") in this False Claims Act ("FCA") case seeking to recover treble damages and civil penalties in connection with two unrelated alleged schemes: a "manufacturer coupon (or 'MC') scheme" (the "MCS") alleging that violations of the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b), resulted in the submission of false claims for payment to the Government, and a "medication therapy management (or 'MTM') scheme" (the "MTMS") alleging a worthless services theory. All of the claims pertaining to both of these alleged schemes fail, as (1) lawsuits alleging the MCS have repeatedly been brought (with the Government declining to intervene each time), thus setting this case up for a straightforward dismissal based on the FCA's public disclosure and first-to-file ("FTF") bars, among other reasons; and (2) the tagalong MTMS allegations fail because Relators do not meet their burden to allege how the services were worthless, nor do they adequately allege that a claim, let alone a false claim, was paid by the Government, among other reasons.

As to the MCS, Relators' claim that Walgreens violated the FCA by accepting MCs from Medicare Part D ("Part D") beneficiaries ("Beneficiaries") from time to time is without merit. *First*, the alleged scheme was publicly disclosed in a *qui tam* complaint unsealed more than four years before Mosley filed his first complaint in this action, as well as in related news coverage of the same. Therefore, Relators' claims are barred by the FCA's public disclosure bar. *Second*, the underlying scheme was also alleged in another FCA lawsuit that was already pending by the time this case was filed, such that the MCS claims also are barred by the FCA's rigid FTF bar. *Third*, Relators fail to state a claim for several reasons. They do not adequately allege falsity through an underlying AKS violation, as (1) Relators fail to allege Walgreens' supposed role in any kickback arrangement (*i.e.*, whether Walgreens was on the paying or receiving end of a kickback, or something else entirely), and (2) in support of their argument that Walgreens somehow violated the AKS, Relators rely exclusively on a non-binding Government bulletin that expounds on AKS implications for *drug manufacturers*—not *pharmacies*—in connection with the use of MCs. Moreover, Relators fail to state a claim because they do not adequately allege scienter or causation. *Fourth*, even if Relators do state a claim, they fail to adequately allege a

nationwide scheme.  Instead, they make allegations based on conduct in two states and attempt to extrapolate that alleged conduct across the entire company and country, without a single particularized factual allegation uniting the disparate allegations under a nationwide scheme.

As to the MTMS, Relators claim that Walgreens billed for MTM services called Comprehensive Medication Reviews ("CMR")—consultation sessions between pharmacists and certain targeted Beneficiaries regarding their medications—that were "worthless" because some of the documentation from those sessions was not as detailed as Relators would have liked.

These claims fail, too.  Relators do not adequately allege that the services were "worthless"; instead, they invent a "standard of care" by cherry-picking non-binding suggestions from industry MTM guidance, and then complain that the provided MTM services were not up to snuff.  Relators do not allege for any of the examples in the Complaint what exactly the pharmacist performing the MTM service could or should have done differently to fulfill their legal obligations.  Moreover, Relators do not adequately allege that any claims for "worthless" MTM services were ever paid by the Government.  Instead, they vaguely describe an attenuated connection to Government payment, with a third party vendor paying for the services using funds that were provided by a Part D sponsor that in turn used funds that were at some point provided by the Government.  This lone, convoluted assertion, bereft of any particularized factual allegations to support it, falls far short of alleging payment by the Government.  Indeed, absent from the Complaint is a single allegation establishing basic facts such as *when* the Government provided the funds, *to whom* the funds were provided, *how much* was provided, or how any money Walgreens received for MTM services was *traceable* to the Government.

Lastly, Counts II and IV, arising under 31 U.S.C. § 3729(a)(1)(B), fail as Relators do not adequately allege any false record or statement material to a false or fraudulent claim.

Accordingly, the Court should dismiss the Complaint with prejudice.

## BACKGROUND

**A.     MCS Claims**

### 1.     Manufacturers, Not Pharmacies, Issue MCs

MCs are coupons that drug manufacturers provide to patients to reduce their copayments for certain brand-name medications.  Compl. ¶¶ 54–56.  Manufacturers issue MCs in a variety of formats, including print coupons, electronic coupons, debit cards, and direct reimbursements. Compl. Ex. 9 at 5.  As the U.S. Department of Health and Human Services Office of Inspector

General ("OIG") has made clear in a report called "*Manufacturer Safeguards May Not Prevent Copayment Coupon Use for Part D Drugs*" (the "Report"), in the context of MCs, "the offerors of coupons"—manufacturers—"ultimately bear the responsibility to operate these programs in compliance with Federal law." *Id.* at 23. Because a drug manufacturer allegedly violates the AKS if it provides an MC purposefully to induce or reward a Beneficiary to purchase the drug where it will be subsidized by Medicare, manufacturers sometimes—but not always—place text on the coupons instructing pharmacists that the coupon may not be used by Beneficiaries. Compl. ¶¶ 76–79; Compl. Ex. 9 at 13–15.[1]

MCs are devised and issued *by manufacturers*, not by pharmacies such as Walgreens. Relators do not allege that Walgreens is paid for processing MCs, nor do they allege that Walgreens funded, advertised, provided, or promoted any MCs. Relators do not allege that Walgreens marketed or advertised that it accepted MCs from Beneficiaries, tracked revenue related to MCs from Beneficiaries, or had any policy or training program encouraging acceptance of MCs from Beneficiaries. Indeed, aside from an alleged general desire to maintain business, "take care of the customers," and "make the customer happy," Compl. ¶¶ 99, 102, Relators do not posit any reason why Walgreens would have been motivated to accept MCs allegedly in violation of the AKS and/or FCA.

### 2. Relators' Allegations Regarding Walgreens' Acceptance of MCs

Relators contend that Walgreens "knowingly accepted [MCs] when it was illegal to do so." *Id.* ¶ 80. According to Relators, Walgreens uses a proprietary pharmacy management system called Intercom Plus to process pharmacy transactions and apply MCs, *id.* ¶¶ 60–72, and violated the AKS each time a pharmacist or other employee accepted an MC from a Beneficiary, *id.* ¶ 112.[2] From there, Relators allege that each claim for payment in connection with those

---

[1] According to OIG, one third of manufacturers reported not including warnings to pharmacists on *any* of their MC formats. Compl. Ex. 9 at 10, 13. And, nearly *half* of coupons OIG reviewed did not have any language specifically directed to pharmacists. *Id.* at 13. In some circumstances, it is difficult or impossible for pharmacists to identify MCs. As the Report recognizes, "electronic coupons, debit cards, and direct reimbursements"—as opposed to "print coupons"—"may be difficult, or impossible, for pharmacists dispensing to beneficiaries on behalf of Part D plans to identify." *Id.* at 20.

[2] Relying exclusively on a 2014 OIG Special Advisory Bulletin (the "Bulletin") (a non-binding guidance document issued by OIG and directed to members of the pharmaceutical industry), Relators claim that pharmacies violate the AKS by accepting MCs from Beneficiaries. *See* Compl. ¶ 112; Compl. Ex. 8. But the Bulletin says no such thing; it applies to *manufacturers*

prescriptions was false.  Compl. ¶¶ 47–51, 112.  Relators contend that "[a]s a result, the Government has suffered increased prescription drug prices on a nationwide scale, as Medicare Part D beneficiaries chose more expensive brand name drugs with discounted copayments over cheaper generic prescription drugs with more expensive copayments." *Id.* ¶ 53.

While the Complaint is long on speculation and conclusory allegations as to Walgreens' knowledge of the supposed scheme, the pleaded *facts* refute rather than support Relators' claims. For example, Relators acknowledge that Walgreens' official policy prohibits Beneficiaries from using MCs.  *Id.* ¶ 105.  Relators also acknowledge that a pharmacist would not know as a matter of course when processing a prescription payment request whether a Part D sponsor paid for the prescription.  *Id.* ¶ 69.  Additionally, Relators acknowledge that Walgreens had a system in place that would generate a warning message when a customer tried to use an MC, emphasizing to the pharmacist, "DO NOT PROCESS IF GOVERNMENT BENEFICIARY."  *Id.* ¶ 68.  Relators further concede that Walgreens went on to institute a "hard block" that automatically blocks Beneficiaries from using MCs.  *Id.* ¶ 72.  Indeed, as Relators' own allegations show, Walgreens took significant steps to prevent Beneficiaries from using MCs.

### 3.      Prior Cases and News Media Disclosed the Alleged MCS

This case is not the first to allege the MCS.  That distinction goes to a *qui tam* case filed over a decade ago on April 19, 2012, captioned *Hammoud et al. v. Walgreen Co.*, Case No. 2:12-cv-11733 (E.D. Mich. 2012) ("*Hammoud*").  In *Hammoud*, the relators alleged they were "aware of a nationwide scheme where Walgreen honors co-pay coupons from pharmaceutical manufacturers" in violation of the AKS.  Ex. 1 ¶ 36.  Nearly identical to the Complaint, *Hammoud* alleged that "Walgreen's acceptance of co-pay coupons for non-generic medications from beneficiaries of federal health care insurance, results in Walgreen's filling of name brand prescriptions, instead of generic prescriptions, resulting in higher reimbursement costs to the federal government."  *Id.* ¶ 42.  *Hammoud* similarly alleged that Walgreens "does not block the user's input of manufacturers' coupons for customers insured by Medicare."  *Id.* ¶ 87; *see id.* ¶¶ 86, 88.  And as with the Complaint, *Hammoud* alleged that "accepting coupons from customers with federal health care insurance" was done in the name of good customer service.  *Id.* ¶¶ 116,

---

and relegates its discussion of pharmacies to a footnote, noting merely that pharmacies that accept MCs from Beneficiaries "*may*" be subject to sanctions under various laws, including the AKS and FCA.  Compl. Ex. 8 at n.6 (emphasis added); *see infra* Section I.C.1.b.

119.  Also like the Complaint, *Hammoud* alleged falsity in connection with AKS violations, claiming that "[c]ompliance with the Federal AKS . . . is a prerequisite to payment of federal funds" and "[a] provider's submission of a claim for payment which violates the Federal AKS . . . constitutes a false claim for payment in violation of the False Claims Act."  *Id.* ¶¶ 33–34.

On August 12, 2013, the Government declined to intervene in *Hammoud*, and the next day, the case was unsealed.  *Hammoud* ECF Nos. 15, 16.  The unsealing of the complaint garnered attention from the press, with *Bloomberg Law* reporting on the underlying allegations.  *See* Ex. 2.  The case was dismissed on December 16, 2013.  *Hammoud* ECF No. 18.

In fact, this is not even the second case to allege the MCS.  That distinction goes to *Pharmaleta, LLC v. Walgreens Boots Alliance Inc. et al.*, Case No. 1:17-CV-01943 (N.D. Ohio 2017) ("*Pharmaleta*"), filed on September 14, 2017.  In *Pharmaleta*, the relator (who later joined this case as a relator) made substantively identical allegations to the ones Relators assert here.  *See* Compl. ¶ 19; *see generally* Ex. 3, *Pharmaleta* Am. Compl.  The Government declined to intervene in *Pharmaleta*, just as it declined to intervene in *Hammoud* and this case, and *Pharmaleta* was dismissed on October 26, 2022.  *See Pharmaleta* ECF Nos. 14, 28–29.[3]

**B.     MTMS Claims**

**1.     Background on MTM Services**

The other "scheme" Relators allege relates to MTM services.  Part D sponsors are required to offer MTM services to certain "targeted" Beneficiaries who have multiple chronic diseases, are taking multiple Part D drugs, and are likely to incur annual Part D drug costs exceeding a statutory threshold.  42 CFR § 423.153(d)(2); *see* Compl. ¶ 114.  Part D sponsors generally contract with downstream vendors to deliver MTM services, with the work ultimately being done in large part by pharmacists, including Walgreens pharmacists.  Compl. ¶¶ 124–25.

The purpose of MTM is "to ensure that covered Part D drugs prescribed to targeted beneficiaries . . . are appropriately used to optimize therapeutic outcomes through improved medication use," and "to reduce the risk of adverse events, including adverse drug interactions, for targeted beneficiaries."  42 CFR § 423.153(d)(1)(i), (ii).  To that end, targeted beneficiaries

---

[3] Relators are incorrect that, "With [*Pharmaleta*] dismissed, the instant case before this Court legally became the 'first filed' case alleging the Manufacturer Coupon Scheme."  Compl. ¶ 20.  Rather, *Pharmaleta* is the "first filed" case alleging the MCS scheme, since it was pending at the time the original complaint in this lawsuit was filed.  *See infra* Section I.B.

must be offered an annual CMR.  42 CFR § 423.153(d)(1)(vii)(B).  The CMR "*[m]ay* result in a recommended medication action plan" ("MAP").  42 CFR § 423.153(d)(1)(vii)(B)(1)(ii) (emphasis added).  Indeed, as Relators' authority notes, a MAP is appropriate when "medication-related problems have been identified and prioritized."  Compl. Ex. 23 at 24.

The Centers for Medicare & Medicaid Services ("CMS") regulations do not suggest any minimum amount of time that must be spent on an MTM service.  *See* 42 CFR § 423.153(d). And although Relators contend that pharmacists did not spend enough time on CMRs, Relators acknowledge that "[t]here is no strict requirement as to the amount of time the patient encounter should take.  Patient encounters will necessarily vary from one another."  Compl. ¶ 137.

## 2. Relators' Allegations Regarding MTM Services

Relators complain that Walgreens encouraged its pharmacists to perform "sham" MTM services that were so lacking in quality and duration that they were "worthless," all so that Walgreens could boost its MTM sales and revenue therefrom.  Compl. ¶¶ 139–60.  But in support of this conjecture, Relators merely point to paperwork generated in connection with seven CMR encounters[4] and complain that the MAPs were not as detailed as Relators would have liked (although they do not allege what more should have been written in the MAPs, or what the pharmacists performing the CMRs otherwise could have done to fulfill their supposed obligations).  *Id.* ¶¶ 148–60.  Because the MTM services were "worthless," so Relators' theory goes, Walgreens' claims for reimbursement for those services were false under the FCA.

## C. Procedural History

Mosley filed the first complaint in this case on February 20, 2018.  ECF No. 1.  By that point, *Hammoud*—the first case to allege the MCS—had been filed, unsealed, and dismissed for over four years, and *Pharmaleta*—the second case to allege the MCS, and the "first to file" for purposes of the FTF bar—had been on file for five months.  The Government declined to intervene on July 18, 2022, ECF No. 39, just as it had done before in *Hammoud* and *Pharmaleta*.

The original complaint in this case was unsealed on August 1, 2022, ECF No. 40, nearly two years after Pharmaleta amended its own complaint in its first-filed case alleging the MCS on October 27, 2020, *Pharmaleta* ECF No. 18.  On October 24, 2022, Pharmaleta filed a notice of dismissal of its first-filed action.  *Pharmaleta* ECF No. 28.  The next day, Relators filed the Amended Complaint in this action, adding Pharmaleta as a Relator.  ECF No. 43.  The following

---

[4] Relators do not allege that any Targeted Medication Reviews, or "TMRs," were worthless.

day, the *Pharmaleta* court formally dismissed the case.  *Pharmaleta* ECF entry 10/26/22.

## LEGAL STANDARD

In cases subject to Rule 8(a)'s pleading standards, to survive a motion to dismiss, the complaint must contain sufficient factual information to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Plausibility requires more than a "sheer possibility that a defendant has acted unlawfully," and a complaint alleging facts that are "merely consistent with" liability "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 557–58).  The allegations must nudge the claim "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.  That standard is met only by factual allegations that allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*  Therefore, a claim has facial plausibility when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Because Relators' claims are premised on allegations of fraud under the FCA, they are subject to the heightened pleading requirements of Rule 9(b).  *See, e.g.*, *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 195 n.6 (2016) ("*Escobar*").  Under Rule 9(b), a plaintiff "alleging fraud . . . must state with particularity the circumstances constituting fraud," Fed. R. Civ. P. 9(b), including the "'who,' 'what,' 'when,' 'where,' and 'how,'" *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005).  "The particularity rule serves an important purpose in fraud actions by alerting defendants to the 'precise misconduct with which they are charged' and protecting defendants 'against spurious charges of immoral and fraudulent behavior.'" *U.S. ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1359 (11th Cir. 2006) (quoting *Durham v. Bus. Mgmt. Assocs.*, 847 F.2d 1505, 1511 (11th Cir. 1988)).

## ARGUMENT

## I.    THE MCS CLAIMS MUST BE DISMISSED

Relators' MCS claims should be dismissed under the FCA's public disclosure and FTF bars.  Even in the absence of those bars, the Complaint fails to state a claim for which relief can be granted and should be dismissed on that separate ground as well.  Moreover, even if Relators stated a claim, the MCS claims must be dismissed to the extent they allege conduct that took

place outside of Florida and Ohio.  Additionally, Count II must be dismissed because Relators do not allege any false records or statements material to a false or fraudulent claim.

### A.      The MCS Claims Are Barred by the Public Disclosure Bar

The Complaint fails under a straightforward application of the FCA's public disclosure bar.  Under that bar, a court "shall dismiss an action or claim . . . if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed (i) in a Federal . . . civil . . . hearing in which the Government or its agent is a party; . . . or (iii) from the news media."  31 U.S.C. § 3730(e)(4)(A).  The exception is if the relator "is an original source of the information."  *Id.*  Significantly, it is the *relator*—not the defendant— who "bears the burden of proving that the public disclosure bar does not preclude his FCA action." *United States ex rel. Brown v. BankUnited Tr. 2005-1*, 235 F. Supp. 3d 1343, 1354 (S.D. Fla. 2017) (quoting *United States ex rel. May v. Purdue Pharma L.P.*, 811 F.3d 636, 640 (4th Cir. 2016)).  The bar has a "broad scope."  *Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401, 408 (2011).

Courts in the Eleventh Circuit use a three-step test known as the "*Cooper* test" to determine whether a public disclosure bars a plaintiff's complaint under the 2010 amendments to the FCA: "(1) have the allegations made by the plaintiff been publicly disclosed; (2) if so, [are the allegations in the complaint substantially the same as allegations or transactions contained in public disclosures]; and (3) if yes, is the plaintiff an 'original source' of that information."  *U.S. ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 812 (11th Cir. 2015) (quoting *Cooper v. Blue Cross & Blue Shield of Fla., Inc.*, 19 F.3d 562, 565 n.4 (11th Cir. 1994)).  The Eleventh Circuit has "described the second prong of the *Cooper* test as a 'a quick trigger to get to the more exacting original source inquiry.'"  *Id.* at 814 (quoting *Cooper*, 19 F.3d at 568 n.10).

Here, each prong of the test is met.  The alleged MCS was disclosed in litigation that was commenced and concluded (without Government intervention) years ago in which materially identical allegations were made, with news media covering that case.  Relators are not "original sources" of the allegations; they do not add any material information to the prior disclosures.

### 1.      *Hammoud* and Related News Coverage Publicly Disclosed the MCS

With regard to the first prong of the *Cooper* test, Relators' allegations were publicly disclosed in the *Hammoud* litigation and news coverage of the same.[5]  *Hammoud* was a civil

---

[5] "Courts may take judicial notice of publicly filed documents . . . at the Rule 12(b)(6) stage.  And courts may take judicial notice of documents such as . . . newspaper articles . . . for the

proceeding brought against Walgreens alleging the MCS, and was unsealed and dismissed in 2013 after the Government declined to intervene.  The relator in *Hammoud* was the Government's agent, therefore satisfying the first prong of the *Cooper* test—that there was a "public disclosure" in a Federal civil hearing in which the Government or its agent is a party. *See United States ex rel. Gilbert v. Virginia Coll., LLC*, 305 F. Supp. 1315, 1323–25 (N.D. Ala. 2018).  *Hammoud* and its underlying allegations were also disclosed through the news media, independently satisfying the first prong of the test.  *See* Ex. 2.[6]

### 2.   The Allegations in the Complaint are Substantially the Same as Those in *Hammoud* and the Related News Coverage

The second prong of the *Cooper* test is satisfied, as well.  This prong "does not require a 'complete identity' of allegations; rather, '[t]he key inquiry is whether the disclosures could have put the government' on notice of the fraud alleged in the *qui tam* complaint.'"  *United States ex rel. Zafirov v. Fla. Med. Assocs. LLC*, 2021 WL 4443119, at *7 (M.D. Fla. Sept. 28, 2021) (alteration in original) (quoting *United States ex rel. Maur v. Hage-Korban*, 981 F.3d 516, 523 (6th Cir. 2020)).

The allegations in *Hammoud* were substantially the same as the MCS allegations in this case.  *See id.* (FCA complaint was substantially the same as a prior FCA case where the "allegations are nearly identical").  Both cases were filed against Walgreens and made essentially the same allegations concerning the alleged scheme.  By way of example:

| ***Hammoud* (Exhibit 1 cites)** | **This case (Complaint cites)** |
|---|---|
| "Walgreen's acceptance of co-pay coupons for non-generic medications from beneficiaries of federal health care insurance, results in Walgreen's filling of name brand prescriptions, instead of generic prescriptions, resulting in higher reimbursement costs to the federal government." ¶ 42. | "As a result, the Government has suffered increased prescription drug prices on a nationwide scale, as Medicare Part D beneficiaries chose more expensive brand name drugs with discounted copayments over cheaper generic prescription drugs with more expensive copayments." ¶ 53. |

---

limited purpose of determining which statements the documents contain (but not for determining the truth of those statements)."  *Osheroff*, 776 F.3d at 812 n.4 (citations omitted); *see also, e.g.*, *Cho on behalf of States v. Surgery Partners, Inc.*, 30 F.4th 1035, 1043 n.5 (11th Cir. 2022) (taking judicial notice of previous *qui tam* complaint); *United States ex rel. Bernier v. InfiLaw Corp.*, 311 F. Supp. 3d 1288, 1292 (M.D. Fla. 2018) (taking judicial notice of online articles).

[6] "News media" includes publicly available websites.  *Osheroff*, 776 F.3d at 813.

| | |
|---|---|
| "In short, Walgreen violated the Anti-kickback Statute . . . by providing prescription drug discounts, which, on their face and/or in practice, remunerated Medicare . . . recipients as an inducement for purchasing prescriptions drugs through Walgreen, without passing that remuneration on to Medicare . . . ." ¶ 48. | "[P]harmacies using manufacturer coupons for Medicare Part D beneficiaries violate the Anti-Kickback Statute and therefore are submitting false claims for payment." ¶ 112. |
| "On one side of the manufacturer's coupon it contains an area for inputting customer billing information. On the other side of the coupon, in very fine print, there is language invalidating the use of these coupons by beneficiaries of Medicare . . . ." ¶ 85. | "[D]rug makers go to great lengths to advise Medicare beneficiaries not to use their coupons and to advise pharmacies not to accept these coupons from Medicare beneficiaries." ¶ 76. |
| "All insurance plans are assigned an acronym by the Intercom Plus system for use in routing the claim to the correct processing company. . . . Medicare Part D has hundreds of acronyms with the majority of them ending with the suffix of 'MPD'." ¶ 78. | "[T]he IntercomPlus system internally identifies all Medicare Part D plans with a 'Plan ID' that contains the abbreviation 'MPD' at the end." ¶ 64. |
| "The computer generates an SDL 'Sales Confirmation Sheet' which contains information regarding the customer (patient name), gender, date of birth, age, phone number, address, insurance information, co-pay, etc." ¶ 73. | "[O]nce a manufacturer coupon is processed, the IntercomPlus system produces a Sales Confirmation Sheet, which contains [information concerning the patient, coupon, insurance, prescription, and payment]." ¶ 66. |
| "Walgreen's SDL system does not block the use of these manufacturers' coupons for Medicare . . . , and they are routinely accepted." ¶ 86. "Walgreen's SDL computer system does not block the user's input of manufacturers' coupons for customers insured by Medicare . . . ." ¶ 87. "The Intercom Plus system does not prohibit the entry of the data which allows deduction of manufacturers' coupons for customers who are insured by Medicare . . . ." ¶ 88. | "[T]he Walgreens IntercomPlus and SDL systems do not contain any 'hard blocks' that would prevent an employee from applying a manufacturer coupon to a Medicare Part D beneficiary's copayment." ¶ 68. |

| | |
|---|---|
| "Defendant's management instructed staff . . . to disregard the legally mandated prohibition and to allow Medicare . . . recipients to use these manufacturers' coupons."  ¶ 46. | "Walgreens' store and regional managers regularly instruct their employees to ignore the Anti-Kickback Statute . . . when processing manufacturer coupons for Medicare Part D beneficiaries."  ¶ 101. |

The allegations in the Complaint also are substantially the same as those in the *Bloomberg* article covering the unsealing of *Hammoud*. *See* Ex. 2.  From the article:

> The False Claims Act lawsuit, first filed in 2012, alleges that Walgreens provided drug discounts that remunerated program beneficiaries as an inducement for using the branded prescription drugs covered by the coupon.
>
> . . .
>
> The lawsuit . . . also alleges that the drugstore chain failed to report discounts on prescription drugs that it provided to Medicare, Medicaid, and other federally funded health program recipients when it honored the coupons for branded drugs.  The complaint said the manufacturers' copay coupons apply only to nongeneric drugs that are "traditionally far more expensive" than their generic counterparts.
>
> . . .
>
> The complaint alleges that the drugstore chain violated state and federal false claims laws by certifying, or impliedly certifying, it was in compliance with Medicare and Medicaid laws, as well as other federal health care laws.

Clearly, the *Hammoud* complaint and the related news coverage put the Government "on notice" of the alleged fraud.  *See Zafirov*, 2021 WL 4443119, at *7.  Indeed, the Government received actual notice of those allegations, investigated them, and declined to intervene.

### 3.    Relators Are Not "Original Sources"

Under the third prong of the *Cooper* test, relators can avoid the public disclosure bar only if they are "original sources" of the information disclosed in the public disclosures.  Under the FCA, a relator is an "original source" if he or she "has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section."  31 U.S.C. § 3730(e)(4)(B).[7]

---

[7] A relator may also be an original source if he or she, "prior to a public disclosure . . . , has voluntarily disclosed to the Government the information on which allegations or transactions in a

Relators are not "original sources," nor do they claim to be.  They do not "materially add" anything to what has long been in the public domain.  *See United States ex rel. Sedona Partners LLC v. Able Moving & Storage, Inc.*, 2022 WL 178225, at *9 (S.D. Fla. Jan. 20, 2022) (Bloom, J.) (relator was not an "original source" where complaint did not allege "independent and material information" that was not contained in public disclosure).  Relators Hammoud, Pharmaleta, and Mosley have all separately alleged a widespread scheme by which Walgreens accepted MCs, with management instructing staff to accept the coupons, where the "MPD" designation shows the pharmacist that the customer is a Beneficiary, and where the coupons state that they cannot be used by Beneficiaries. *See* Ex. 1 ¶¶ 36, 46, 78, 85, 100; Ex. 3 ¶¶ 4, 27, 32; ECF No. 1, ¶¶ 8–15, 46–50, 54–59.[8]  Relators, therefore, do not "materially add" anything.

###   B.   The MCS Claims Are Barred by the FTF Bar

Relators' MCS claims are also barred by the FCA's FTF bar, which provides: "When a person brings an action under [the FCA], no person other than the Government may intervene or bring a related action based on the facts underlying the pending action."  31 U.S.C. § 3730(b)(5).  "[T]wo actions are related if they 'incorporate 'the same material elements of fraud.  That is, to be related, the cases must rely on the same 'essential facts." *Cho*, 30 F.4th at 1042 (citations and

---

claim are based." 31 U.S.C. § 3730(e)(4)(B).  This provision does not apply; Relators allege that they disclosed the information to the Government well after *Hammoud* was filed and resolved and well after the *Bloomberg* article was published. Compl. ¶¶ 14, 18.

[8] At best, Relators allege additional details to the schemes that have otherwise been disclosed. But that is a far cry from "materially adding" to those disclosures. *See Osheroff*, 776 F.3d at 815–16 (relator was not an original source where he "add[ed] background information and details . . . , making [the alleged violations of law] somewhat more plain," and where the public disclosures "were already sufficient to give rise to an inference that the clinics were providing illegal remuneration to patients"); *Gilbert*, 305 F. Supp. 3d at 1326 (relator was not an original source where she alleged "background information and details" about a scheme that took place at one college campus, and that was already publicly disclosed in a previous lawsuit in connection with another campus); *Zafirov*, 2021 WL 4443119, at *8 ("Indeed, a side-by-side review of Zafirov's compliant and the allegations publicly disclosed in *Sewell* reveals that Zafirov is not alleging a new scheme as much as she is alleging a perpetuation of a previously disclosed scheme."); *United States ex rel. Urquilla-Diaz v. Kaplan Univ.*, 2017 WL 2992197, at *8 (S.D. Fla. July 13, 2017) (article made statements "virtually identical to Relator's current allegations" and "allege[d] the same fraud"); *Bernier*, 311 F. Supp. 3d at 1297–98 ("[The public disclosures] clearly outline 'the essential elements comprising [Defendants'] fraudulent [conduct] . . . so as to raise a reasonable inference of fraud.'  Against this backdrop, Plaintiff's additions contribute little, let alone anything 'material.'" (citations omitted) (second and third alterations and omission in original)).

quotation marks omitted).  In applying this test, courts compare the complaints "side-by-side" and ask "whether the later complaint 'alleges a fraudulent scheme the government already would be equipped to investigate based on the first complaint.'"  *Id.* (quoting *U.S. ex rel. Heath v. AT&T, Inc.*, 791 F.3d 112, 116 (D.C. Cir. 2015)).  "[T]he first-filed and later-filed claims need not be identical; . . . [the FTF bar] can still bar a later claim, 'even if the allegations 'incorporate somewhat different details.''"  *Id.* (quoting *Heath*, 791 F.3d at 116).  Critically, to determine whether a related action was pending, courts examine the state of play *as of the filing of the original complaint*, as opposed to any later amendments.  *Id.* at 1040–42 ("[W]e conclude that the FCA's plain text tethers our analysis [of whether a related complaint was pending] to the moment a q*ui tam* action is filed.  When the Relators filed this *qui tam* suit, [a related action] was pending.  Therefore, the Relators cannot evade the first-to-file bar by amending their pleading after the [related action] was dismissed.").

This case presents a straightforward application of the FTF bar, and is materially indistinguishable from *Cho*.  *Pharmaleta* was filed on September 14, 2017.  Five months later, while *Pharmaleta* was pending, the original complaint in this case was filed on February 20, 2018.  Although this case and *Pharmaleta* are procedurally completely separate—*Pharmaleta* was dismissed outright, rather than, for example, being transferred to this Court or consolidated with this case—it cannot be seriously disputed that the two cases are related for purposes of the FTF analysis.  Indeed, the Complaint uses the defined phrase "Manufacturer Coupon Scheme" to refer to both the *Pharmaleta* allegations *and* the allegations here, and the *Pharmaleta* amended complaint itself used the defined phrase "Manufacturer Coupon Scheme."  Compl. ¶¶ 1, 19; Ex. 3; *see also supra* Section I.A.3.  Therefore, *Pharmaleta* was the first to file, and Counts I and II are barred.

### C.    The Complaint Fails to Adequately Allege a Violation of the FCA

The MCS claims also must be dismissed under Rule 12(b)(6), as Relators fail to allege falsity, scienter, or causation.

#### 1.    Relators Fail to Adequately Allege Falsity

The MCS claims must be dismissed for failure to adequately allege falsity under Rule 8(a), much less under the heightened pleading requirements of Rule 9(b).  Relators' theory is that Walgreens violated the AKS when it accepted MCs from Beneficiaries, and therefore that the claims it allegedly submitted to the Government in connection with those transactions were false.

Compl. ¶¶ 1, 31, 53, 72–76, 112, 165–74.  Therefore, in addition to pleading their FCA claims with particularity, Relators must also plead with particularity the underlying AKS violation under Rule 9(b).  *See, e.g.*, *U.S. ex rel. Keeler v. Eisai, Inc.*, 568 F. App'x 783, 798 (11th Cir. 2014); *United States ex rel. Lewis v. Cmty. Health Sys., Inc.*, 2020 WL 3103994, at *20 (S.D. Fla. June 11, 2020).  They have not done so.

> **a.      Relators Do Not Adequately Allege a Kickback Scheme**

The AKS contains two mutually exclusive sets of elements, depending on the theory of liability and on which side of the kickback the defendant stood.  42 U.S.C. § 1320a–7b(b)(2) prohibits knowingly and willfully *offering or paying* remuneration to induce or reward patient referrals or the generation of business involving any item or service payable by Federal health care programs.  Conversely, § 1320a–7b(b)(1) prohibits knowingly and willfully *soliciting or receiving* that remuneration.  *See generally United States v. Vernon*, 723 F.3d 1234, 1251–52 (11th Cir. 2013) (discussing the two subsections and their elements).

Here, Relators do not adequately allege a violation of the AKS.  Walgreens has no way of knowing whether Relators' theory is that Walgreens, by accepting MCs presented by customers despite the alleged prohibition on doing so, *offered or paid remuneration to patients* to induce them to purchase their prescriptions through Walgreens, supposedly in violation of 42 U.S.C. § 1320a–7b(b)(2);[9] *solicited or received remuneration from manufacturers* in exchange for filling orders for the manufacturers' brand name drugs, supposedly in violation of § 1320a–7b(b)(1); or something else.  This failure is particularly egregious in light of Relators' pleading burden under Rule 9(b).  "In applying the particularity requirement to FCA violations premised on AKS violations, 'a plaintiff must plead facts as to time, place, and substance of the defendants alleged fraud, specifically the details of the defendants allegedly fraudulent acts, when they occurred, and who engaged in them.'"  *United States ex rel. Musachia v. Pernix Therapeutics, LLC*, 2021 WL 2826429, at *3 (N.D. Ala. July 7, 2021) (quoting *U.S. ex rel. Clausen v. Lab'y Corp. of Am.*,

---

[9] Any "remuneration" offered or paid to a Beneficiary to induce them to select that drug would not be offered or paid by the pharmacy, but rather by the *manufacturer*.  And if Relators' assertion is that Walgreens' alleged acceptance of MCs constituted "remuneration" to the extent that it induced patients to choose Walgreens over another pharmacy, the theory fails because it is (a) based on speculation that another pharmacy also would not have accepted MCs, and (b) not tied to the presentment of a claim to Medicare, since the MC itself, not the pharmacy, induced the Beneficiary to purchase the drug for which payment was made by Medicare.  Further, Relators fail to allege that any alleged inducement was made with corrupt intent.

290 F.3d 1301, 1310–11 (11th Cir. 2002)).  Relators' allegations, which fail to even allege whether Walgreens paid or received a kickback, flaunt the requirements of Rule 9(b).

Relators' allegations are akin to a "shotgun pleading" that fails to "give the defendants adequate notice of the claims against them and the grounds upon which each claim rests."  *Id.* at *4 (quoting *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1323 (11th Cir. 2015)); *see also Sledge v. Goodyear Dunlop Tires N. Am., Ltd.*, 275 F.3d 1014, 1018 n.8 (11th Cir. 2001) ("The failure of the plaintiff to identify his claims with sufficient clarity to enable the defendant to frame a responsible pleading constitutes shotgun pleading.").  In *Musachia*, the complaint alleged two different methods of kickbacks—pharmacy copay waivers and free shipping.  The plaintiff then alleged that claims submitted to the Government were false based on the AKS violations.  The court dismissed the complaint, noting with respect to one of the claims:

> Plaintiff does not state whether the AKS violations supporting its FCA claim . . . is due to Defendants waiving copayments, providing free shipping, or waiving copayments and providing free shipping to federally insured patients.  Plaintiff's attempt to assert various theories of liability in the same count fails to provide a clear and plain statement required under Rule 8(a), let alone doing so with particularly under Rule 9(b).  This is particularly important where, as here, a plaintiff bears the burden of pleading his claims in accordance with Rule 9(b).  The court will not "dig[] through [Plaintiff's] complaint in search" of a valid claim by embellishing Plaintiff's allegations.

*Musachia*, 2021 WL 2826429, at *5 (alterations in original) (citations omitted).

Here, Relators allege a kickback scheme with Walgreens in the mix, but not the specifics that would form the foundation of their claim.  In fact, Relators do not even allege whether Walgreens paid kickbacks, received kickbacks, both, or neither.  The point is especially salient given that the *offeror or payor* of a kickback must have been motivated to "induce" the recipient into taking action, whereas no such showing is required for the *recipient*.  *United States v. Shah*, 981 F.3d 920, 925–26 (11th Cir. 2020).  The Complaint thus fails to state a claim, failing to meet the basic pleading requirements of Rule 8(a), and falling far short of the heightened pleading burdens of Rule 9(b).

### b.     The Bulletin Does Not Support Relators' Claims

In support of their allegations that Walgreens violated the AKS by accepting MCs, Relators rely on the Bulletin.  Compl. ¶¶ 73–74 (citing Compl. Ex. 8).  Contrary to Relators' suggestion, however, the Bulletin does not state that there is a *per se* violation of the AKS any time an MC is offered to or used by a Beneficiary, nor does it state that every entity involved in

such a transaction violates the AKS.  Rather, the Bulletin "focuses" on pharmaceutical manufacturers, and the only time it mentions *pharmacies* is when it relegates to a footnote the supposition that pharmacies that accept MCs "*may*" be "subject to sanctions" under the AKS. Compl. Ex. 8 at n.6; *see United States ex rel. Hanlon v. Columbine Mgmt. Servs., Inc.*, 676 F. App'x 787, 791 (10th Cir. 2017) (reliance on a Special Advisory Bulletin was misplaced, where the bulletin listed examples of arrangements that *could* provide the basis for law enforcement action, and listed characteristics of *potentially* problematic arrangements).  The Bulletin therefore provides no theory of liability for Relators to import wholesale, and does not relieve Relators of their obligation to allege with particularity Walgreens' alleged violations of the AKS.[10]

###    2.    Relators Fail to Adequately Allege Scienter

Relators' claims also fail because they do not adequately allege scienter.  "Congress did not intend to turn the False Claims Act, a law designed to punish and deter fraud, into a vehicle . . . punishing honest mistakes or incorrect claims submitted through mere negligence . . . ."  *United States ex rel. Phalp v. Lincare Holdings, Inc.*, 857 F.3d 1148, 1155 (11th Cir. 2017) (quoting *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1058 (11th Cir. 2015)). For that reason, to state a garden variety FCA claim, Relators must allege that Walgreens acted "knowingly," meaning that it had "actual knowledge" of the falsity of the alleged claims, or that it acted "in deliberate ignorance" or "in reckless disregard" of "the truth or falsity of the information."  31 U.S.C. § 3729(a)(1), (b).[11]  Where a defendant is alleged to have "fail[ed] to disclose violations of legal requirements" in connection with a claim for payment, the defendant must have "knowingly violated a requirement that the defendant knows is material to the Government's payment decision"—a "rigorous" requirement.  *Escobar*, 579 U.S. at 181, 192.

---

[10] Moreover, even if the Bulletin supported Relators' claims, it would have no binding effect; it is simply OIG's unchallenged interpretation of the law.  *See U.S., ex rel. Jamison v. McKesson Corp.*, 784 F. Supp. 2d 664, 677 n.10 (N.D. Miss. 2011) (noting that an OIG Special Advisory Bulletin does not "ha[ve] the force of authoritative law" and is an "agency interpretation[] of regulations that [is] not binding on this Court"); *cf. Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000) ("Interpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference.").

[11] Relators affirmatively allege that Walgreens' pharmacists and managers acted with actual knowledge.  Compl. ¶¶ 100, 104, 110–11.

Where, as here, FCA are claims based on AKS violations, the AKS's even higher scienter standard applies—the defendant must act "knowingly and willfully."  42 U.S.C. § 1320a-7b(b). "Willfully" means that "the defendant acted with an evil-meaning mind, that is to say, that he acted with knowledge that his conduct was unlawful."  *Bryan v. United States*, 524 U.S. 184, 193 (1998); *see United States v. Starks*, 157 F.3d 833, 838 (11th Cir. 1998) (discussing *Bryan* in the context of willfulness under the AKS).  Relators have not adequately alleged that Walgreens acted willfully, however, nor do they even attempt to do so—there is not a single allegation that Walgreens willfully violated the AKS by accepting MCs from Beneficiaries.  Nor do Relators allege that Walgreens pharmacists or staff ever provided any MCs to customers, or that Walgreens ever promoted, advertised, or funded any MCs.[12]

To the contrary, Relators recognize that Walgreens took significant and appropriate measures to ensure that it did *not* accept MCs from Beneficiaries.  As Relators acknowledge, Walgreens policy prohibits employees from applying MCs to Beneficiaries' copayments. Compl. ¶¶ 101, 105.  And, Relators acknowledge that Intercom Plus generates warnings reminding Walgreens employees not to process claims with MCs for Beneficiaries.  *Id.* ¶ 68.

### a. The Allegations About Various Employees' Knowledge Fail to Demonstrate Scienter

Relators attempt to concoct various reasons why Walgreens employees would have had knowledge of the MCS, but those allegations fare no better.  Relators do not adequately allege that Walgreens pharmacists or management allowed the occasional use of MCs by Beneficiaries with an intent to violate a known legal duty.  Moreover, Relators do not allege that CMS, even with supposed knowledge that pharmacies might be accepting MCs from Beneficiaries, did anything to prevent payment of such claims, nor even tell pharmacies or managers that those claims were improper.

### i. Staff-level Employees

Relators allege that "each Walgreens' [sic] employee who processed a manufacturer coupon for a Medicare Part D beneficiary had *actual knowledge* that they were violating the

---

[12] Relators mischaracterize the documents on which they rely.  Contrary to Relators' suggestion, the Coordination of Benefits Processing Procedures do not say anything about Beneficiaries, and certainly do not instruct pharmacists or staff to process or accept MCs for Beneficiaries. *Compare* Compl. ¶ 60, *with* Compl. Ex. 5.  Rather, the general policy against Beneficiaries using MCs applies.  Further, the allegations in Paragraph 61 regarding multiple MCs are untethered to any policy—rather, they are Relators' own explanation of how to violate Walgreens' policy.

Anti-Kickback Statute and submitting a false claim when they did so."  Compl. ¶ 100 (emphasis added).  But these allegations fail—the Complaint itself explains how difficult it is for pharmacy staff to determine whether a Part D sponsor paid for a prescription, given that the Sales Confirmation Sheet does not show that information.  *Id.* ¶ 69.  These allegations, which are buttressed by the Report, Compl. Ex. 9, concede that Walgreens pharmacy staff would not as a matter of course know whether a Part D sponsor paid for the medication, and fatally undermine any argument that pharmacists/staff had actual knowledge of any AKS/FCA violation.[13]  This failure is critical, given that the AKS's knowing and willful scienter element requires that the defendant act "voluntarily and purposely, with the specific intent to do something the law forbids, that is with a bad purpose, either to disobey or disregard the law."  *Starks*, 157 F.3d at 838.  Accepting an MC presented by a customer with a valid prescription is a far cry from willfully violating the AKS.  *Cf. United States ex. rel. Ruscher v. Omnicare, Inc.*, 2015 WL 5178074, at *23 (S.D. Tex. Sept. 3, 2015) (noting that "the requirement that remuneration be paid 'knowingly and willfully' requires some evidence of a 'bad purpose'"; accordingly, an effort to "maintain good customer relationships" was insufficient).

## ii.    Mid-level Managers

Relators' allegations concerning Walgreens' mid-level managers fare no better.  *First*, Relators provide no factual allegations to support their assertion that Walgreens managers "regularly instruct" their employees to ignore the AKS, Walgreens' policies, and Intercom Plus warnings designed to prevent applying MCs to Beneficiary copayments.  *See* Compl. ¶ 101.  The Complaint does not provide a single example in which an MC was applied to a Beneficiary's copayment as a result of such an instruction.

*Second*, Relators' allegations concerning mid-level managers' supposed motivation to violate the AKS/FCA fall short.  Relators point to an internal Walgreens document allegedly showing that bonuses for Walgreens managers "were partially tied to 'Sales & Profit' defined as 'Rx/Day' (*i.e.* prescriptions per day)."  Compl. ¶ 101; Compl. Ex. 15.  The mere fact that managers received bonuses based in part on the number of *all* (not just Part D) prescriptions per

---

[13] Even if pharmacists were aware that Part D sponsors paid for certain medications, Relators do not offer a single example of a Walgreens employee accepting an MC from a Beneficiary with *actual knowledge* that doing so would violate the AKS/FCA.  Moreover, there is no allegation that any of MCs stated that use by a Beneficiary would result in a violation of law or regulation by the pharmacist, and none of the coupons attached as exhibits to the Complaint state as such.

day is a far cry from plausibly alleging that these same managers had an incentive to boost their sales of Part D drugs specifically, or that they were not just purposefully disregarding Walgreens' polices but also "regularly instructing" their employees to violate the law.  These allegations are even weaker given that prescriptions per day is only one of several metrics that went into the bonus calculations, only comprising between 15% and 35% of the total amount (depending on position).  Compl. Ex. 15.

    *Third*, Relators' allegation that store managers would review every MC transaction, and therefore would have actual knowledge that MCs were accepted for Beneficiaries, Compl. ¶ 104, is unsupported by their own exhibit and belied by their own allegations.  Relators only allege that these store managers reviewed the transactions to ensure the manufacturers processed and paid the coupons—*not* to determine whether the coupons were used by Beneficiaries.  And, Relators only allege that store managers would be *able to* view each customer's Plan ID, *not* that they actually did so, would have done so as a matter of course, or otherwise had "actual knowledge" that any given customer was a Beneficiary.  *See id.*

### iii.    Upper-level Managers

    Relators allege that "Walgreens' upper-level management . . . either deliberately ignored [Walgreens'] policy or recklessly allowed [the MCS] to take place."  *Id.* ¶ 105.  The Complaint does not support these assertions, however.  Aside from one non-specific allegation of a "reprimand" by a District Manager on one occasion,[14] Relators allege no facts establishing or even suggesting that "upper-level managers" knew of Beneficiaries using MCs.  Nor does the Complaint allege any examples of anyone instructing employees to ignore policies or warnings.

    Relators contend that Walgreens' management could have placed a "hard block" in the Intercom Plus system that would "block[] the processing of [an MC] for insurance plans with a Medicare Part D-linked BIN, PCN, and Plan ID."  Compl. ¶ 107.  Allegations that Walgreens' systems could have been better do not satisfy the FCA's scienter requirement, however.  *Cf. Urquilla-Diaz*, 780 F. 3d at 1061 (defendant does not act recklessly simply because she "should

---

[14] *See* Compl. ¶¶ 81, 106.  However, (1) this is not one of the "representative examples" and does not include the information contained in those examples such as the value of the coupon, the name of the Part D insurer, or how much was allegedly billed to the plan/Government; (2) there is no allegation as to the specifics of the "reprimand"; (3) there is no allegation that the pharmacist who ended up processing the coupon knew that the customer was a Beneficiary; and (4) there is no allegation that the pharmacist knew that it was illegal to process the coupon.

have performed her job better"); *United States ex rel. Hefner v. Hackensack Univ. Med. Ctr.*, 495 F.3d 103, 110 (3d Cir. 2007) ("The mere failure of a system to catch an error does not establish recklessness.").[15]

Relators also complain about the soft block that Walgreens had in place, but those complaints are unfounded.  Relators say that the soft block "may be overridden by a Walgreens' [sic] employee for all manufacturer coupons," Compl. ¶ 108, but ignore that the exhibit on which they rely clearly states that the soft block may be overridden *only if* the employee calls the patient's insurance and confirms that the plan is not a Part D or other government benefit plan, Compl. Ex. 18.  Indeed, the document goes on to warn in bold, "**Failure to follow the procedures and complete all required documentation will result in disciplinary action, up to and including termination**." *Id.*[16]

> **b.     The "Representative Examples" Do Not Establish Scienter**

Relators' supposed "representative examples" do not establish scienter, either.  Swihart's examples do not allege that any of the pharmacists were presented with physical coupons and therefore knew that MCs were in play,[17] and Mosley only alleges that "coupon cards" were presented "[o]n information and belief."  These examples suffer from other deficiencies, as well.

> **i.     Swihart's Examples**

With regard to Swihart's examples, there is no allegation that the MCs contained any language instructing employees that they may not be used by Beneficiaries.  Moreover, there is

---

[15] Relators do not allege that it was standard or required for a hard block to be in place after the issuance of the Report in 2014, and also ignore reasons why a hard block would not have been implemented (such as the expense and difficulty in implementing such a block, particularly where, as Relators and the Report acknowledge, identifying Beneficiaries is not easy).  Relators also ignore that it is the *manufacturer's* obligation to operate MC programs in compliance with federal law.  Compl. Ex. 9 at 23.  Further, the allegation that Walgreens created a "hard block" for the Valeant Access Program, Compl. ¶ 108, is contradicted by Relators' own exhibit, which states that the block was put in place "by Valeant," Compl. Ex. 17.  And of course, the mere fact that one manufacturer set up a block hardly establishes an industry-wide standard of care.

[16] The allegation that the soft block shows that upper-level management had actual knowledge of the MCS, Compl. ¶ 110, is preposterous.  Nothing in Exhibit 18 contemplates any "scheme."  Further, the document does not merely "add an extra step in the override process" as Relators allege, but rather makes it clear that under no circumstances may a Beneficiary use an MC.

[17] "[E]lectronic coupons, debit cards, and direct reimbursements"—as opposed to "print coupons"—"may be difficult, or impossible, for pharmacists dispensing to beneficiaries on behalf of Part D plans to identify."  Compl. Ex. 9 at 20.

no allegation that the pharmacists knew that Part D sponsors paid for the prescriptions.  For Example 1, Relators allege that Swihart—*not* the pharmacist—wrote the Plan ID on the Sales Confirmation Sheet in accordance with the allegations in Paragraph 69.  Examples 2–7 suffer from the same deficiency.[18]  Examples 8–10 are not "marked" and do not even allege that the customers were Beneficiaries—only that it was "highly likely" that they were given they were over age 65, but that is not enough.  *See* Compl. Ex. 9 at 17–18 ("patient date of birth cannot always approximate Part D coverage"); *cf. Carrel v. AIDS Healthcare Found., Inc.*, 898 F.3d 1267, 1278 (11th Cir. 2018) (allegations and document about "*possible*" sources of funding fell short of the pleading requirement that the claims "*actually*" were submitted to the Government).

### ii.    Mosley's Examples

Mosley's examples do not establish scienter, either.  Mosley alleges—upon information and belief—that the MCs contained language instructing pharmacists that they may not be used by Beneficiaries, but there is no basis for that information and belief; it is merely an assumption.  Indeed, as the Report makes clear, MCs frequently do *not* contain any language instructing pharmacists not to process the coupons for Beneficiaries.  Compl. Ex. 9 at 10, 13.

Additionally, Mosley's examples do not support the allegation that pharmacists would have known that Part D sponsors paid for the prescriptions.  Exhibit 14 to the Complaint is a collection of "Refill History" forms—not the Sales Confirmation Sheets that Relators describe elsewhere in the Complaint.  Relators do not allege what these documents are or that any pharmacists would have seen them or "MPD" Plan ID designations in connection with filling and accepting payment for a prescription.  Nor is there any other allegation that the pharmacists knew these customers were Beneficiaries.

### 3.    Relators Fail to Adequately Allege Causation

For FCA claims where falsity is premised on AKS violations under the 2010 amendments to the FCA, the relator must establish that the false claim "result[ed] from" the AKS violation.  42 U.S.C. § 1320a-7b(g); *see* Compl. ¶ 30.  As the Eighth Circuit recently held, this requires that the false claim would not have been submitted *but for* the alleged kickback.  *United States ex rel. Cairns v. D.S. Med. LLC*, 42 F.4th 828, 834–36 (8th Cir. 2022).  After analogizing to similar

---

[18] Relators allege that these examples contain "marked" Sales Confirmation Sheets, but they do not allege that the dispensing pharmacist marked them.  However, the handwriting appears the same as the handwriting in Example 1, such that it is clear that Swihart, and not the dispensing pharmacist, marked these sheets.  In addition, Example 4 does not contain any "marking" at all.

language in other statutes and the Supreme Court's interpretation thereof, as well as the text of the statute and ordinary dictionary definitions, the court had "little trouble concluding that, in common and ordinary usage, the participle phrase 'resulting from' also expresses 'a but-for causal relationship.'"  *Id.* at 834 (quoting *Burrage v. United States*, 571 U.S. 204, 213 (2014)).

As applied here, the "resulting from" language and corresponding "but for" causation standard require Relators to plead that Walgreens would not have filled and submitted claims for brand name drugs *but for* its alleged acceptance of MCs in violation of the AKS.  Relators have simply not alleged this, and this failure is fatal to their claims.

### D.      Relators Fail to Adequately Allege a Nationwide Scheme

In the event the Court finds that Relators have sufficiently alleged viable FCA claims, it should dismiss any claims from pharmacies outside Florida and Ohio because Relators fail to adequately allege a nationwide scheme.  Swihart's "representative examples" are from "the greater Cleveland area."  Compl. ¶ 83.  Mosley's examples are from two stores in Florida and one in New York City (although the basis for Mosley's supposed knowledge of what happened at the New York store is not alleged).  *Id.* ¶¶ 91–96.  Relators ask the Court to infer that the MCS was "pervasive" and occurred nationwide, *id.* ¶ 105, but this is inappropriate.  *See U.S. ex rel. Saldivar v. Fresenius Med. Care Holdings, Inc.*, 906 F. Supp. 2d 1264, 1277 (N.D. Ga. 2012) (relator's complaint failed to allege a nationwide fraudulent billing scheme in part because relator's firsthand knowledge was based only on his work with clinics in only two states); *United States v. Team Fin., L.L.C.*, 2019 WL 3943958, at *7 (E.D. Tex. Aug. 21, 2019) (allegations of a "nationwide" scheme "based on [the relators'] experiences at . . . hospitals in Colorado and the Virgin Islands" were insufficient); *U.S. ex rel. Thomas v. Bailey*, 2008 WL 4853630, at *6 (E.D. Ark. Nov. 6, 2008) (finding insufficient allegations of a "nationwide" policy based on anecdotal episodes from two states); *U.S. ex rel. Woods v. SouthernCare, Inc.*, 2013 WL 1339375, at *6 (S.D. Miss. Mar. 30, 2013) ("[T]he Relators have not adequately alleged facts to support their belief of company-wide fraud.  As such, the Relators' claims pertaining to SouthernCare facilities other than the Mississippi facilities at which the Relators assert knowledge of fraudulent practices are dismissed without prejudice.").

Per the facts alleged, the only things "nationwide" were Walgreens' policy against Beneficiaries using MCs, and warning messages instructing pharmacists not to process MCs for Beneficiaries.  Relators present one-off examples that allegedly contravened the policy, but with

nothing tying their allegations to a systemic, nationwide scheme.  *See U.S. ex rel. Fox Rx, Inc. v. Omnicare, Inc.*, 2013 WL 2303768, at *7 (N.D. Ga. May 17, 2013) ("Relator's contention, that Defendants' 'nationwide' conduct should be inferred from the conduct for which Relator alleges actual information, is exactly what is proscribed by Rule 9(b)."); *see also United States ex rel. Buth v. Walmart Inc.*, 2021 WL 424160, at *4 (E.D. Wis. Feb. 8, 2021) (noting that "there must . . . be sufficient facts to support a reasonable inference that the fraud was, in fact, widespread").

      **E.**      **Relators Fail to Adequately Allege a Violation of 31 U.S.C. § 3729(a)(1)(B)**

      Count II also should be dismissed because Relators do not adequately allege any false record or statement material to a false or fraudulent claim.  *See* 31 U.S.C. § 3729(a)(1)(B). Indeed, Relators do not even attempt to allege what these records or statements are or how they were false.  Moreover, since Relators do not allege what the false records or statements are, they also do not allege how these records or statements were material to any allegedly false or fraudulent claim.  *See United States ex rel. Stepe v. RS Compounding LLC*, 304 F. Supp. 3d 1216, 1225 (M.D. Fla. 2018) ("The Court previously warned Stepe that it was important to specifically identify the false statements and certifications upon which each claim relies.  Stepe has not done so. . . .  To the extent the Court can divine what false records or statements Stepe intended to reference in this count, the Court finds those statements insufficiently pled under Rule 9(b). . . .  As no false records or statements to support this claim have been pled with particularity, the Court need not also address whether the vaguely identified false statements were material to a false claim.").  Accordingly, Count II must be dismissed.

**II.**      **THE MTMS CLAIMS MUST BE DISMISSED**

      The MTMS claims must also be dismissed.  Relators fail to adequately allege that the MTM services were "worthless" in the first place, or that any claims for "worthless" MTM services were paid by the Government.  Relators also fail to adequately allege scienter, materiality, or a nationwide scheme, as well as a false record or statement material to a false or fraudulent claim.

      **A.**      **Relators Fail to Adequately Allege That MTM Services Were "Worthless"**

      The MTMS claims must be dismissed because Relators fail to adequately allege that the MTM services were "worthless."  To prevail on this theory, the defendant must have "sought reimbursement for services that it knew were not just of poor quality but had no medical value."

*United States v. Houser*, 754 F.3d 1335, 1348 (11th Cir. 2014) (citing *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 468 (6th Cir. 2011)).  "*[A] 'diminished value' of services theory does not satisfy this standard.*  Services that are 'worth less' are not 'worthless.'"  *U.S. ex rel. Absher v. Momence Meadows Nursing Ctr., Inc.*, 764 F.3d 699, 710 (7th Cir. 2014) (emphasis added).

Tellingly, Relators do not allege that any recipients of MTM services ever complained about the usefulness or value of them, nor do they allege that any recipients ever suffered harm because of inadequacies with those services.  Instead, Relators point to a variety of circumstantial reasons why the MTM services were "worthless," none of which suffice.

### 1.    Relators Rely on and Mischaracterize Nonbinding Guidance

Aside from alleging formatting standards for paperwork related to MTMs, Compl. ¶¶ 116–23, Relators rely only on nonbinding industry guidance, as opposed to statutes, regulations, or anything authoritative, to allege what an MTM service should entail, *see* Compl. ¶¶ 129–37; Compl. Exs. 22–23.  Indeed, even the Complaint acknowledges that these documents provide guidance, rather than strict requirements, describing recommendations and things that pharmacists "should" do in connection with MTM services.  *See* Compl. ¶¶ 129–37.

Even when alleging what pharmacists "should" do when performing MTM services, Relators greatly overstate the documents on which they rely.  For example, the cited industry guidance does not say that "the pharmacists should obtain the patient's laboratory blood work as part of the CMR."  *See* Compl. ¶ 132.  Rather, the passage quoted in the Complaint goes on to say, "Depending upon the payer requirements and patient complexity, *pharmacists may not need to obtain all this information to do a CMR*.  However, *if* the patient indicates he or she has a problem or the pharmacist suspects a problem that may be due to a medication, assessment of laboratory data *may* be warranted."  Compl. Ex. 23 at 11 (emphases added).  Similarly, the cited guidance does not say that communication with doctors is a routine part of the CMR process.  *See* Compl. ¶ 133.  Rather, the passage quoted in the Complaint starts off by saying, "During the course of an MTM encounter, medication-related problems *may* be identified that require the pharmacist to intervene on the patient's behalf.  Interventions *may* include collaborating with physicians or other healthcare professionals to resolve existing or potential medication-related problems or working with the patient directly."  Compl. Ex. 22 at 9 (emphases added).

Compared to what Relators allege pharmacists *should* do, there are scant allegations— exclusively pertaining to MAPs—speaking to what pharmacists *must* do.  Compl. ¶ 138 (citing

Compl. Ex. 23).  Even here, Relators mischaracterize the documents.  The guidance does not contemplate a detailed MAP for every patient; it plainly notes that recommendations and action items are included in the MAP "*[w]hen medication-related problems have been identified and prioritized.*"  Compl. Ex. 23 at 24 (emphasis added); *see* 42 CFR § 423.153(d)(1)(vii)(B)(1)(ii) (noting that a CMR "*[m]ay* result in a recommended medication action plan" (emphasis added)).

### 2.      The Allegations Concerning "Sales Pressure" Fail

Relators attempt to support their claim that MTM services were "worthless" by attributing nefarious intent to Walgreens encouraging pharmacists to perform MTM services, Compl. ¶¶ 140–43, but these allegations miss the mark.  Relators do not allege, for example, that pharmacists were pressured to complete MTM services in a certain amount of time or that any bonuses were tied to MTM services; nor do they allege how Walgreens' encouragement resulted in MTMs being completed in a "sham" manner.  Relators provide examples of Walgreens encouraging its pharmacists to complete MTM services, including a system allegedly requiring lesser performing stores to reach out to higher performing stores to determine how to do better; a friendly "March Madness" competition that took place in one month in 2014 in a single county in Florida; and pizza parties, jeans days, and paid time off for the highest performing stores. Compl. ¶¶ 141–43.  But Relators never connect the dots between Walgreens providing this recognition to employees of high-performing stores, and pharmacists performing the MTM services in a "sham" manner.[19]

### 3.      The Allegations Concerning "Inadequate Instruction" Fail

Relators attempt to support their claim of worthlessness by arguing that pharmacists were provided with inadequate instructions concerning MTM services.  But these allegations grossly exaggerate and mischaracterize the documents on which they rely.

---

[19] Complaint Exhibit 25 actually undermines Relators' claims that pharmacists were under such "immense pressure" to complete MTM services that they could not possibly have completed the services adequately.  The email notes that each store in that district was expected to complete only *$200* in MTM claims per month.  Given Relators' allegation that each MTM service generates $50 to $100, Compl. ¶ 128, Exhibit 25 reveals that the sender of the email expected those stores to only complete *two to four MTM services per month*—a far cry from the "immense pressure" alleged.  Further, the Government recently has made it clear that the lack of eligibility/demand for MTM services is an issue, and therefore has proposed loosening minimum eligibility for the MTM program.  87 Fed. Reg. 79452, 79542–46 (Dec. 27, 2022).  Any suggestion that Walgreens was cutting corners with its MTM services to meet the demand for them is therefore implausible.

*First*, Relators point to Complaint Exhibit 26 to allege that, "Since at least 2007, Walgreens has encouraged pharmacists to advise beneficiaries that the patient encounter will only take 15 to 20 minutes," even though "the patient encounter should take 45 to 60 minutes, if performed properly."  Compl. ¶ 144.  However, this overstates Exhibit 26, which is an email (devoid of context) from a Pharmacist Business Analyst that includes "an example talking script for scheduling patients."  Compl. Ex. 26.  The email disclaims, "Use all of it or none of it, I just thought it may help."  *Id.*  Moreover, the "45 to 60 minute" figure on which Relators hang their hat is found only in nonbinding industry guidance, *see supra* Section II.A.1—guidance that is nothing more than "[e]stimates" that "vary with patient complexity."  Compl. Ex. 23 at 7.

*Second*, Relators make hay about what they dub "surprise 'in-line' or 'on the fly' CMRs," Compl. ¶¶ 145–46, but these allegations are nonsensical.  As Complaint Exhibit 27 shows, "in-line" CMRs simply refer to the pharmacist doing the workup prior to *offering* the CMR.[20]  And Exhibit 27 discusses *offering* the CMR at the point of sale—not forcing it on the patient.  Indeed, Exhibit 27 cautions, emphasized in bold, "**All elements of a traditional CMR must be completed in order for the in-line CMR to be considered to be of high quality.**"[21]

### 4.       The "Representative Examples" Do Not Establish Worthlessness

The "representative examples" do not show that the MTM services had "no medical value" such that they were "worthless."  Relators only allege deficiencies with regard to the MAPs, and do not allege that the MTM consultation sessions or any other components of the services were worthless.  Accordingly, there is no allegsd that the overall MTM service, rather than, at most, a single document resulting therefrom, was deficient or had "no medical value."

With regard to Examples 1–3 and 5, Relators complain about inadequacies in the MAPs.  However, Relators' own "authority" plainly notes that recommendations and action items are included in the MAP "*[w]hen medication-related problems have been identified and prioritized.*"  Compl. Ex. 23 at 24 (emphasis added).  Relators do not allege, nor do the examples suggest, that any "medication-related problems" in connection with these MTM services were "identified and prioritized."  And critically, Relators do not allege for any of these patients what else the

---

[20] Relators do not point to any document or information indicating that Walgreens dubbed in-line CMRs as "surprise" or "on the fly" CMRs; those characterizations are Relators' histrionics.

[21] Additionally, the hearsay allegation about an MTM service allegedly performed for a dead person lacks factual detail such as the contents of the accompanying paperwork, the amount that was billed, and the source of Mosley's claimed knowledge.  *See* Compl. ¶ 147.

pharmacists could have done or said to fulfill their supposed obligations, or how they could have further "tailored" the MAPs to the patients.

Example 4 clearly documents issues of noncompliance by the patient due to "[c]onvenience, routine, or forgetfulness," and documents that the "[p]atient agreed to modify behavior to take medication as directed.[22]  Example 6 also documents noncompliance for the same reasons, and notes that the pharmacist nevertheless decided to fill the medication.  Again, Relators do not even attempt to allege what else the pharmacists could have done or said to fulfill their supposed obligations, above and beyond what was already noted.

With regard to Example 7, the allegations are simply incorrect—the document shows (1) the "Assessment," "Plan," "What we talked about," and "What patient needs to do" sections were all filled out; (2) the pharmacist "[s]uggested engaging a caregiver's assistance in medication administration"; and (3) "Pharmacist notes" about blood pressure and blood sugar.

In sum, Relators have failed to adequately allege that the supposedly "sham" MTM services were "not just of poor quality but had no medical value."  *Houser*, 754 F.3d at 1348.

**B.     Relators Fail to Adequately Allege That Any Claims for "Worthless" MTM Services Were Paid by the Government**

The MTMS claims must also be dismissed because Relators do not adequately allege that any claims were paid by the Government.  The FCA's definition of a "claim" requires that the Government "provides or has provided any portion of the money or property requested or demanded; or . . . will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded."  31 U.S.C. § 3729(b)(2)(A)(ii). Relators' sole allegation attempting to establish that claims were paid by the Government is a non-specific assertion that Walgreens submits a bill to a vendor for somewhere between $50 and $100 per service per Beneficiary, which is then paid by the Part D sponsor, using funds that were at one point or another provided by the Government.  Compl. ¶ 128.

However, Relators do not allege facts as to the Government's alleged payment of those claims, such as how or when the Government provided the funds that supposedly paid the claims, or the basis for the allegation that the funds used to pay for those particular "sham" MTM services came from or were traceable to the Government.  Nor is there any allegation for any of the "representative examples" that any claims were ultimately paid by the Government.  Indeed,

---

[22] The "CMR Cover Letter" alleged in Paragraph 155 appears to be missing from Example 4.

the Government does not even pay for MTM services on a claim-by-claim basis—"CMS considers MTMP services provided to targeted beneficiaries as an administrative cost (included in the plan bid), incident to appropriate drug therapy, and not an additional benefit." Compl. Ex. 21, Section 30.5; *see also* 87 Fed. Reg. at 79698-99 ("MTM program costs are not a specific line item that can be easily extracted from the bid.").

Relators thus fail to meet their pleading burden under Rule 8(a), and fall far short of alleging the circumstances of the fraud with particularity under Rule 9(b). *Cf. Paul v. Biotronik, Inc.*, 2020 WL 13369048, at *3 (M.D. Fla. Oct. 16, 2020) ("Relator states, in a conclusory fashion, that after Defendant provided 'padded' invoices to hospitals for fraudulent services, those services were eventually paid for, in some manner, by a government-funded healthcare program. The Court must infer that the 'padded' invoices Defendant provided to the hospitals were ultimately presented to the government for payment. This is generally insufficient to state a claim under the FCA." (citation omitted)).

### C.     Relators' Allegations Concerning Walgreens' Knowledge of the MTMS Fail

In support of their argument that Walgreens knew of the alleged MTMS, Relators merely allege that pharmacists know the MTM services were a "sham" given their training, and that managers know the MTM services were a "sham" because their pressure caused it. Compl. ¶¶ 161–63. These allegations do nothing more than bootstrap off of the (inadequate) allegations of worthlessness, and fail for similar reasons why Relators fail to allege worthlessness. *See supra* Section II.A; *see also United States ex rel. Fzco v. Supreme Foodservice GmbH*, 2020 WL 4579458, at *13 (E.D. Va. July 8, 2020) ("For the same reasons that Plaintiff-Relators failed to plead the existence of an objectively false statement or fraudulent conduct, Plaintiff-Relators cannot plausibly allege that Defendants acted with the requisite scienter." (internal citation omitted)), *aff'd sub nom. United States ex rel. ANHAM FZCO v. Supreme Foodservice, GmbH*, 855 F. App'x 174 (4th Cir. 2021)). Relators do not allege what pharmacists knew they should have included in the "representative example" MAPs to render the MTM services *not* worthless, nor do they allege how mid-level and upper-level managers knew that encouraging pharmacists to perform MTM services would result in them being performed in a "sham" manner such that they were "worthless." And to the extent Relators contend it would be obvious that the pharmacists' services were worthless and that the managers' "pressure" caused worthless MTMs, such inferences are unwarranted. *Cf. United States ex rel. Schagrin v. LDR Indus., LLC*, 2018

28

WL 6064699, at *6 (N.D. Ill. Nov. 20, 2018) (Relators[] argue that the Greenspons[] must have had the requisite knowledge because the falsity of LDR's customs claims would be 'obvious' to persons 'in the industry.'  The Court questions whether the allegation of 'obviousness' is well-pled, since it requires the Court to draw an inference which—not being 'in the industry'—the Court does not have the expertise to make.").

### D.   Relators Fail to Adequately Allege Materiality

Relators' MTMS claims also fail because they do not adequately allege materiality. Relators allege in a conclusory fashion that "Walgreens' pharmacists' failure to perform MTM services in accordance with [supposed industry standards and CMS regulations concerning how long MTM services are supposed to take and the documentation that is supposed to be created in the process] goes to the 'essence of the bargain' and is therefore material to the Government's decision to pay."  Compl. ¶ 164.[23]  But Relators' authorities contradict that conclusion.  The supposed "industry standards" do not establish how long MTM services *must* take; rather, they contain estimates.  Compl. Ex. 23 at 7.  Moreover, they only discuss MAPs in the context of addressing "medication-related problems [that] have been identified and prioritized."  *Id.* at 24.

"CMS regulations" do not establish materiality, either.  Rather, the regulations—which apply to the Part D sponsors, as opposed to pharmacies—note only that a CMR "*[m]ay* result in a recommended medication action plan."  42 CFR § 423.153(d)(1)(vii)(B)(1)(ii) (emphasis added).  Relatedly, the CMS Manual sets forth a list of "expectations" that CMS considers when reviewing a Part D sponsor's "MTMP submission" in connection with its plan bid, none of which reference the duration of MTM services.  Compl. Ex. 21, Section 30.7.

To the contrary, the Government has indicated, through the statutory framework and the CMS Manual, that alleged shortcomings in the provision of MTM services are *im*material.  CMS considers MTM services to be a mere "administrative cost (included in the plan bid), incident to

---

[23] Not only must the alleged misrepresentation be material to the *Government's* alleged decision to pay, but it must also be material to the intermediate payor's (the vendor and/or the Part D sponsor) decision to pay.  *United States v. Joel Kennedy Constructing Corp.*, 584 F. Supp. 3d 595, 623 (N.D. Ill. 2022) ("[W]here . . . the allegedly fraudulent misrepresentations were made to a . . . 'contractor, grantee, or other recipient' disbursing federal funds under Section 3729(b)(2)(ii), a relator must plead that the misrepresentations are material to the federal government's funding decision as well as those of the contractor, grantee, or other funding recipient.").  Relators have not alleged materiality as to these vendors or Part D sponsors.  And for the same reason these alleged deficiencies do not equate to worthlessness and were immaterial to the Government, they also were immaterial to the vendors and/or Part D sponsors.

appropriate drug therapy, and not an additional benefit." *Id.*, Section 30.5.  Additionally, the Government does not pay for any given MTM service, nor is it made aware of fees generated in connection with the same during the ordinary course.  Rather, Part D sponsors are only required to explain how MTM fees are established in connection with plan bids, and disclose MTM fees to CMS upon request.  42 CFR § 423.153(d)(5).

At bottom, just because MTM services allegedly did not take as long as industry guidance suggests they might, and did not result in as robust MAPs as Relators would prefer, does not mean that those alleged shortcomings were material to the Government, Part D sponsors, or vendors such that they would not have paid claims had they known of them.

### E.      Relators Fail to Adequately Allege a Nationwide Scheme

Relators only allege examples of supposedly "sham" MTM services that took place in Florida.  Compl. ¶¶ 148–60.  However, they allege nothing connecting these "representative examples" to a nationwide scheme, policy, or directive.  For the reasons set forth *supra* Section I.D, Relators have therefore failed to allege a nationwide scheme.

### F.      Relators Fail to Adequately Allege a Violation of 31 U.S.C. § 3729(a)(1)(B)

As with their MCS claims, Relators have failed to adequately allege in Count IV a violation of 31 U.S.C. § 3729(a)(1)(B).  *First*, the claim fails because Relators have failed to adequately allege that the Government paid claims that it did not owe in connection with the alleged MTMS.  *See United States v. All Children's Health Sys., Inc.*, 2013 WL 1651811, at *4 & n.4 (M.D. Fla. Apr. 16, 2013) ("Relator has failed to allege with specificity any amounts the government paid that it did not owe and therefore fails to state a claim under subsection (a)(1)(B).").  *Second*, Relators do not allege any false record or statement, much less one that is material to a false or fraudulent claim.  Indeed, following Relators' own allegations, the MAPs could not have been false, since Relators are basing their entire theory of liability on the fact that the MAPs allegedly *reveal* that MTM services were performed in a "sham" manner.  And Relators do not allege the existence of any other potentially false records or statements.  *See Stepe*, 304 F. Supp. 3d at 1225.  Accordingly, Count IV fails.

### <u>CONCLUSION</u>

For the foregoing reasons, the Court should dismiss the Complaint with prejudice.

## REQUEST FOR HEARING

Pursuant to Local Rule 7.1(b)(2), Walgreens respectfully requests oral argument on the foregoing motion.  Walgreens believes oral argument will assist the Court in analyzing and resolving the motion, particularly given the complexity of the issues presented.  Walgreens estimates that one hour will be necessary for the argument.

Dated: January 18, 2023                                   Respectfully submitted,

                                                          */s/ David W. Marston Jr.*
                                                          David W. Marston Jr., Bar No. 111636
                                                          david.marston@morganlewis.com
                                                          Matthew Papkin, Bar No. 106565
                                                          matthew.papkin@morganlewis.com
                                                          **MORGAN, LEWIS & BOCKIUS LLP**
                                                          600 Brickell Avenue
                                                          Suite 1600
                                                          Miami, FL  33131-3075
                                                          Telephone:  +1.305.415.3000
                                                          Facsimile:   +1.305.415.3001

                                                          Howard Young, *pro hac vice*
                                                          howard.young@morganlewis.com
                                                          **MORGAN, LEWIS & BOCKIUS LLP**
                                                          1111 Pennsylvania Avenue NW
                                                          Washington, DC  20004-2541
                                                          Telephone:  +1.202.739.3000
                                                          Facsimile:   +1.202.739.3001

                                                          Rebecca Hillyer, *pro hac vice*
                                                          rebecca.hillyer@morganlewis.com
                                                          Ryan McCarthy, *pro hac vice*
                                                          ryan.mccarthy@morganlewis.com
                                                          Jeffrey Masters, *pro hac vice*
                                                          jeffrey.masters@morganlewis.com
                                                          **MORGAN, LEWIS & BOCKIUS LLP**
                                                          1701 Market Street
                                                          Philadelphia, PA  19103-2921
                                                          Telephone:  +1.215.963.5000
                                                          Facsimile:   +1.215.963.5001

                                                          *Counsel for Defendant Walgreen Co.*

31

### <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing Motion to Dismiss was filed on January 18, 2023, through the Court's CM/ECF portal, which will serve a copy on all counsel of record.

*/s/ David W. Marston Jr.*
David W. Marston Jr.