UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:  18-CV-80200-BLOOM/REINHART

UNITED STATES OF AMERICA ex rel.
ELMER MOSLEY, PHARM. D., R. PH. and
PHARMALETA, LLC,

                      Plaintiffs/Relators,

vs.

WALGREEN CO.,

                      Defendant.

_____/

## REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO DISMISS (ECF NO. 63)

Relators Dr. Elmer Mosley and Pharmaleta, LLC, bring this action on behalf of the United States under the False Claims Act (FCA) based on two allegedly fraudulent schemes perpetrated by Defendant Walgreen Co. ("Walgreens"): the Manufacturer Coupon Scheme ("Coupon Scheme") and the Medication Therapy Management ("MTM") Scheme.[1]  The Amended Complaint contains four causes of action: Counts I and II allege that Walgreens obtained illegal kickbacks from the Coupon Scheme in violation of 31 U.S.C. §§ 3729(a)(1)(A) and (B), and Counts III and

_____

[1]  Although the United States declined to intervene in this lawsuit, Judge Bloom granted the government's request to allow the Relators, who have worked with Walgreens' pharmacies for years, to maintain the action in the name of the United States.  ECF Nos. 39, 40.

IV allege FCA violations under the same statutory provisions for the MTM scheme. ECF No. 43.

Currently pending before me is Walgreens' motion to dismiss the Amended Complaint under Rule 12(b)(6). ECF No. 63. I have reviewed the motion, as well as the response and reply papers (ECF Nos. 72, 79), and I held oral argument on April 26, 2023. For the reasons set forth below, I RECOMMEND that the motion be GRANTED IN PART AND DENIED IN PART.

## I.   APPLICABLE LEGAL STANDARDS

### A.  Rule 12(b)(6)

A pleading in a civil action must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To satisfy this Rule 8 pleading requirements, a claim must provide the defendant fair notice of plaintiff's claim and the grounds upon which it rests. *See Swierkiewicz v. Sorema N.A.,* 534 U. S. 506, 512 (2002). While a claim "does not need detailed factual allegations," it must provide "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007); *see Ashcroft v. Iqbal,* 556 U. S. 662, 678 (2009) (explaining that the Rule 8(a)(2) pleading standard "demands more than an unadorned, the defendant-unlawfully-harmed-me accusation"). Nor can a claim rest on "'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal,* 556 U. S. at 678 (*quoting Twombly*, 550 U. S. at 557 (alteration in original)).

On a motion to dismiss under Rule 12(b)(6), the Court must view the well-pled factual allegations in a claim in the light most favorable to the non-moving party.

2

*Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1246 (11th Cir. 2016). Viewed in that manner, the factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the claim are true (even if doubtful in fact). *Twombly*, 550 U. S. at 555 (citations omitted). The Supreme Court has emphasized that "[t]o survive a motion to dismiss a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* at 570. In addition, "courts may infer from factual allegations in the complaint obvious alternative explanations, which suggest lawful conduct rather than the unlawful conduct that plaintiff would ask the court to infer." *Am. Dental Assoc. v. Cigna Corp.*, 605 F. 3d 1283, 1290 (11th Cir. 2010) (citing *Iqbal,* 556 U. S. at 682). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Iqbal,* 556 U. S. at 678 (quoting *Twombly,* 550 U. S. at 557). When evaluating a motion to dismiss under Rule 12(b)(6):

> [A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

*Iqbal,* 556 U. S. at 679. Factually unsupported allegations based "on information and belief" are not entitled to the assumption of truth. *See Scott v. Experian Info. Sols., Inc.*, No. 18-CV-60178, 2018 WL 3360754, at *6 (S.D. Fla. June 29, 2018) (J. Altonaga) ("Conclusory allegations made upon information and belief are not entitled to a

3

presumption of truth, and allegations stated upon information and belief that do not contain any factual support fail to meet the *Twombly* standard.").

### B. *False Claims Act*

The FCA "allows private persons, known as relators, to bring civil actions, known as *qui tam* suits, on the United States' behalf for fraudulent claims." *United States ex rel. Crocano v. Trividia Health Inc.*, 615 F. Supp. 3d 1296, 1303 (S.D. Fla. 2022) (citing *United States ex rel. Clausen v. Lab'y Corp. of Am.*, 290 F.3d 1301, 1307 (11th Cir. 2002)). The Act "broadly proscribes the knowing or reckless submission of false claims for payment to the federal government or within a federally funded program." *United States ex rel. Heath v. AT & T, Inc.*, 791 F.3d 112, 115 (D.C. Cir. 2015). FCA cases are often brought, as they are here, as "presentment" claims under section 3729(a)(1)(A) and "false statement or document" claims under section 3729(a)(1)(B). *Crocano*, 615 F. Supp. 3d at 1303.

To establish a presentment claim, a relator must prove three elements: (1) a false or fraudulent claim; (2) which was presented, or caused to be presented, for payment or approval; (3) with the knowledge that the claim was false. *Id.* (citing 31 U.S.C. § 3729(a)(1)(A)). To prove a false statement or document claim, a relator must show that: (1) the defendant made (or caused to be made) a false statement, (2) the defendant knew it to be false, and (3) the statement was material to a false or fraudulent claim. *Id.* (citing 31 U.S.C. § 3729(a)(1)(B)).

To state a claim for violating the FCA, a plaintiff must show "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was

material, causing (4) the government to pay out money or forfeit moneys due." *United States ex rel. Jacobs v. JP Morgan Chase Bank, N.A.*, No. 20-20543-CIV, 2022 WL 573663, at *2 (S.D. Fla. Feb. 25, 2022) (quoting *Urquilla-Diaz v. Kaplan U.*, 780 F.3d 1039, 1052 (11th Cir. 2015)). It is well settled that Rule 9(b) applies to actions brought under the FCA. *Jacobs,* 2022 WL 573663, at *3 (citing *Clausen*, 290 F.3d at 1311). To comply with Rule 9(b), a complaint must allege "facts as to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendant's allegedly fraudulent acts, when they occurred, and who engaged in them." *Jacobs,* 2022 WL 573663, at *3 (quoting *Hopper v. Solvay Pharm., Inc.*, 588 F.3d 1318, 1324 (11th Cir. 2009)).

## II.   FACTS ALLEGED IN THE AMENDED COMPLAINT

### A. Coupon Scheme

"To outcompete other retail pharmacies, Walgreens knowingly accepted manufacturer coupons for pharmaceuticals that were clearly marked as ineligible for Medicare patients. This practice, which results in reduced copayments by Medicare beneficiaries and increased profits for Walgreens, constitutes an illegal inducement to Medicare patients to buy name-brand pharmaceuticals rather than less expensive competing brands or generic versions in violation of the Anti-Kickback Statute." ¶¶ 1(1), 28 (citing 42 U.S.C. § 1320a–7b(b)).[2]

---

[2] Unless otherwise noted, the citation "¶" refers to the numbered paragraphs of the Amended Complaint at ECF No. 43.

Medicare Part D is a federally funded prescription drug program primarily aimed at senior citizens, whereby the Centers for Medicare & Medicaid Services (CMS) (part of the U.S. Department of Health and Human Services) contract with private entities—typically insurance companies—known as Part D Plan "Sponsors" to administer prescription drug plans. ¶¶ 29, 32, 35.  According to the Amended Complaint, "When a retail pharmacy dispenses a drug to a Medicare beneficiary, it submits an electronic claim to the beneficiary's Part D Sponsor and receives reimbursement from the Part D Sponsor for the costs not paid by the beneficiary. The Part D Sponsor then notifies CMS that a drug has been purchased and dispensed through a document called a 'Prescription Drug Event' [PDE] record, which includes [information] about the drug dispensed, the prescription, and the payment to the pharmacy." ¶¶ 36, 37. "Each PDE that is submitted to CMS . . . serves as the request for payment for each individual prescription submitted to Medicare under the Part D program." ¶ 40. CMS relies on the PDE record to validate claims and to process payments to the Part D Sponsor. ¶¶ 38, 39. "[I]f a Medicare Part D beneficiary purchases a prescription drug from a pharmacy using a Medicare Part D insurance plan, the Government reimburses the Part D Sponsor for that prescription drug purchase. Therefore, any retail pharmacy that submits a claim for payment to a Part D Sponsor indirectly submits a claim for payment to the Government." ¶ 46.[3]

---

[3] "Compliance with the Anti-Kickback Statute is necessary for Medicare Part D insurance carriers to receive reimbursement under a Medicare Part D program. Claims that are submitted to Medicare in violation of the Anti-Kickback Statute are considered false or fraudulent claims under the FCA. Therefore, a pharmacy that submits a claim for payment to a Medicare Part D insurance carrier that violates the

Medicare Part D beneficiaries would regularly present manufacturer coupons to Walgreens' employees to reduce the copayment for a given prescription drug covered by their Part D Sponsor; Walgreens' employees would regularly process the manufacturer coupons for Medicare Part D beneficiaries despite knowing, based on a warning included on the back of the coupon and a "soft block" in the Walgreens' computer software system, that to do so is a violation of the Anti-Kickback Statute and thus a violation of the FCA; Walgreens' mid-level management would encourage this practice to increase store sales and their contingent bonuses; Walgreens' upper-level management were aware of this practice but failed to implement any mechanism to stop it; and the practice has caused the Government to suffer increased prescription drug prices on a nationwide scale, because Medicare Part D beneficiaries chose more expensive brand name drugs with discounted copayments over cheaper generic prescription drugs with more expensive copayments. ¶¶ 53(a)-(e), 75 (citing Exhibit 9).[4]  The practice has also "caused millions of dollars of kickback-tainted claims to be presented to Government healthcare programs." ¶ 72.

Although customers with private insurance often use pharmaceutical coupons, their use by customers with Government-sponsored plans, such as Medicare Part D, is strictly prohibited. ¶ 73. In September 2014, the U.S. Department of Health and

---

Anti-Kickback Statute is submitting a false claim to the Government for which the pharmacy may be liable under the FCA." ¶¶ 30, 31 (citation omitted).

[4]   Walgreens' computer system "do[es] not contain any 'hard blocks' that would prevent an employee from applying a manufacturer coupon to a Medicare Part D beneficiary's copayment. Occasionally, the system would generate an 'Additional Message' . . . stating 'do not process if government beneficiary,'" but "Walgreens' employees would routinely ignore" this directive. ¶ 68.

Human Services, Office of Inspector General ("HHS OIG") issued a Special Advisory Bulletin ("the 2014 Bulletin") notifying drug manufacturers and pharmacies that pharmaceutical coupons can violate the Anti-Kickback Statute and that sanctions may be imposed against drug makers that issue the coupons and pharmacies that accept the coupons from Part D beneficiaries. ¶¶ 73, 74 (citing Exhibit 8 at 1, n.6) ("The anti-kickback statute makes it a criminal offense to knowingly and willfully offer, pay, solicit, or receive any remuneration to induce or reward the referral or generation of business reimbursable by any Federal health care program.").

Nevertheless, Walgreens "consistently pressured its pharmacy managers to accept these coupons" from Part D customers to prevent the loss of business to other pharmacies that would accept the coupons (¶¶ 80-82), and Walgreens' regional managers "regularly instruct[ed] their employees to ignore the Anti-Kickback Statute" when accepting these coupons from Part D beneficiaries because the regional managers received bonuses based on pharmaceutical drug sales. ¶ 101.

In fiscal year 2021, sales from the Government's Medicare Part D program accounted for approximately 20% of Walgreens' pharmaceutical drug sales in the United States and is expected to increase due to the country's aging population; thus, losing Medicare Part D beneficiary customers to a competing retail pharmacy would substantially affect sales and, by extension, mid-level management bonuses. ¶¶ 22, 103.

Walgreens is obligated to comply with the terms and conditions of the Part D program because "CMS regulations require that all subcontracts between Part D

Sponsors and downstream entities, such as pharmacies, contain language obligating the pharmacy to comply with all applicable federal laws, regulations, and CMS instructions." ¶¶ 47, 48 (citing 42 C.F.R. § 423.505(i)(4)(iv)).  As a subcontractor for the Part D Sponsors, Walgreens is required to comply with the FCA and Anti-Kickback Statute. ¶ 49.

"Even though Walgreens' upper-level management's 'official policy' is to prohibit the Manufacturer Coupon Scheme, it either deliberately ignored that policy or recklessly allowed it to take place . . . [and] [s]ince multiple Walgreens stores across the country utilize the same fraudulent practice with different levels of employees and managers, it can be reasonably inferred that this illegal practice was pervasive and inculcated throughout Walgreens retail stores and all levels of management at the corporate level." ¶ 105.[5]  "Walgreens' upper-level management's late introduction of the soft block to its pharmacies' software system also shows Walgreens' management had actual knowledge of the Manufacturer Coupon Scheme because Walgreens eventually tried to fix it."  ¶ 110.  But, the supposed fix did not stop the scheme because Walgreens included an override feature that could negate the soft block.  ¶ 110.  Thus, Walgreens' upper-level management had actual knowledge of the nationwide scale of the Coupon Scheme and recklessly failed to implement a nationwide policy and software fix to stop it. ¶ 111.

---

[5]  The Amended Complaint cites examples in Florida, Ohio, and New York where Walgreens' employees processed manufacturer coupons for Medicare Part D beneficiaries. ¶¶ 81, 83, 88-96.

### B.  MTM Scheme

Congress requires all Part D Sponsors to offer MTM services to ensure that Part D beneficiaries use their medications safely and effectively. ¶ 114. These services are intended to assist patients with multiple chronic conditions, those that take multiple medications, and those whose annual medication costs exceed a certain level. ¶ 114. However, Part D Sponsors do not offer these services to beneficiaries directly; instead, they contract with vendors, who then work with pharmacies to provide the MTM services to customers. ¶¶ 124, 125.[6]

"To maximize reimbursement from Medicare without incurring necessary pharmacist labor costs, Walgreens knowingly allows and encourages its pharmacists to perform sham MTM services that are not in accordance with industry standards or regulations promulgated by CMS. While these services are supposed to provide Medicare beneficiaries with important counseling services regarding their medications, Walgreens performs these services in such a sham manner that they are 'worthless' within the meaning of the False Claims Act and amount to false claims for payment to the Government." ¶¶ 1(2).

CMS has developed a set of regulations to govern the "strict format" that Part D Sponsors must follow in providing MTM services; these are set forth in The Prescription Drug Benefit Manual. ¶¶ 116, 117, 121, Exhibit 21.[7] CMS "contemplates

---

[6]  Two major vendors in the United States provide the majority of MTM services for Part D Sponsors: Mirixa Corporation and Outcomes, Inc.  ¶ 124.

[7]   The Amended Complaint also attaches publications by the American Pharmacists Association setting industry standards for MTM.  ¶ 129, Exhibits 22, 23.

that the pharmacist and the beneficiary have had a meaningful conversation" to discuss a plan for the beneficiary's medications and that the beneficiary receive a written document summarizing the plan. ¶¶ 120, 121. The Part D Sponsor must also give the beneficiary a Personal Medication List containing relevant, tailored information. ¶ 123.

Under the MTM Scheme, Part D Sponsors subcontract with a vendor that "work[s] with" Walgreens' pharmacists to provide MTM services to its Medicare Part D beneficiaries; Walgreens' managers instruct Walgreens' pharmacists to perform these services in a manner inconsistent with CMS regulations and industry standards; the Government would not compensate Walgreens for these services if it knew how they were being performed; thus, the Government pays for sham MTM services performed by Walgreens' pharmacists on a nationwide scale as well as increased prescription drug costs due to Walgreens' pharmacists abandoning their role as cost managers for the Medicare Part D program. ¶¶ 113(a)-(d), 125.

Once a beneficiary becomes eligible for MTM services, the vendor automatically identifies them and puts their name in a database visible to Walgreens' employees. ¶¶ 126, 127. Walgreens pressures its pharmacists to monitor the database and contact the beneficiaries to persuade them to agree to receive MTM services. ¶ 128. Walgreens then submits a bill to the vendor for the MTM service, which ranges between $50-$100 per service per beneficiary. The vendor then pays Walgreens using funds provided by the Part D Sponsor, which funds have, in turn, been provided by the Government. ¶ 128.

### III.   WALGREENS' ARGUMENTS IN SUPPORT OF DISMISSAL

Walgreens contends that the Coupon Scheme, as alleged in Counts I and II, must be dismissed pursuant to the FCA's public disclosure and first-to-file bars. Specifically, Walgreens claims that the alleged Coupon Scheme "was publicly disclosed in a *qui tam* complaint unsealed more than four years before [Relator] Mosley filed his first complaint in this action, as well as in related news coverage of the same." ECF No. 63 at 8.  According to Walgreens, the Coupon Scheme "was also alleged in another FCA lawsuit [filed by Relator Pharmaleta] that was already pending by the time this case was filed," and so it is barred by the first-to-file rule. *Id.*

Walgreens also claims that the Coupon Scheme alleged in Counts I and II fails because the Amended Complaint does not adequately set forth "Walgreens' supposed role in any kickback arrangement (*i.e.*, whether Walgreens was on the paying or receiving end of a kickback, or something else entirely)," and because the Relators "rely exclusively on a non-binding Government bulletin that expounds on [Anti-Kickback] implications for *drug manufacturers*—not *pharmacies*." *Id.*  Walgreens contends that the Amended Complaint also fails to adequately allege scienter, causation, or a nationwide scheme.  *Id.* at 8-9.

With regard to the alleged MTM scheme in Counts III and IV, Walgreens argues that the Amended Complaint does not adequately allege how the services provided were "worthless" nor how they were paid for by the government.  *Id.*  Finally, Walgreens contends that Counts II and IV do not adequately allege the existence of any false record or statement that is material to a false claim. *Id.* at 9.

# IV.   DISCUSSION

*A. Manufacturer Coupon Scheme*

1. <u>Public Disclosure Bar</u>

The FCA requires a court to dismiss an action or claim if substantially the same allegations were publicly disclosed before the *qui tam* action was initiated. *Crocano*, 615 F. Supp. 3d at 1304 (citing 31 U.S.C. § 3730(e)(4)(A)). The purpose of the public disclosure bar is to eliminate "opportunistic, 'parasitic' lawsuits by late-comers who may have heard of the fraud but played no part in exposing it." *United States ex rel. Osheroff v. Humana, Inc.*, No. 10-24486-CV, 2012 WL 4479072, at \*4 (S.D. Fla. Sept. 28, 2012) (citation omitted), aff'd, 776 F.3d 805 (11th Cir. 2015). An exception exists, however, if the relator is an original source of the information. *Id.*

A three-part inquiry, known as the *Cooper* test,[8] helps courts decide whether the public disclosure bar applies: (1) before the filing of the *qui tam* complaint, had the plaintiff's allegations been publicly disclosed? (2) if so, are the plaintiff's allegations substantially the same as those described in the public disclosure? (3) if yes, is the complaint nonetheless allowed because the relator is an original source of the information? *Crocano*, 615 F. Supp. 3d at 1304 (citing *Osheroff*, 776 F.3d at 812). "Original source" means an individual who either (i) prior to a public disclosure voluntarily disclosed to the Government the information on which allegations are based, or (2) who has knowledge that is independent of and materially adds to the

---

[8] *See Cooper v. Blue Cross Blue Shield of Fla., Inc.*, 19 F.3d 562, 565 n.4 (11th Cir. 1994).

publicly disclosed allegations, and who has voluntarily provided the information to the Government. 31 U.S.C § 3730(e)(4)(B).[9]

Here, Walgreens claims that *Hammoud et al. v. Walgreen Co.,* Case No. 2:12-cv-11733 (E.D. Mich. 2012) was "nearly identical" to the Amended Complaint's allegations regarding the Coupon Scheme, namely Counts I and II. ECF No. 63 at 11-12, 15-18. In their response, the Relators acknowledge the similarities in the cases; they also acknowledge that the government declined to intervene in *Hammoud,* that the case was unsealed, covered in the press, and ultimately dismissed in 2013. ECF No. 72 at 4. Thus, Walgreens has satisfied the first prong of the *Cooper* test.

The Relators claim, however, that Walgreens cannot prevail on the second prong of the *Cooper* test because the allegations in the Amended Complaint are not substantially the same as those in *Hammoud.* In assessing this prong, the Relators urge the Court to rely upon a framework used in *United States ex rel. Gilbert v. Virginia Coll., LLC*, 305 F. Supp. 3d 1315 (N.D. Ala. 2018). In *Gilbert*, the court identified several factors used by the Seventh Circuit to determine substantial sameness, asking whether the complaint 1) presents genuinely new and material information beyond what has been publicly disclosed; 2) alleges a different kind of deceit; 3) requires independent investigation and analysis to reveal any fraudulent

---

[9] At the oral argument of this motion, defense counsel acknowledged that Walgreens bears the burden of proving the applicability of both the public disclosure and first-to-file procedural bars. *See* Transcript at 92. *See also United States ex rel. Urquilla-Diaz v. Kaplan Univ.*, No. 09-20756-CIV, 2017 WL 2992197, at *7, n. 8 (S.D. Fla. July 13, 2017), aff'd 763 F. App'x 908 (11th Cir. 2019) (noting that the 2010 amendment of the FCA lowered the public disclosure bar from jurisdictional to an affirmative defense or basis for dismissal under Rule 12(b)(6)).

14

behavior; 4) involves an entirely different time period than the publicly disclosed allegations; and 5) supplies vital facts not in the public domain. *Id.* at 1321 (citing *Bellevue v. Universal Health Servs. of Hartgrove, Inc.*, 867 F.3d 712, 718–19 (7th Cir. 2017)).[10]

Applying the *Gilbert* factors, I find that the Amended Complaint's allegations regarding Walgreens' response to the 2014 Bulletin constitute new and material information that was not included in the *Hammoud* complaint, and which lend to a heightened inference of scienter by Walgreens. It is significant that the 2014 Bulletin, which was issued after *Hammoud* was dismissed, specifically warned pharmacies that accepting manufacturer coupons from Part D beneficiaries could subject them to sanctions under the FCA. *Id.* at 4-5. Viewed in the light most favorable to the Relators, this Bulletin put Walgreens on notice in a way that did not exist when *Hammoud* was filed and implies both knowledge and a willful disregard given the Amended Complaint's allegations that Walgreens persisted in its practice of accepting these coupons after the Bulletin was issued. *See* ¶¶ 81, 90(a)-(c), 92-96.[11]

Moreover, I find that the allegations in the Amended Complaint required the Relators to conduct an independent investigation because their allegations expand well beyond those in *Hammoud*, both in temporal and geographic scope, and thus,

---

[10]   At oral argument, defense counsel acknowledged that the *Gilbert* factors were "something to consider." *See* Transcript at 128.

[11]   As discussed more fully below, the fact that the Bulletin was directed at manufacturers does not negate the inference that the Bulletin, viewed in the light most favorable to the Relators, put Walgreens, a significant participant in the Part D program, on direct notice that accepting manufacturer coupons could violate the FCA.

they "materially add[ed] to the publicly disclosed allegations." 31 U.S.C § 3730(e)(4)(B). The Amended Complaint alleges that the Coupon Scheme continued after 2013 and occurred in multiple and different locations, namely, Ohio, Florida, and New York, as opposed to just Michigan, as was alleged in *Hammoud*. The Amended Complaint also alleges Walgreens' implementation of a "soft block" in their computer system to purportedly stop the acceptance of these coupons, but which could be overridden (¶¶ 108-111), as well as the availability of a "hard block" which Walgreens chose not to implement (¶¶ 68, 108). Viewed in the light most favorable to Relators, adding a "soft block" indicates that Walgreens knew it could not accept manufacturer coupons from Medicare Part D beneficiaries. These additional allegations constitute new "vital facts" that were absent from the *Hammoud* complaint and were not in the public domain. Simply put, all of these facts differentiate the Amended Complaint from the *Hammoud* complaint in a way that precludes a finding that they are "substantially the same."

Although I need not address the third prong of the *Cooper* test, given my finding that Walgreens has not satisfied its burden at the second prong, I nevertheless find that the Relators are original sources who provided new information that materially adds to the publicly disclosed allegations. This new information is essentially the same as that listed above. The Amended Complaint provides new facts about the knowledge, intent, and motivation of Walgreens' management to perpetuate the scheme which were not included in the *Hammoud* complaint because they occurred after the *Hammoud* case was unsealed, dismissed,

and reported on in 2013. The Relators are the original sources of this new information and therefore, Walgreens has not met its burden of showing that the public disclosure bar applies. *See Jacobs v. Bank of Am. Corp.*, No. 1:15-CV-24585-UU, 2017 WL 2361943, at *7 (S.D. Fla. Mar. 21, 2017) (plaintiff was an original source because he had information that defendants continued using unlawful robo-signed promissory notes even after entering into a consent judgment with the government, thus contributing information "that adds in a significant way to the essential factual background") (citation omitted).[12]

2. <u>First-to File Bar</u>

Walgreens also claims that Counts I and II of the Amended Complaint must be dismissed based on the FCA's first-to-file bar. Under the first-to-file bar, "[w]hen a person brings an action under [the FCA], no person other than the Government may intervene or bring a related action based on the facts underlying the pending action." 31 U.S.C. § 3730(b)(5). "As other courts have observed, the first-to-file bar serves two related purposes: 'to eliminate parasitic plaintiffs who piggyback off the claims of a prior relator, and to encourage legitimate relators to file quickly by protecting the spoils of the first to bring a claim.'" *Cho on behalf of States v. Surgery Partners, Inc.*, 30 F.4th 1035, 1040 (11th Cir. 2022) (citations omitted). The FCA "pursues the 'twin goals' of rewarding whistleblowers for bringing fraud to the

---

[12]  I reject Walgreens' reliance upon the Coupon Scheme claims brought by Relator Pharmaleta in 2017 as yet another prior public disclosure (ECF No. 63 at 12) given that Pharmaleta's action was still under seal when Dr. Mosley filed this lawsuit. *See* Transcript at 98.

government's attention, while seeking to discourage opportunists who would enrich themselves by pursuing fraud the government already knows about." *Id.* at 1041.

It is undisputed that Pharmaleta's sealed action alleging Walgreens' Coupon Scheme in Ohio (ECF No. 63-3) was already pending for five months when on February 20, 2018, Dr. Mosley filed his lawsuit alleging the existence of the Coupon Scheme in Florida and New York, as well as the MTM scheme. ECF No. 1. The question is whether Walgreens has shown that the Coupon Scheme claims in the two actions are sufficiently related and rely on the same essential facts and the same material elements, such that "the later complaint 'alleges a fraudulent scheme the government already would be equipped to investigate based on the first complaint.'" *Cho*, 30 F.4th at 1042 (citation omitted). "[T]he same material elements test creates a framework under which § 3730(b)(5) can still bar a later claim, 'even if the allegations incorporate somewhat different details.'" *Id.* The question is whether the later-filed action "put the government on notice of a broader, more pervasive, or distinct scheme." *Id.* at 1043.

In this regard, *United States ex rel. Heath v. AT&T, Inc.*, 791 F.3d 112 (D.C. Cir. 2015), which the Eleventh Circuit analyzed in *Cho*, is instructive. In *Heath*, the relator initiated two separate actions, but the D.C. Circuit found the later-filed action was not subject to the first-to-file bar because the complaints in the two lawsuits "target[ed] factually distinct types of fraud." *Id.* at 121. In the first action Heath alerted the federal government to a limited scheme by Wisconsin Bell employees who defrauded the government by affirmatively misrepresenting and "openly den[ying]

18

the existence of a state contract" offering lower prices to schools and libraries in Wisconsin. *Id.* Heath's second action alleged "a different and more far-reaching scheme to defraud the federal government through service contracts entered into across the Nation, and then to cover up that fraud." *Id.* Heath's second complaint exposed AT&T's "institutionalized disregard" of the pricing limitation such that the company "refus[ed] to train or even tell its employees" about the pricing mandate and deliberately failed to incorporate the limitation into its billing practices. *Id.* The complaint stated that AT&T then "knowingly concealed those violations to avoid having to reimburse" the government. *Id.* The D.C. Circuit distinguished the first complaint as "disclos[ing] nothing more than the rogue actions of individuals within a single AT&T subsidiary" from the second complaint which exposed "a nationwide scheme centered in AT&T's corporate headquarters of mischarging [a government] program and subsequently concealing those overpayments." *Id.* at 121-22. The appellate court found that nothing in the first complaint would have "pointed the federal government to AT&T's systematic refusal to institutionalize compliance by employees." *Id.* at 122. On these facts, the court held that Heath's later-filed action alleged different material elements of fraud, and thus, was not precluded by the first-to-file bar. *Id.* at 122–23.

The Eleventh Circuit distinguished *Heath*, finding that the two complaints at issue in *Cho* alleged the same essential scheme. In *Cho* a first group of relators filed an FCA complaint under seal in August 2016 against a pain management center and its drug testing laboratory alleging an unlawful patient referral and overbilling

scheme that sought reimbursement from the government. *Cho*, 30 F.4th at 1038-39. Eight months later, while the original case was still pending, the relators in *Cho* filed a similar lawsuit but included the parent company as a defendant. The Eleventh Circuit upheld the dismissal of the second complaint under the first-to-file bar, finding that the second action "[did] not meaningfully expand the scope" of the scheme "or suggest that it was more pervasive" than the original complaint alleged. *Id.* at 1043. The Eleventh Circuit concluded that since the government was already alerted to the scheme, it "would have been equipped to investigate whether any corporate affiliates" were also involved and so dismissal was appropriate. *Id.* at 1044.

Here, I have performed a "side-by-side" comparison of Pharmaleta's original complaint, which was filed under seal in the Northern District of Ohio on September 14, 2017, with the original complaint filed by Dr. Mosley in this Court on February 20, 2018, while the Pharmaleta action was still pending. I am mindful that both complaints allege a scheme whereby Walgreens encouraged employees to accept drug manufacturers' coupons from Part D beneficiaries, in knowing contravention of the 2014 Bulletin and violation of the Anti-Kickback Statute, as a means of increasing Walgreens' business. Nevertheless, I find that Dr. Mosley's complaint does more than merely "incorporate somewhat different details," which the Eleventh Circuit deemed inadequate in *Cho.* Indeed, Dr. Mosley's complaint expands the geographic scope of the scheme thus rendering it "broader and more pervasive" than that alleged in Pharmaleta's action. *Cho*, 30 F.4th at 1043. While the difference between the two

actions may not be as stark as it was in *Heath*, neither is the distinction as narrow as it was in *Cho*.

Here, Pharmaleta's complaint was limited to representative examples of Walgreens' Coupon Scheme as it existed in one specific area of Ohio, whereas Dr. Mosley's complaint significantly broadened the scope of the scheme by providing examples from stores in New York and Florida. ¶¶ 51, 54-58.[13]  Even though the Pharmaleta complaint suggested that it would be reasonable to "extrapolate[]" that Walgreens' "fraudulent practice [was] national in scope and size," I reject this inference because Pharmaleta's factual allegations limited the scheme to "stores in the greater Cleveland area," and primarily to one specific store. ECF No. 63-3 at ¶¶ 5, 40, 45, 46, 48, 52. I am not convinced that the government would have realized the extent of Walgreens' Coupon Scheme without Dr. Mosley's lawsuit. Indeed, the first-to-file bar appears to hinge on whether the second lawsuit "put the government on notice of a broader, more pervasive" scheme (*see Cho,* 30 F.4th at 1043), and here, I find that Walgreens has not met its burden of showing that the government was (or would have become) aware of the scope of the Coupon Scheme absent Dr. Mosley's complaint.  It is also important to note that Pharmaleta's lawsuit was still under seal when Dr. Mosley filed his action, thus eliminating the concern that the later-filed

---

[13]  I further note that Dr. Mosley's lengthy history with Walgreens working in a variety of capacities (as a pharmacy manager, trainer, consultant, and recruiter) had him working for Walgreens in many states throughout the country, thus greatly expanding the scope of his knowledge of the company's history, procedures, and corporate culture.  ECF No. 1 at ¶¶ 10-15.

action simply "piggybacked" on the earlier whistleblower's lawsuit. For these reasons, I find that the first-to-file bar should not result in dismissal of Counts I and II. [14]

   3. <u>Adequacy of Claims</u>

In its motion, Walgreens alleges that the Amended Complaint does not set forth with the specificity required under Rule 9(b) what was "Walgreens' supposed role in any kickback arrangement (i.e., whether Walgreens was on the paying or receiving end of a kickback, or something else entirely)." ECF No. 63 at 8, 21-22. I reject this argument. The Amended Complaint clearly identifies Walgreens as the entity (1) whose pharmacists and store managers unlawfully accepted from Part D beneficiaries the manufacturer's coupons at the point-of-sale and processed the coupons despite knowing that to do so violated the Anti-Kickback Statute; (2) that accepted payment for the coupon from the Part D Sponsor (who then submitted the fraudulent claim to the government); and (3) received kickbacks generated by the Coupon Scheme in the form of "increased profits," "increase[d] store sales," and increased bonuses. ¶¶ 1(1), 36, 40, 53(b), (c), 82, 101. The Amended Complaint is replete with details breaking down each element of the alleged scheme and representative examples of how it was carried out. The allegations are sufficient to satisfy Rule 9(b)'s heightened pleading requirement.

---

[14]  I emphasize that at this phase of the litigation, I must view the facts in the light most favorable to the Relators. The public disclosure bar and original source exception "may involve consideration of matters of fact" that are "more appropriate [for the] summary judgment phase" of this case. *United States ex rel. Ellsworth Assoc., LLP v. CVS Health Corp.*, No. CV 19-2553, 2023 WL 2467170, at *7 (E.D. Pa. Mar. 10, 2023) (citing *United States ex rel. Freedom Unlimited, Inc. v. City of Pittsburgh*, 728 F. App'x 101, 104 (3d Cir. 2018)).

Similarly, I reject Walgreens' claim that the Relators improperly rely upon a "non-binding Government bulletin" describing the legal obligations of "*drug manufacturers—not pharmacies*."  ECF No. 63 at 8. That argument is belied by the language of the 2014 Bulletin itself, which states that

> this Special Advisory Bulletin focuses on the measures used by pharmaceutical manufacturers in connection with the copayment coupons they offer. *However, pharmacies that accept manufacturer coupons for copayments owed by Federal health care program beneficiaries also may be subject to sanctions under the anti-kickback statute, the beneficiary inducement CMP, and the False Claims Act.*

ECF No. 43-8 at 2, n.6 (emphasis added). Given that the Bulletin specifically extended its warnings to pharmacies, and viewing the evidence in the light most favorable to the Relators, I find the Relators' reliance upon the Bulletin to be reasonable. As for the Bulletin's alleged non-enforceability, Walgreens' argument misses the mark. The significance of the 2014 Bulletin is that it put pharmacies, such as Walgreens, on notice that accepting manufacturer coupons from Part D beneficiaries was in violation of the indisputably enforceable Anti-Kickback Statute.

I also reject Walgreens' claim that the Amended Complaint fails to adequately allege scienter, causation, or a nationwide scheme. With regard to scienter, Walgreens incorrectly contends that "there is not a single allegation that Walgreens willfully violated the [Anti-Kickback Statute] by accepting [manufacturer coupons] from Beneficiaries." ECF No. 63 at 24.  It is undisputed that Walgreens' official policy was to reject coupons presented by Part D customers because Walgreens knew that it was unlawful to accept them. *Id.*; *see also* ¶¶ 101, 105. Nevertheless, the Amended Complaint is replete with examples of Walgreens' employees doing just that,

specifically alleging that pharmacy workers would routinely override the computer's soft block to force the system to accept the coupons.

For example, Paragraph 81 details how Dr. Mosley was reprimanded by his district manager when he refused to accept a manufacturer coupon from a Part D customer. "After his reprimand, Dr. Mosley checked the customer's history and saw that the coupon ultimately was accepted by a different Walgreens' pharmacist at the same store during another shift." ¶ 81. The Amended Complaint details five other instances where Dr. Mosley was aware of Walgreens' employees accepting manufacturer coupons from Part D customers despite the coupons containing language explicitly prohibiting these customers from redeeming them. ¶¶ 92-96, Exhibit 14. *See also* ¶¶ 84-90 (similar instances reported by Ms. Swihart).

> Moreover, according to Ms. Swihart (Relator Pharmaleta's sole member),
>
> it was Walgreens' policy that store managers must review every single manufacturer coupon transaction from the previous day to ensure the pharmaceutical manufacturer processed and paid for the coupon . . . During that review process, store managers had to open each customer's patient profile . . . [which] show[ed] the customer was a government beneficiary. Thus, Walgreens' store managers would have actual knowledge of every manufacturer coupon processed by a pharmacy technician or staff-level employee on behalf of a Medicare Part D beneficiary.

¶ 104. These allegations are sufficient to create a plausible inference of scienter, which is bolstered by Walgreens' delay in instituting a "hard block" in their computer software to completely reject these coupons. ¶¶ 107, 108. Viewed in their totality and in the light most favorable to the Relators, these allegations are sufficient to satisfy the willfulness component of the FCA at this stage of the proceedings.

With regard to the causation element, Walgreens claims that the Amended Complaint must allege "that Walgreens would not have filled and submitted claims for brand name drugs *but for* its alleged acceptance of [manufacturer coupons] in violation of the [Anti-Kickback Statute]." ECF No. 63 at 29. In their response, the Relators seem to agree, stating that "When a Walgreens employee accepts a manufacturer coupon from a Medicare Part D beneficiary, the [Anti-Kickback Statute] violation is the but-for cause of Walgreens' subsequent drug claim." ECF No. 72. I find that the Amended Complaint adequately and plausibly alleges that if Walgreens had not accepted the manufacturer coupons from the Part D beneficiaries, those customers would have purchased a generic version of the drug instead, and therefore, Walgreens would not have submitted claims for brand name drugs to the Part D Sponsors who are reimbursed by the government. *See* ¶¶ 1(1), 53 (a)(b)(e), 75, 112. This is sufficient to establish the requisite causation.

With regard to the geographic scope of the Coupon Scheme, Walgreens argues that the Court should dismiss any claims outside of Florida and Ohio because the Amended Complaint alleges only "one-off examples" of stores contravening Walgreens' policy, not a nationwide scheme. ECF No. 63 at 29. On the contrary, it is reasonable to infer that a Walgreens' pharmacist's ability to override the computer system's soft block on these coupons existed nationwide. Moreover, the Amended Complaint alleges numerous instances of Walgreens unlawfully accepting these coupons in Ohio, Florida and New York, and given that Dr. Mosley served as a manager and trainer for Walgreens throughout the country (¶¶ 6-13), I find him to

"have knowledge sufficient to lend the[] allegations the 'indicia of reliability' needed to infer the existence of a nationwide scheme." *United States ex rel. Bibby v. Wells Fargo Bank, N.A.*, 165 F. Supp. 3d 1340, 1347-48 (N.D. Ga. 2015) ("The reasonable inference to draw here is that if the alleged violations of a national VA fee ban were occurring in seven states—including four of the ten most populous states in the nation in Texas, Florida, Georgia, and North Carolina—such conduct is likely to have occurred nationwide.") (collecting cases).

Finally, to the extent Walgreens makes a fleeting argument that the Relators do not adequately allege any false record or statement that is material to the fraudulent claim (ECF No. 63 at 9), I find that the Amended Complaint's factual allegations about the PDE record which Walgreens generates and the Part D Sponsor submits to CMS for payment in violation of the Anti-Kickback Statute is sufficient for Count II to proceed. *See supra,* at 6.

For these reasons, I find that the Relators' claims regarding Walgreens' manufacturer Coupon Scheme (Count I and II) should survive Walgreens' motion to dismiss.

### B. *Medication Therapy Management Scheme*

Walgreens claims that for the Relators to prevail on their claims alleging an MTM scheme, the Relators must prove that Walgreens "sought reimbursement for services that it knew were not just of poor quality but had no medical value." ECF No. 63 at 30 (citing *United States v. Houser*, 754 F.3d 1335, 1348 (11th Cir. 2014). Walgreens notes the absence of any customer complaints about the usefulness or

value of the MTM services Walgreens provided. ECF No. 63 at 31. Moreover, Walgreens argues that the Relators rely exclusively upon "non-binding industry guidance" to support their claim that Walgreens' MTM services are inadequate. *Id.*; *see also* Amended Complaint (ECF No. 43), Exhibit 23. Essentially, Walgreens argues that its pharmacists have discretion in how they perform MTM services and that it should not be subject to a False Claims Act lawsuit because the quality of its services may not meet certain industry recommendations.

Walgreens also argues that the Relators do not adequately allege that any claims for these allegedly worthless services were paid by the government. The Relators' "sole allegation attempting to establish that claims were paid by the Government is a non-specific assertion that Walgreens submits a bill to a vendor for somewhere between $50 and $100 per service per Beneficiary, which is then paid by the Part D sponsor, using funds that were at one point or another provided by the Government;" however, the Relators "do not allege facts . . . such as how or when the Government provided the funds that supposedly paid the claims." ECF No. 63 at 34. There is no allegation that any of the "representative examples" listed in the Amended Complaint were ultimately paid for by the government. *Id.* And the Relators' argument that the government would not have paid for Walgreens' MTM services if it knew the "hasty way" they were performed (ECF No. 72 at 27) is pure speculation.

To plead fraud with the particularity required under Rule 9(b), the plaintiff must allege (1) "the time, place, and content of the alleged misrepresentation," (2)

"the fraudulent scheme," (3) the defendant's fraudulent intent, and (4) the resulting injury. *Chesbrough v. VPA, P.C.,* 655 F.3d 461, 467 (6th Cir. 2011) (citation omitted). A worthless service that has "*no* medical value . . . is the equivalent of no performance at all," so if that service is billed to the government, it may be fraudulent under the FCA because it is effectively submitting a claim for a service that was not actually performed. *Id.* at 468 (emphasis in original).

First, the Amended Complaint fails to allege that Walgreens' provision of MTM services amounted to a fraudulent scheme because the Relators do not allege that Walgreens' compliance with CMS's regulations was a prerequisite for payment of a claim. "Medicare does not require compliance with an industry standard as a prerequisite to payment. Thus, requesting payment for [services] that allegedly did not comply with a particular standard of care does not amount to a 'fraudulent scheme' actionable under the FCA."  *Id.* at 468 ("a relator cannot merely allege that a defendant violated a standard—he or she must allege that compliance with the standard was required to obtain payment."). In any event, the regulations and industry standards alleged in the Amended Complaint are directed to the *Part D Sponsors*, not the pharmacies, such as Walgreens, that actually provide the MTM services. The Relators ignore that Chapter 7 of CMS's Prescription Drug Benefit Manual speaks to what the Part D Sponsor "must," "should," or is "expected" to do. ECF No. 43, Exhibit 21 at 10-14. The Prescription Drug Benefit Manual does not impose any obligations on Walgreens.

28

Second, although the Amended Complaint characterizes the MTM service Walgreens provided as "worthless," this conclusory designation is purely speculative and is not supported by the factual allegations pled. Indeed, the Amended Complaint alleges that following a "rudimentary conversation with the patient," the Walgreens' pharmacist typically prepares "a generic, cut-and-paste Medication Action Plan that gives little advice other than 'take your medication as directed.'"  ¶ 146.  However, the Amended Complaint does not show that the entirety of Walgreens' MTM services had "no medical value" because the Relators only allege deficiencies with regard to the Medical Action Plan, which was only one of three documents the Part D Sponsor is expected to deliver to the beneficiary following his or her consultation session with the pharmacist. ¶¶ 118, 138, 149-158. As Walgreens argues in its motion, "there is no allegation [in the Amended Complaint] that the overall MTM service, rather than, at most, a single document . . . was deficient or had 'no medical value.'"  ECF No. 63 at 33.

Finally, the Amended Complaint is devoid of any allegation that Walgreens or any of the other entities in the MTM service supply chain (i.e., the vendor or Part D Sponsor) submitted any claims for payment to the government. In fact, the Amended Complaint acknowledges that Walgreens is three levels removed from any payment of funds by the government and it does not specify how or when those funds are paid. Notably, the Prescription Drug Benefit Manual states that "CMS considers MTM[ ] services provided to targeted beneficiaries as an administrative cost . . . incident to appropriate drug therapy, and not an additional benefit" offered by the Part D

Sponsor, so it seems unlikely that a separate "false claim" is ever even submitted to the government. ECF 43-21 at 14. Simply put, the Amended Complaint's allegations regarding Walgreens' MTM scheme do not satisfy the specificity requirements of Rule 9(b).

## RECOMMENDATION

Accordingly, I RECOMMEND that Walgreens' Motion to Dismiss (ECF No. 63) be **GRANTED IN PART AND DENIED IN PART** and that Walgreens' Motion to Stay Discovery (ECF No. 64) be **DENIED AS MOOT.** The Coupon Scheme that forms the basis of Counts I and II of the Amended Complaint should survive dismissal and discovery on those claims should proceed; the MTM scheme alleged in Counts III and IV should be dismissed but without prejudice, since I cannot conclude that permitting further amendment would be futile. *See Bryant v. Dupree*, 252 F.3d 1161, 1164 (11th Cir. 2001).

## NOTICE OF RIGHT TO OBJECT

A party shall serve and file written objections, if any, to this Report and Recommendation with the Honorable Beth Bloom, United States District Court Judge for the Southern District of Florida, within **FOURTEEN (14) DAYS** of being served with a copy of this Report and Recommendation. Failure to timely file objections shall constitute a waiver of a party's "right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." 11th Cir. R. 3-1 (2016).

**If counsel do not intend to file objections, they shall file a notice advising the District Court within FIVE DAYS of this Report and Recommendation.**

**DONE and SUBMITTED** in Chambers at West Palm Beach, Palm Beach County, in the Southern District of Florida, this 10th day of May 2023.

_____
BRUCE E. REINHART
UNITED STATES MAGISTRATE JUDGE