UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION


CASE NO. 18-CV-80200-BLOOM/REINHART


UNITED STATES OF AMERICA ex rel.
ELMER MOSLEY, PHARM. D., R. PH. and
PHARMALETA, LLC,

               Plaintiffs/Relators,

v.

WALGREEN CO.,

               Defendant.

_____


**DEFENDANT WALGREEN CO.'S MOTION TO DISMISS THE SECOND
AMENDED COMPLAINT AND SUPPORTING MEMORANDUM OF LAW**

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ............................................................................................. 1

BACKGROUND ................................................................................................................. 2

    A.    Background on MTM Services............................................................................... 2

    B.    Relators' Allegations Regarding MTM Services................................................... 3

    C.    Procedural History .............................................................................................. 3

LEGAL STANDARD.......................................................................................................... 4

ARGUMENT ...................................................................................................................... 5

I.     THE FAC'S FATAL FLAWS PERSIST IN THE SAC, AND THEY REQUIRE
      DISMISSAL ............................................................................................................ 5

    A.    Relators' Continued Inadequate Reliance on Industry Standards Fails................. 6

         1.    Relators Continue to Rely on Industry Standards and Do Not
             Allege Plausibly That Compliance with Those Standards Was a
             Prerequisite to Payment ....................................................................... 6

         2.    Relators Continue to Rely on Regulations and Industry Standards
             Applicable to Part D Sponsors, Not Walgreens......................................... 8

    B.    Relators Still Fail to Allege Plausibly That MTM Services Were
       "Worthless"........................................................................................................ 9

         1.    Relators' Allegations of Worthlessness Are Still Conclusory,
             Speculative, and Not Supported by the Factual Allegations Pled .......... 10

         2.    Relators Still Do Not Allege Plausibly That the Entirety of
             Walgreens' MTM Services Were "Worthless"...................................... 14

    C.    Relators Still Fail to Allege Plausibly Government Payment............................. 14

II.    RELATORS' CLAIMS SHOULD BE DISMISSED ON THE ALTERNATIVE
      BASES RAISED BY WALGREENS IN ITS MOTION TO DISMISS THE FAC ....... 17

III.   PHARMALETA'S CLAIMS SHOULD BE DISMISSED UNDER THE PUBLIC
      DISCLOSURE BAR.............................................................................................. 20

CONCLUSION................................................................................................................. 20

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*U.S. ex rel. Absher v. Momence Meadows Nursing Ctr., Inc.*,
764 F.3d 699 (7th Cir. 2014) ...................................................9

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).........................................................4

*U.S. ex rel. Atkins v. McInteer*,
470 F.3d 1350 (11th Cir. 2006) .............................................5

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)........................................................4

*U.S. ex rel. Buth v. Pharmerica Corp.*,
2014 WL 4355342 (E.D. Wis. Sept. 3, 2014)................................16, 18

*U.S. ex rel. Buth v. Walmart Inc.*,
2021 WL 424160 (E.D. Wis. Feb. 8, 2021)......................................19

*Chesbrough v. VPA, P.C.*,
655 F.3d 461 (6th Cir. 2011) ...............................................6, 9

*Corsello v. Lincare, Inc.*,
428 F.3d 1008 (11th Cir. 2005) .............................................5

*Durham v. Bus. Mgmt. Assocs.*,
847 F.2d 1505 (11th Cir. 1988) ...........................................5

*U.S. ex rel. Fox Rx, Inc. v. Omnicare, Inc.*,
2013 WL 2303768 (N.D. Ga. May 17, 2013)....................................19

*U.S. ex rel. George v. Fresenius Med. Care Holdings, Inc.*,
2015 WL 12819145 (N.D. Ala. Nov. 2, 2015) ................................20

*Harris v. F.D.I.C.*,
885 F. Supp. 2d 1296, 1310 (N.D. Ga. 2012) ..............................5

*U.S. ex rel. McBride v. Halliburton Co.*,
2007 WL 1954441 (D.D.C. July 5, 2007).....................................20

*U.S. ex rel. Schagrin v. LDR Indus., LLC*,
2018 WL 6064699 (N.D. Ill. Nov. 20, 2018) ...............................18

ii

*U.S. v. All Children's Health Sys., Inc.,*
   2013 WL 1651811 (M.D. Fla. Apr. 16, 2013) .........................................................................19

*U.S. v. Houser,*
   754 F.3d 1335 (11th Cir. 2014) .............................................................................................9

*U.S. v. Team Fin., L.L.C.,*
   2019 WL 3943958 (E.D. Tex. Aug. 21, 2019) ..................................................................19

*Universal Health Servs., Inc. v. United States,*
   579 U.S. 176 (2016)...............................................................................................................4

**Statutes**

31 U.S.C. § 3729.........................................................................................................................19

31 U.S.C. § 3730.........................................................................................................................20

**Other Authorities**

42 CFR § 423.153 ...............................................................................................2, 8, 10, 17, 18

42 CFR § 423.308 ...................................................................................................................16

87 Fed. Reg. 79452 (Dec. 27, 2022) .......................................................................................15

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendant Walgreen Co. ("Walgreens") moves to dismiss the Second Amended Complaint (the "SAC").

## PRELIMINARY STATEMENT

Now that the manufacturer coupon claims alleged in the First Amended Complaint (the "FAC") have been dismissed based on the False Claims Act's first-to-file bar, leaving Relators with no ability to amend those claims, the only claims remaining in this litigation are those alleging that Walgreens engaged in a scheme to perform "worthless" Medication Therapy Management ("MTM") services.

This is Relators' third attempt at pleading an MTM scheme. Relators' prior attempt failed when the Court adopted the well-reasoned Report and Recommendation of Magistrate Judge Reinhart and dismissed those claims. The MTM claims were dismissed for three reasons. First, Relators did not establish that compliance with supposed industry standards was a prerequisite to payment, and in any event relied on regulations and industry standards that apply to Part D Sponsors and not pharmacies. Second, Relators failed to allege plausibly that Walgreens performed "worthless" MTM services; at most, they alleged deficiencies in a single type of written deliverable, not the MTM service as a whole. Third, Relators failed to plead that the Government paid claims for MTM services.

The SAC tweaks language from the FAC and adds a few new allegations and exhibits, but none of these changes can salvage the MTM claims. The same deficiencies remain. Relators still fail to identify how compliance with purported industry standards is a prerequisite to payment, and still rely on regulations and industry guidance directed to Part D Sponsors and not pharmacies. Relators still make conclusory allegations as to worthlessness and premise their claims on allegedly inadequate Medication Action Plans ("MAPs"), making no mention of any deficiencies in other written components of the service. Relators still do not allege that any claims for specific MTM services are actually submitted to the Government (because they are not), or that the Government actually pays for any specific MTM services (because it does not).

After filing their original complaint in 2018, Relators failed to convince the United States to intervene, and now have failed multiple times to plead a viable MTM claim. More than five years into this litigation, enough is enough. The Court should again dismiss these claims, and the dismissal should be with prejudice.

## BACKGROUND

### A.    Background on MTM Services

Medicare Part D Sponsors are required to offer MTM services to "targeted" Part D beneficiaries ("Beneficiaries") who (1) have multiple chronic diseases, (2) are taking multiple Part D drugs, and (3) are likely to incur annual Part D drug costs exceeding a statutory threshold. 42 CFR § 423.153(d)(2); *see* SAC ¶¶ 43–45.  Part D Sponsors generally contract with and pay downstream vendors to deliver MTM services, who in turn contract with and pay providers, such as Walgreens, to perform MTM services.  *See* SAC ¶¶ 61–68.

Regulations require that Part D Sponsors offer to provide targeted Beneficiaries with a Comprehensive Medication Review ("CMR") on an annual basis.  42 CFR § 423.153(d)(1)(vii)(B).  If a targeted Beneficiary elects to participate in a CMR, that interaction "*[m]ay* result in a recommended medication action plan," 42 CFR § 423.153(d)(1)(vii)(B)(1)(ii) (emphasis added), which may be used to discuss "medication-related problems," if and when such problems "have been identified and prioritized" during a CMR, SAC Ex. 6 at 24.  Targeted Beneficiaries who opt to undergo a CMR also should receive a "CMR Cover Letter" and "Personal Medication List."  *See, e.g.*, SAC Ex. 3 at 2.  These documents have value in and of themselves (particularly the Personal Medication List, which provides the Beneficiary in one complete document a list of all of their medications, what they are used for, how to take them, drug allergies, etc.).  *See, e.g.*, SAC ¶¶ 47, 60; SAC Ex. 1; SAC Ex. 3 at 3, 20–31; SAC Ex. 6 at 23–24.

The Centers for Medicare & Medicaid Services ("CMS") regulations do not specify, or even suggest, any particular amount of time that must be spent on a CMR (or on any MTM services) or how detailed a MAP should be.  *See generally* 42 CFR § 423.153(d).  Indeed, the regulations impose only high-level obligations on a Part D Sponsor with respect to its MTM program, such as: (1) that it ensures optimum therapeutic outcomes for targeted Beneficiaries through improved medication use; (2) that it reduces risk of adverse events; (3) that it is developed in cooperation with licensed physicians and pharmacists; and (4) that it offers a "minimum level" of MTM services, including action plans and summaries that comply with CMS' formatting requirements, as well as an annual CMR (which requires only an interactive consultation that "may" result in a MAP, and a written summary thereof).  *Id.*; *see* SAC ¶ 44. Further, the Prescription Drug Benefit Manual (directed to Part D Sponsors) only provides

guidance at a high level as to what Part D Sponsors are "expected" to include in MTM services, again not mentioning how long a CMR (or any other MTM service) should take or any detail about MAPs (other than that a MAP is a potential component of "an individualized written 'take-away'"). SAC Ex. 2 at 12–14. Rather, deciding how to execute MTM services is left up to the Part D Sponsors. And although Part D Sponsors must attest that their MTM programs comply with the relevant regulations, *see* SAC Ex. 4 at 37–38, there is never a claim submitted to the Government for any specific MTM service, let alone any certification regarding a claim for a specific MTM service.

### B. Relators' Allegations Regarding MTM Services

Relators continue to allege that Walgreens encouraged its pharmacists to perform "sham" MTM services that were so lacking in quality and duration that they were "worthless," all so that Walgreens could boost revenue from MTM sales. SAC ¶¶ 92–105.[1] Because Walgreens' CMR services were "worthless," so Relators' theory goes, Walgreens' claims to MTM vendors such as Mirixa Corporation or Outcomes, Inc. for payment for those services were false under the FCA.

However, Relators do not add anything to the SAC that would save their claims from being dismissed for the same reasons that the FAC's MTM claims were dismissed—Relators still have not established that compliance with supposed industry standards was a prerequisite to payment and rely on regulations and industry standards that apply to Part D Sponsors and not pharmacies; Relators still fail to allege plausibly that Walgreens performed "worthless" MTM services, at most alleging deficiencies in a single type of written deliverable, not the MTM service as a whole; and Relators still fail to adequately plead that the Government pays claims for MTM services.

### C. Procedural History

Mosley filed the first complaint in this case on February 20, 2018, alleging the MTM scheme and another scheme involving Walgreens' alleged acceptance of manufacturer coupons from Part D Beneficiaries (the "MC claims"). ECF No. 1 (the "Original Complaint"). The Government declined to intervene on July 18, 2022, ECF No. 39, and the Original Complaint

---

[1] Relators' allegations are focused nearly exclusively on CMRs, and Relators do not appear to allege that Targeted Medication Reviews, or "TMRs," were "worthless." "[T]he TMR is distinct from a CMR because it is focused on specific actual or potential medication-related problems," as opposed to a "comprehensive" CMR. SAC Ex. 4 at 13.

was unsealed on August 1, 2022, ECF No. 40.  On October 25, 2022, Relators filed the FAC in this action, adding Pharmaleta as a Relator.  ECF No. 43.  In the FAC, no factual allegations pertaining to the MTM claims were made specifically by Pharmaleta—only Mosley.  *See, e.g.*, *id.* ¶ 113 (under "Framework of the Scheme" heading, alleging that "*According to Dr. Mosley*, as he disclosed to the Government prior to filing his claims, Walgreens has caused false claims to be submitted to Medicare by performing and billing for sham, worthless [MTM] services." (emphasis added)).

On January 18, 2023, Walgreens moved to dismiss the FAC.  ECF No. 63.  On May 10, 2023, Magistrate Judge Reinhart recommended dismissal of the MTM claims, but not the MC claims.  ECF No. 86 (the "R&R").  Relators did not object to the R&R—including to the extent that it recommended dismissal of the MTM claims, ECF No. 87—but Walgreens objected to the R&R insofar as it recommended against dismissal of the MC claims, ECF No. 90.  On August 8, 2023, the Court dismissed all claims—adopting the R&R as it relates to the MTM claims and finding Magistrate Judge Reinhart's analysis of those claims to be "well reasoned."  ECF No. 102.  Relators filed the SAC, containing MTM claims only, on October 19, 2023.  ECF No. 114.

## LEGAL STANDARD

To survive a motion to dismiss, the complaint must contain sufficient factual information to "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Plausibility requires more than a "sheer possibility that a defendant has acted unlawfully," and a complaint alleging facts that are "merely consistent with" liability "stops short of the line between possibility and plausibility of 'entitlement to relief.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 557–58).  The allegations must nudge the claim "across the line from conceivable to plausible."  *Twombly*, 550 U.S. at 570.  That standard is met only by factual allegations that allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*  Therefore, a claim has facial plausibility when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*

Because Relators' claims are premised on allegations of fraud under the FCA, they are subject to the heightened pleading requirements of Rule 9(b).  *See, e.g.*, *Universal Health Servs.,*

*Inc. v. United States*, 579 U.S. 176, 195 n.6 (2016)).  Under Rule 9(b), a plaintiff "alleging fraud . . . must state with particularity the circumstances constituting fraud," Fed. R. Civ. P. 9(b), including the "'who,' 'what,' 'when,' 'where,' and 'how,'" *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005).  "The particularity rule serves an important purpose in fraud actions by alerting defendants to the 'precise misconduct with which they are charged' and protecting defendants 'against spurious charges of immoral and fraudulent behavior.'"  *U.S. ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1359 (11th Cir. 2006) (quoting *Durham v. Bus. Mgmt. Assocs.*, 847 F.2d 1505, 1511 (11th Cir. 1988)); *see also Harris v. F.D.I.C.*, 885 F. Supp. 2d 1296, 1310 (N.D. Ga. 2012) ("Despite the Court having granted Plaintiffs leave to amend their original Complaint to plead fraud with the particularly required by Rule 9(b), Plaintiffs have failed to do so . . . . This claim, therefore, is due to be dismissed.").

## ARGUMENT

### I.   THE FAC'S FATAL FLAWS PERSIST IN THE SAC, AND THEY REQUIRE DISMISSAL

In the portion of the R&R addressing the MTM claims, which the Court found "well reasoned" and adopted in its entirety, Magistrate Judge Reinhart provided three grounds for his dismissal recommendation.

*First*, Relators did not "allege that Walgreens' compliance with CMS's regulations [or purported industry standards] was a prerequisite for payment of a claim."  R&R at 28.  And those regulations and standards were "directed to the *Part D Sponsors*, not the pharmacies, such as Walgreens, that actually provide the MTM services."  *Id.*  The Prescription Drug Benefit Manual, upon which Relators relied, did "not impose any obligations on Walgreens."  *Id.*

*Second*, Relators' claim that Walgreens' MTM services were "worthless" was "not supported by the factual allegations pled"—indeed, it was "purely speculative."  *Id.* at 29.  Rather than alleging that "the entirety of Walgreens' MTM services had no medical value," Relators cited flaws only in MAPs—"only one of three documents the Part D Sponsor is expected to deliver to the beneficiary following his or her consultation session with the pharmacist."  *Id*.

*Third*, the R&R concluded that "the [FAC] is devoid of any allegation that Walgreens or any of the other entities in the MTM service supply chain (*i.e.*, the vendor or Part D Sponsor) submitted any claims for payment to the government," and that because "'CMS considers MTM[] services provided to targeted beneficiaries as an administrative cost . . . incident to

appropriate drug therapy, and not an additional benefit' offered by the Part D Sponsor, . . . it seems unlikely that a separate 'false claim' is ever even submitted to the government." *Id.* at 29–30 (second alteration and first omission in original).

Magistrate Judge Reinhart's observations apply with equal force to the SAC, because Relators fail to remedy these deficiencies. The SAC therefore must be dismissed for the same reasons that supported dismissal of the FAC.

### A.   Relators' Continued Inadequate Reliance on Industry Standards Fails

### 1.   Relators Continue to Rely on Industry Standards and Do Not Allege That Compliance with Those Standards Was a Prerequisite to Payment

In a finding that Relators did not challenge, the FAC was dismissed in part because "Relators [did] not allege that Walgreens' compliance with CMS's regulations [or purported industry standards] was a prerequisite for payment of a claim." R&R at 28. In spite of their apparent recognition of that infirmity in the FAC, Relators still fail to make any plausible allegation that compliance with certain CMS regulations and industry guidance was a prerequisite for any payment that was made or flowed to Walgreens. *See Chesbrough v. VPA, P.C.*, 655 F.3d 461, 468 (6th Cir. 2011) ("Medicare does not require compliance with an industry standard as a prerequisite to payment. Thus, requesting payment for tests that allegedly did not comply with a particular standard of care does not amount to a 'fraudulent scheme' actionable under the FCA."). Instead, they point to two CMS documents that mention "industry standards," but neither of these documents overcomes the shortcomings previously found in the FAC.[2]

Relators first quote "Instructions for Implementing the Standardized Format," SAC Ex. 3, a document that describes how the written summary of a CMR using the "Standardized Format" should be completed. According to Relators, these instructions state "that use of the format is subject to all applicable rules, regulations, and industry standards." SAC ¶ 75 (emphasis removed) (citing SAC Ex. 3 at 2). However, this sentence in the instructions relates only and specifically to the *use of* the Standardized Format as a document, specifically referencing HIPAA

---

[2] Relators otherwise largely point to the same portions of the same "industry standards" as they did in the FAC in support of their allegation that "[p]roperly performing MTM services, especially CMRs, takes a great deal of time and effort," SAC ¶ 75. *See* SAC Exs. 5, 6; SAC ¶¶ 75–91. These "industry standards" are non-binding guidance from trade associations—not a set of guidelines set forth by CMS.

and Section 508 of the Rehabilitation Act (relating to accessibility for people with disabilities). It has nothing to do with supposed industry standards for Part D Sponsors or pharmacies completing CMRs or any other MTM services, much less demonstrate that compliance with those supposed industry standards is a prerequisite to payment.

Relators also point to a memorandum from CMS to "All Part D Sponsors" (not to pharmacies such as Walgreens) in support of an allegation that "CMS advises Part D Sponsors to refer to industry publications . . . for examples of industry standards of care for delivering MTMs and CMRs." *Id.* (emphasis removed). However, not only was this memorandum simple "guidance" directed to Part D Sponsors and not pharmacies such as Walgreens, but it merely notes that CMS "expect[s]" CMRs to meet its professional service definition, and "encourages" Part D Sponsors to "review" two documents "for examples of industry standards." SAC Ex. 4 at 9. It does not establish that compliance with those sample standards is a prerequisite to payment.

Relators also add to the SAC lengthy quotations from purported industry standards pertaining to supposed documentation requirements and justifications therefor, as well as Walgreens' MTM Policy and Procedures consistent with those standards. SAC ¶¶ 88–90. These documents also fail to move the needle. Relators' Representative Examples show that Walgreens satisfied these purported industry standards and Walgreens' own policy. *See infra* Section I.B.1.[3] Moreover, these documents do not demonstrate that compliance with the purported industry standards was a prerequisite for payment. Relators also cite Walgreens training materials estimating that it will take 38 minutes to complete a CMR service, SAC ¶ 86, which is consistent with the estimates (not requirements) set forth in the Guidebook, SAC Ex. 6 at 7. Yet again, however, Relators do not allege plausibly that compliance with these purported standards or training materials is a prerequisite to payment.

_____

[3] Relators cite SAC Exhibit 7, a Walgreens MTM Policy and Procedures document, for the proposition that, "per Walgreens' own policy, in order for a CMR to be deemed 'of good quality' and 'successful,' *it must include the identification of a medication therapy issue during the medication therapy assessment*, the completion of a MAP that contains any action items for the beneficiary, and follow-up with the beneficiary after the CMR to see if the therapy issue has resolved." SAC ¶ 91 (emphasis added). Relators suggest that this policy, contrary to the other exhibits they cite, requires Walgreens to identify a medication therapy issue, *even if there is no medication therapy issue*. That interpretation of an arguably ambiguous policy is nonsensical because it would require providers to perform an unnecessary service.

**2.      Relators Continue to Rely on Regulations and Industry Standards Applicable to Part D Sponsors, Not Walgreens**

Magistrate Judge Reinhart recommended dismissal of the MTM claims in the FAC in part because "the regulations and industry standards alleged in the [FAC] are directed to the *Part D Sponsors*, not the pharmacies, such as Walgreens, that actually provide the MTM services." R&R at 28.  Despite having failed to object to that ruling, Relators continue to rely on regulations and industry guidance directed to Part D Sponsors, not Walgreens.  In the SAC, Relators point to regulations stating that Part D Sponsors' MTM programs must offer a "minimum" level of MTM services.  SAC ¶¶ 48, 128.  For CMRs, this "minimum" level is an interactive consultation that "may" result in a MAP, and a written summary thereof.  42 CFR § 423.153(d)(vii)(B); *see* SAC ¶ 49.  This regulation, however, is applicable to Part D Sponsors, not Walgreens.  But even if it were applicable to Walgreens, this regulation does not help Relators—it establishes only a *minimum level* of MTM services, and nothing in the SAC supports a conclusion that Walgreens failed to provide at least that level of MTM services.  *See infra* Section I.B.

Relators also continue to rely on the Prescription Drug Benefit Manual, which provides that one of three "minimum" components of a CMR that Part D Sponsors are "expected" to offer is the "[i]mplementation of a systematic process to summarize the interactive consultation and provide an individualized written 'take-away' to the beneficiary such as a personal medication record, reconciled medication list, action plan, recommendations for monitoring, education, or self-management, etc."  SAC ¶ 52 (quoting SAC Ex. 2 at 12–13).  However, Magistrate Judge Reinhart expressly found Relators' reliance on the Prescription Drug Benefit Manual to be inadequate, given that the document is directed to Part D Sponsors and not Walgreens.  R&R at 28 ("The Relators ignore that Chapter 7 of CMS's Prescription Drug Benefit Manual speaks to what the Part D Sponsor 'must,' 'should,' or is 'expected' to do.  The Prescription Drug Benefit Manual does not impose any obligations on Walgreens." (citation omitted)).  And even if it does apply to Walgreens, just like the "minimum" level of MTM services required by the MTM regulations discussed above, Relators fail to allege plausibly that Walgreens failed to meet these obligations.  *See infra* Section I.B.

### B. Relators Still Fail to Allege Plausibly That MTM Services Were "Worthless"[4]

Relators' claims also must be dismissed because Relators still fail to allege facts plausibly showing that Walgreens' MTM services were "worthless," just as Magistrate Judge Reinhart found regarding the FAC. To prevail on this theory, the defendant must have "sought reimbursement for services that it knew were not just of poor quality but had no medical value." *U.S. v. Houser*, 754 F.3d 1335, 1348 (11th Cir. 2014) (citing *Chesbrough*, 655 F.3d at 468). "*[A] 'diminished value' of services theory does not satisfy this standard*. Services that are 'worth less' are not 'worthless.'" *U.S. ex rel. Absher v. Momence Meadows Nursing Ctr., Inc.*, 764 F.3d 699, 710 (7th Cir. 2014) (emphasis added). Tellingly, Relators still do not allege that any Medicare Part D covered recipients of MTM services ever complained about the usefulness or value of them, nor do they allege that any recipients ever suffered harm because of inadequacies with those services (despite now alleging that "MTM programs function as critical safeguards"; that "[p]harmacists . . . act as gatekeep[er]s to assess whether beneficiaries are taking their medications effectively or are at risk of adverse drug interactions or are otherwise not optimizing the benefits of the drugs to treat their conditions"; and that "MTM programs serve a preventative function by reducing the incidence of emergency room or acute care visits," SAC ¶ 46). Instead, Relators point to a variety of anecdotes, none of which—even if true—comes

---

[4] Relators' theory of liability is a worthless services theory, not a false certification theory. *See generally* SAC; *see also* ECF No. 72 (Relators' Opposition to Walgreens' Motion to Dismiss FAC) at 20. Nevertheless, even if Relators were proceeding under a false certification theory, their claims still would fail. Relators do not allege that Part D Sponsors (or anyone else, such as Walgreens) certifies to the Government compliance with anything pertaining to MTM services in connection with receiving funds. And although the SAC alleges that Walgreens agrees, in its agreement with Outcomes, "to comply with all federal and state laws and any written compliance policies and procedures and standards of conduct made available by Outcomes, or comparable policies, procedures, or standards of conduct of its own that meet applicable CMS requirements," Outcomes MTM Network Participation Agreement, *available at* https://www.outcomesmtm.com/wp-content/uploads/2018/02/MTM_Network_Agreement_Online_20170703.pdf; *see* SAC ¶ 72 (referring to the language of the agreement, but incorrectly adding "for the provision of MTM services"), neither Walgreens nor Part D Sponsors submit claims for reimbursement of specific MTM services to the Government. Accordingly, there is no certification made in connection with (non-existent) claims data. *See infra* Section I.C. Indeed, Part D Sponsors must attest only that their MTM programs as a whole comply with the minimal statutory and regulatory requirements, not that any particular MTM service complied with any purported requirements. *See* SAC Ex. 4 at 37–38.

close to adequately alleging that MTM services furnished by Walgreens pharmacists were worthless.

**1.      Relators' Allegations of Worthlessness Are Still Conclusory, Speculative, and Not Supported by the Factual Allegations Pled**

As Magistrate Judge Reinhart concluded in the R&R, "although the [FAC] characterizes the MTM service Walgreens provided as 'worthless,' this conclusory designation is purely speculative and is not supported by the factual allegations pled."  R&R at 29.  These deficiencies persist in the SAC.

Although their theory of liability rests largely on allegedly inadequate MAPs, Relators still do not address the fact that CMS regulations do not even require a MAP to be completed in the first place, stating only that a CMR "*may*" result in a MAP.  42 CFR § 423.153(d)(vii)(B)(1)(ii) (emphasis added).  Nor do Relators acknowledge that two of their new exhibits contain similar language reinforcing the point.  *See* SAC Ex. 3 at 1 ("The CMR must also include a review of the individual's medications, which *may* result in the creation of a recommended medication action plan with a written or printed summary of the results of the review provided to the targeted individual." (emphasis added)); SAC Ex. 4 at 8 ("The beneficiary's CMR must include an interactive, person-to-person, or telehealth consultation performed by a pharmacist or other qualified provider; and *may* result in a recommended medication action plan." (emphasis added)).  Nevertheless, Relators now claim that allegedly inadequate MAPs demonstrate that the entire consultation was worthless.  SAC ¶¶ 87, 106.  These allegations are illogical and fail to state a claim.

Relators rely on mostly the same speculative allegations and Representative Examples that were insufficient to save the FAC from dismissal.  For four of the Representative Examples (1, 2, 3, and 5), there was an affirmative finding of no medication-related problems.  SAC Ex. 13 at 1, 12, 22, 47.  The MAPs reflect the conversation that took place during the consultation session, during which the pharmacist and patient talked about creating a list of medications the patient is taking, why the patient uses each medication, and the best way to take them.  These MAPs further instructed the patients to take their medication as directed to get the most use from them, and to talk to the pharmacist if there are changes to their medications or if they have any questions.  Far from being "not customized to the patients" and "demonstrating that the consultations on the whole were worthless," SAC ¶ 123, these MAPs are entirely consistent with the Instructions for Implementing the Standardized Format—an exhibit new to the SAC—which

10

says that a MAP "may also include acknowledgement and reinforcement of favorable behaviors."  SAC ¶ 57 (quoting SAC Ex. 3 at 15).  Indeed, as the Instructions for Implementing the Standardized Format recognize, "[t]here may be CMRs that do not identify issues of current drug therapy or beneficiary specific action items.  The standardized format allows plan sponsors to enter other statements into a new MAP as appropriate for the beneficiary, such as reinforcing compliance, maintaining beneficiary's actions, and acknowledging beneficiary success in his/her medication therapy."  SAC Ex. 3 at 15; *see* SAC ¶ 58.[5]  For these Representative Examples, that is exactly what Walgreens did.

For the other three Representative Examples (4, 6, and 7), medication-related problems were identified.[6]  SAC Ex. 13 at 35, 63, 74–75.  For these, there are specific notes as to what was discussed pertaining to those issues—all of which were simple "adherence" issues (*i.e.*, patients not adhering to their medication regimen)—reflecting that Walgreens "determine[d] the most important activities for the beneficiary based on the beneficiary's concerns, the therapeutic need, and the beneficiary's ability to understand and complete the recommended activities."  *See* SAC ¶ 57 (quoting SAC Ex. 3 at 15).[7]  Relators complain that these MAPs did not contain enough

---

[5] The Instructions for Implementing the Standardized Format also note that "[b]lank action items may be deleted."  SAC Ex. 3 at 15.  Accordingly, even if Walgreens filled nothing in for these MAPs and simply deleted the spaces for action items, it *still* would be consistent with these instructions.

[6] Further, Representative Examples 4, 6, and 7 may not even relate to Part D MTM services at all.  In contrast to Representative Examples 1, 2, 3, and 5, these Representative Examples do not reference MTM or a CMR (or TMR) at all, and instead were delivered as part of an "SSI Performance Network Program," "Pharmacy Advisor Commercial Program," and "CVSC Performance Network Program."  SAC Ex. 13 at 32, 39, 61, 69, 70, 76.  Relators do not explain what these programs are, let alone if they even pertain to Part D MTM services in the first place.

[7] In Representative Example 4, the document notes that the pharmacist confirmed two adherence issues and that the patient agreed to modify their behavior to take the medication as directed.

In Representative Example 6, the document notes that the pharmacist confirmed adherence issues with two medications, that the pharmacist filled the medications, and that the patient already picked up the medication (*i.e.*, prior to the telephone MTM consultation).

In Representative Example 7, the document notes that the patient understood the value of the medication, and further notes that the patient had no concerns.  The document also notes that the pharmacist suggested engaging a caregiver's assistance in medication administration, and that the patient stated her blood pressure and glucose were under control such that she was no longer taking her medications.  The Assessment and Plan were not "completely blank," SAC ¶ 122, but note that the patient's medications were filled the previous month, and that "[t]he plan is to

detail, but as their own exhibit new to the SAC (the Instructions for Implementing the Standardized Format) notes, "[t]he MAP **should not include detailed action plans of the MTM provider** and is not intended to be a template for communications with other healthcare providers."  SAC Ex. 3 at 15 (emphasis added).  Recognizing that this instruction undermines their claims, Relators misleadingly omitted this language when quoting the sentences immediately before and after it.  *See* SAC ¶ 57.

All of the Representative Examples reflect "tailored" information, *see* SAC ¶ 54, and Relators still do not allege what should have been done differently that would have rendered them *not* "worthless," particularly in light of the affirmative findings and notes as to medication-related issues or lack thereof.  Moreover, Relators do not offer any explanation as to why these claims were approved and paid if the MAPs allegedly demonstrated that the services were "worthless."

Beyond the Representative Examples, Relators' new allegations fare no better.  Relators now allege that pharmacy and store manager bonuses were "tied" to the number of MTM services performed (although they do not allege how or the extent to which MTM services impacted bonuses or the size of bonuses attributable to MTM services), and that stores would get monthly progress statements showing how many MTM services they performed.  *Id.* ¶¶ 96, 98.[8]  However, Walgreens encouraging its employees to perform MTM services is entirely consistent with the Government's stated goal of increasing the volume of MTM services, as discussed in Relators' own exhibits.  *See, e.g.*, SAC Ex. 4 at 8 ("Plan sponsors are expected to actively engage beneficiaries to increase the number of CMRs delivered to MTM enrollees, not just 'offer' CMRs."); SAC Ex. 6 at 5–6 (discussing how pharmacists should "identify and recruit"

---

follow up with patient's medication, counsel and ensure patient [is] compliant."  The MAP also shows that the pharmacist and patient talked about "[m]edication adherence for optimum outcome," and that the patient needs to refill the medication three days before the next refill.

[8] Just like in the FAC, SAC Exhibit 9 (erroneously identified in the SAC as Exhibit 25) actually undermines Relators' claims that pharmacists were under such "immense pressure" to complete MTM services that they could not possibly have completed the services adequately.  The email notes that each store in that district was expected to complete only *$200* in MTM claims per month.  Given Relators' allegation that each MTM service generates $50 to $100, SAC ¶ 70, SAC Exhibit 9 reveals that the sender of the email expected those stores to only complete *two to four MTM services per month*—a far cry from the "immense pressure" alleged.  *See also* SAC Exhibit 8 at 1–7 ("expectation" of $2,000 in claims per year or $200 in claims per month).

MTM patients).[9]  Relators also allege that Walgreens has identified labor as one of the challenges facing its stores in providing MTM services and that pharmacists "cut corners" to meet MTM demand.  SAC ¶¶ 95, 100.  Even if true, this conclusory allegation could at most help support a conclusion that some MTM services may have been "worth less," not a conclusion that MTM services were entirely "worthless," which is what Relators must allege to state a claim.

In support of their allegations about "inadequate instruction" (which are largely identical to the allegations in the FAC that were previously found inadequate), Relators also attach as an exhibit to the SAC a single page from a Walgreens MTM Pharmacist Training slide deck, which observes that certain components of a CMR can be completed "on the fly" if the pharmacist has "[s]pen[t] 5-10 minutes filling out the CMR worksheet before the patient arrives to pick up their script."  *Id.* ¶ 102; SAC Ex. 12.  But that instruction is consistent with the Prescription Drug Benefit Manual, which says (in an instruction directed to Part D Sponsors, not pharmacies) that "[r]eview of medications to assess medication use and identify medication-related problems . . . may be conducted . . . 'behind the scenes' by a qualified provider and/or using computerized, clinical algorithms."  SAC Ex. 2 at 13.

Next, Pharmaleta/Swihart makes an allegation that was inexplicably absent from the FAC (along with any other MTM-related allegations specifically by Pharmaleta/Swihart, *see infra* Section III) concerning alleged pressure by Walgreens for employees to rush MTM services.  SAC ¶ 104.  This allegation does not specify whether it even pertains to CMRs in the first place; it may well relate to other MTM services such as TMRs, which do *not* include a comprehensive review of medications and take less time to complete.  *See, e.g.*, SAC Ex. 4 at 13 (noting that a TMR is "focused on specific actual or potential medication-related problems," as compared to a "comprehensive" CMR).  But even if the allegations in this paragraph pertain to CMRs, they do not materially add to the allegations in Paragraph 103, which were insufficient to state a claim in

---

[9] Relators also repeat the "sales pressure" allegations that were in the FAC about a system allegedly requiring lesser performing stores to reach out to higher performing stores to determine how to do better, a friendly "March Madness" competition that took place in one month in 2014 in a single county in Florida, and pizza parties, jeans days, and paid time off for the highest performing stores.  SAC ¶¶ 97, 99.  These allegations were insufficient to save the FAC from dismissal and are insufficient here.

the FAC.  Further, the allegation that certain patients never received paperwork is inconsistent with the Representative Examples, which reflect that paperwork was sent to patients.[10]

### 2.    Relators Still Do Not Allege Plausibly That the Entirety of Walgreens' MTM Services Were "Worthless"

Even if Relators were to show that some examples of MAPs were worthless (and they have not alleged facts that would allow them to do so), that would not support the conclusion that MTM services as a whole were worthless.  Indeed, as the R&R concluded, "the [FAC] does not show that the entirety of Walgreens' MTM services had 'no medical value' because the Relators only allege deficiencies with regard to the Medica[tion] Action Plan, which was only one of three documents the Part D Sponsor is expected to deliver to the beneficiary following his or her consultation session with the pharmacist."  R&R at 29.  As Relators acknowledge, a personalized medication list and CMR cover letter are also created in connection with a CMR, as contemplated by the Standardized Format.  *See, e.g.*, SAC ¶ 53.  And as the SAC and its exhibits demonstrate, the medication list has value in and of itself, to the extent it provides the Beneficiary in one complete document (including for use at appointments with other healthcare providers) a list of all of their medications, what they are used for, how to take them, drug allergies, etc.  *See, e.g., id.* ¶¶ 47, 60; SAC Ex. 1; SAC Ex. 3 at 3, 20–31; SAC Ex. 6 at 23–24.  Yet, Relators still do not allege (nor can they) that the personalized medication lists (or the cover letters) that Walgreens prepared were worthless.[11]

### C.    Relators Still Fail to Allege Plausibly Government Payment

Lastly, even though the R&R concluded that because MTM services are an administrative cost, and therefore that "it seems unlikely that a separate 'false claim' is ever even

---

[10] Even if true, and even if related to CMRs, this anecdote involving a single supervisor is inconsistent with the Walgreens training cited by Relators, which emphasizes in bold that "**[a]ll elements of a traditional CMR must be completed in order for the in-line CMR to be considered to be of high quality**," SAC Ex. 11 at 2, and cannot plausibly support Relators' allegation of a nationwide scheme to provide worthless MTM services.

[11] Relators allege that the Instructions for Implementing the Standardized Format state that, "[a]lthough the [medication list] may initially be populated with information from claims data, EMRs, or other data files, there should be a verification step by the MTM provider with the beneficiary," and that "[t]his step may also identify adherence concerns to be addressed in the MAP."  SAC ¶ 60 (quoting SAC Ex. 3 at 5).  However, Relators do not allege that Walgreens did not perform this "verification" step, that this verification step was required for any claims to be paid, or that any medication lists were worthless or even deficient.

submitted to the government," R&R at 29–30, the SAC still fails to allege submission to or payment by the Government of any specific claims for allegedly "worthless" MTM services. Indeed, there is simply no payment that CMS *ever* makes to Part D Sponsors or anyone else downstream specifically for any given MTM service.

Although the SAC now includes additional allegations as to how Walgreens gets paid for its MTM services through vendors upstream from Walgreens, SAC ¶¶ 61–74, Relators still do not allege that "a separate 'false claim' is ever even submitted to the government" by Walgreens or any other MTM service participant—nor can they.  As Relators now acknowledge, a Part D Sponsor's costs in providing MTM services are a mere administrative cost, *see id.* ¶ 71, and not a separate Part D benefit for which the Government pays, *see* SAC Ex. 2 at 14.  In fact, when approving plan bids, the Government does not even know the amount of MTM costs a Part D Sponsor anticipates, given that "MTM program costs are not a specific line item that can be easily extracted from the bid."  87 Fed. Reg. 79452, 79698–99 (Dec. 27, 2022).

Moreover, the terms of payment for any given MTM service, as well as the amount that is paid, is determined by contract between the vendor such as Outcomes and the MTM provider such as Walgreens.[12]  Thus, although Relators allege that administrative costs are factored into Part D Sponsors' bids and affect the direct subsidies paid to Part D Sponsors in some capacity, SAC ¶¶ 30–32, that is far too attenuated a connection to support a false claim for Government payment.  One of Relators' own exhibits, the Guidebook, even underscores this point, noting Part D Sponsors' discretion in paying for MTM services and other matters that vary from payer to payer, which the Government is not involved with and does not dictate:

- "***Some payers specifically define*** the amount of direct patient contact time, by type of encounter, for which they are willing to pay . . . ."

- "***Depending upon the payer requirements*** . . . , pharmacists may not need to obtain [certain information] to do a CMR."

---

[12] *See* Outcomes MTM Network Participation Agreement, *available at* https://www.outcomesmtm.com/wp-content/uploads/2018/02/MTM_Network_Agreement_Online_20170703.pdf, Section 2.4 ("Outcomes shall compensate Vendor/MTM Center for the provision of MTM delivered to Members in accordance with the rates properly adjudicated within the Outcomes System upon claim approval."), Section 3.4(c) (noting that the Vendor/MTM Center "shall accept compensation from Outcomes as payment in-full for MTM provided pursuant to this Agreement, in accordance with the payment rate adjudicated within the Outcomes system upon claim approval.").  Relators refer to, but do not attach as an exhibit, the Outcomes MTM Network Participation Agreement.  *See* SAC ¶¶ 63, 68–69, 72.

- "The type of follow-up (telephone or face-to-face) and time frame for follow-up *will vary from . . . payer to payer*."

- "*Some payer groups may also request* this level of detail [relating to MAPs] when claims are submitted."

- "*Since MTM payers and intermediaries often require a specific format* for documenting encounters, the information documented internally may need to be reformatted for electronic claims submissions."

- "*Other payers may impose different deadlines* for supplying [the Personal Medication List] to the patient."

SAC Ex. 6 at 7, 11, 15, 16, 22, 24 (emphases added).[13]

Nor does the Government pay for specific MTM services on the backend through the reconciliation process. The SAC alleges that "[a]fter the close of the plan year, CMS is responsible for reconciling the prospective payments with the Part D Sponsor's cost of providing the benefits (referred to as 'actual allowable costs') to calculate final payments and risk-sharing amounts." SAC ¶ 35. However, CMS regulations expressly exclude "administrative costs" from the definitions of "allowable risk corridor costs" and "gross covered prescription drug costs." 42 CFR § 423.308; *cf. U.S. ex rel. Buth v. Pharmerica Corp.*, 2014 WL 4355342, at *7 (E.D. Wis. Sept. 3, 2014) (rejecting defendant's argument "that there is no loss to the government" because "[b]y pleading [the reconciliation] process *and reliance on the actual costs* [submitted as part of the reconciliation process], the United States has satisfied any requirement that the false statement be material to the claim and have a tendency to influence the government's actions by inflating the amount of its payment" (emphasis added)). Relators do not allege, nor could they, that claims for MTM services are part of this reconciliation process.

Further, while Part D Sponsors must generally attest that their MTM programs comply with the relevant regulations, *see* SAC Ex. 4 at 37–38, that does not amount to a claim submitted to the Government for any MTM services, let alone a certification in connection with such (nonexistent) claims.[14] Therefore, regardless of how many CMRs or other MTM services

---

[13] Relying on the Guidebook, Relators point to the alleged importance of documentation to justify billing for MTM services. SAC ¶¶ 88–89. However, this guidance pertains to documentation providing justification for billing the MTM vendor and/or Part D Sponsor—as discussed herein, there is never a separate claim made to the Government for MTM services.

[14] Moreover, the Government does not even state that it can recoup any costs if an audit reveals that a Part D Sponsor's MTM program does not comply with regulations. The Part D Sponsor's attestation form notes that CMS "may audit or review the Organization's MTM submission or

Walgreens (or other providers) performs, a claim for those services is never submitted to the Government.[15]  Rather, a Part D Sponsor's MTM program as a whole is simply one of many components of a Part D Sponsor's overall administrative costs that are factored into the plan bid.[16]  If Relators' theory of FCA liability were to be accepted, it would transform *any* alleged contractual failure to properly perform administrative functions of Medicare Part D adjacent to the provision of prescription drug benefits into an FCA violation.  This is an untenable result.

## II.    RELATORS' CLAIMS SHOULD BE DISMISSED ON THE ALTERNATIVE BASES RAISED BY WALGREENS IN ITS MOTION TO DISMISS THE FAC

Although the above bases for dismissal of the FAC are sufficient to dismiss the SAC, additional or alternative grounds also exist.  Neither Magistrate Judge Reinhart nor the Court had reason to consider Walgreens' other arguments for dismissal of the MTM claims in the FAC, but the SAC should be dismissed for those alternative reasons as well.

*First*, Relators still fail to allege scienter.  Relators merely allege (as in the FAC) that pharmacists knew the MTM services were a "sham" given their training, and that managers knew the MTM services were a "sham" because their pressure caused it.  SAC ¶¶ 124–26.  These allegations merely bootstrap off of the (inadequate) allegations of worthlessness and fail for the same reasons as those allegations fail.  Relators also do not allege how mid-level and upper-level managers knew that encouraging pharmacists to perform MTM services—consistent with the

---

program at any time," but failure to comply with MTM program requirements can only result in CMS issuing a compliance notice, declining to enter into a Part D contract, terminating or non-renewing its existing contract, or imposing intermediate sanctions.  SAC Ex. 4 at 38.

[15] According to Relators, "[b]ecause MTM claims submitted on behalf of Medicare beneficiaries are paid using government funds, Walgreens informs its employees that such claims are subject to the same payment regulations as other claims billed to government payors and therefore, they must be supported by appropriate documentation."  SAC ¶ 73.  Relators do not provide any exhibits to support this assertion, but even if Walgreens makes such a representation to employees, it does not change the fact that there is never a claim for MTM services submitted to the Government.

[16] Further, the Government is not even aware of how much Part D Sponsors pay their downstream vendors for MTM services—the amount of MTM fees is only ever disclosed to CMS upon request, with the Part D Sponsor only being required to "provide CMS with information regarding the procedures and performance of its MTM[ program]."  42 CFR § 423.153(d)(5), (6).  Any "loss" in connection with an allegedly "worthless" MTM service would inure to the Part D Sponsor, which, at worst, would incur increased administrative costs that are not reconciled at the end of the year.

Government's desire to increase the utilization of MTM services—somehow would result in them being performed in a "sham" manner.  And, the allegation that these managers instructed pharmacists to complete MTM services "regardless of the substandard manner in which they were performed" is conclusory and unsupported by any facts.  Further, to the extent Relators contend it would be obvious that the pharmacists' services were worthless and that the managers' "pressure" caused worthless MTMs, such inferences are unwarranted.  *Cf. U.S. ex rel. Schagrin v. LDR Indus., LLC*, 2018 WL 6064699, at *6 (N.D. Ill. Nov. 20, 2018) ("Relators[] argue that the Greenspons[] must have had the requisite knowledge because the falsity of LDR's customs claims would be 'obvious' to persons 'in the industry.'  The Court questions whether the allegation of 'obviousness' is well-pled, since it requires the Court to draw an inference which—not being 'in the industry'—the Court does not have the expertise to make.").

*Second*, Relators still fail to allege materiality.  MTM services are a mere "administrative cost"—not a separate benefit to which Beneficiaries are entitled—and Part D Sponsors and/or their downstream MTM contractor, not the Government, decide what MTM claims they will pay and dictate the requirements for payment.  *See supra* Section I.C.

Relators allege in the SAC that "[t]he proper performance of MTM services is material to CMS's decision to fund such services because a Part D sponsor's participation in the Part D program in the first place is contingent on offering an approved MTM program that offers a minimum level of MTM services," and that "[s]ham MTM services that lack any medical value fail to accomplish either goal and increase the costs of federally funded healthcare, going to the 'essence of the bargain' between CMS and Part D Sponsors."  SAC ¶¶ 128–29.  However, the regulatory framework itself negates any notion that the performance of any given MTM service—as opposed to the adequacy of a Part D Sponsor's MTM program generally—is material.  CMS only sets forth the general requirements for a Part D Sponsor's MTM program and requires an attestation from the Part D Sponsor regarding its compliance with those requirements, but is otherwise generally unaware, by design, of how Part D Sponsors effectuate their MTM obligations.  CMS is not made aware as a matter of course of how much Part D Sponsors pay for MTM services—the amount of fees is only disclosed to CMS upon request, and the Part D Sponsor is only required to "provide CMS with information regarding the procedures and performance of its MTM[ program]."  42 CFR § 423.153(d)(5), (6).  Indeed, administrative costs such as MTM fees are not reconciled as part of annual reconciliation, and accordingly, any

supposedly "worthless" MTM services are not material to any payment decision by the Government. *Cf. Buth*, 2014 WL 4355342, at *7 ("By pleading [the reconciliation] process *and reliance on the actual costs* [submitted as part of the reconciliation process], the United States has satisfied any requirement that the false statement be material to the claim and have a tendency to influence the government's actions by inflating the amount of its payment" (emphasis added)). Further, although CMS may audit a Part D Sponsor's MTM program generally (not specific claims made to the Government, because there are none), CMS has no recoupment authority in connection with audit results. *See* SAC Ex. 4 at 38.

    *Third*, even if Court finds that Relators have alleged viable FCA claims, it should dismiss any claims outside of Florida and Ohio because Relators fail to adequately allege a nationwide scheme. Relators present one-off examples of allegedly "worthless" MTM services from a single store in Florida, but nothing connects their allegations to a supposedly systemic, nationwide scheme to conduct "sham" or "worthless" CMRs. *See U.S. ex rel. Fox Rx, Inc. v. Omnicare, Inc.*, 2013 WL 2303768, at *7 (N.D. Ga. May 17, 2013) (contention that "'nationwide' conduct should be inferred from the conduct for which Relator alleges actual information, is exactly what is proscribed by Rule 9(b)"); *see also U.S. ex rel. Buth v. Walmart Inc.*, 2021 WL 424160, at *4 (E.D. Wis. Feb. 8, 2021) (noting that "there must . . . be sufficient facts to support a reasonable inference that the fraud was, in fact, widespread"); *U.S. v. Team Fin., L.L.C.*, 2019 WL 3943958, at *7 (E.D. Tex. Aug. 21, 2019) (allegations of a "nationwide" scheme "based on [the relators'] experiences at . . . hospitals in Colorado and the Virgin Islands" were insufficient). Indeed, the SAC even cites favorably to Walgreens' corporate MTM policies and procedures. *See* SAC ¶ 90; SAC Ex. 7. And, with regard to "in-line" CMRs, Walgreens' materials note in bold, "**[a]ll elements of a traditional CMR must be completed in order for the in-line CMR to be considered of high quality**." SAC Ex. 11.

    *Fourth*, Relators have failed to adequately allege a violation of 31 U.S.C. § 3729(a)(1)(B). Indeed, the claim fails at the outset because Relators have failed to adequately allege that the Government paid claims that it did not owe in connection with the alleged MTM scheme. *Cf. U.S. v. All Children's Health Sys., Inc.*, 2013 WL 1651811, at *4 & n.4 (M.D. Fla. Apr. 16, 2013) ("Relator has failed to allege with specificity any amounts the government paid that it did not owe and therefore fails to state a claim under subsection (a)(1)(B)."). Moreover, Relators do not allege any false record or statement, much less one that is material to a false or

fraudulent claim.  Indeed, following Relators' own allegations, the MAPs could not have been false, since Relators base their entire theory of liability on the fact that the MAPs allegedly *reveal* that MTM services were performed in a "sham" manner.  Accordingly, Count II fails.

## III.   PHARMALETA'S CLAIMS SHOULD BE DISMISSED UNDER THE PUBLIC DISCLOSURE BAR

Lastly, even if the MTM claims otherwise survive dismissal, Pharmaleta's claims still should be dismissed pursuant to the FCA's public disclosure bar.  In the FAC, the MTM claims were brought on behalf of and based on allegations exclusively from Mosley.  Under the public disclosure bar, a court "shall dismiss an action or claim . . . if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed . . . in a Federal . . . civil . . . hearing in which the Government or its agent is a party."  31 U.S.C. § 3730(e)(4)(A). The exception is if the relator "is an original source of the information," *id.*, defined as "an individual who either (i) prior to a public disclosure . . . , has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section," 31 U.S.C. § 3730(e)(4)(B).

The public disclosures in this very case—the unsealed Original Complaint and the FAC—bar Pharmaleta's MTM claims.  Pharmaleta is not an "original source" of the claims, given that there is no allegation that Pharmaleta or Swihart disclosed or provided any information pertaining to the alleged MTM scheme to the Government at any point.  The claims fail and should be dismissed to the extent they are brought by Pharmaleta, and Paragraph 104 of the SAC (the sole allegation from Pharmaleta pertaining to the alleged MTM scheme, which also does not materially add to the FAC's allegations) should be stricken.  *Cf. U.S. ex rel. George v. Fresenius Med. Care Holdings, Inc.*, 2015 WL 12819145 (N.D. Ala. Nov. 2, 2015) (dismissing claims brought by relator added to lawsuit in amended complaint because unsealing of complaint was a public disclosure and relator was not an original source); *U.S. ex rel. McBride v. Halliburton Co.*, 2007 WL 1954441, at *3–4 (D.D.C. July 5, 2007) (denying motion for leave to amend and to add additional relators for the same reason).

## CONCLUSION

For the foregoing reasons, the Court should dismiss the SAC, which failed to cure the deficiencies that required dismissal of the FAC, with prejudice.

## REQUEST FOR HEARING

Pursuant to Local Rule 7.1(b)(2), Walgreens respectfully requests oral argument on the foregoing motion.  Walgreens believes oral argument will assist the Court in analyzing and resolving the motion, particularly given the complexity of the issues presented.  Walgreens estimates that two hours will be necessary for the argument.

Dated: November 16, 2023

Respectfully submitted,

/s/ David W. Marston Jr.

David W. Marston Jr., Bar No. 111636
david.marston@morganlewis.com
Matthew Papkin, Bar No. 106565
matthew.papkin@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
600 Brickell Avenue
Suite 1600
Miami, FL  33131-3075
Telephone:  +1.305.415.3000
Facsimile:   +1.305.415.3001

Howard Young, *pro hac vice*
howard.young@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
1111 Pennsylvania Avenue NW
Washington, DC  20004-2541
Telephone:  +1.202.739.3000
Facsimile:   +1.202.739.3001

Rebecca Hillyer, *pro hac vice*
rebecca.hillyer@morganlewis.com
Ryan McCarthy, *pro hac vice*
ryan.mccarthy@morganlewis.com
Jeffrey Masters, *pro hac vice*
jeffrey.masters@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
2222 Market Street
Philadelphia, PA  19103-3007
Telephone:  +1.215.963.5000
Facsimile:   +1.215.963.5001

*Counsel for Defendant Walgreen Co.*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a true and correct copy of the foregoing Motion to Dismiss was filed on November 16, 2023, through the Court's CM/ECF portal, which will serve a copy on all counsel of record.

*/s/ David W. Marston Jr.*
David W. Marston Jr.