UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**Case No. 18-cv-80200-BLOOM/Torres**

UNITED STATES *ex rel.*
Elmer Mosley, Ph.D., R.PH.,
and PHARMALETA, LLC,

       Plaintiff/Relator,

v.

WALGREEN CO.,

       Defendant.

_____/

## <u>ORDER ON MOTION TO DISMISS</u>

**THIS CAUSE** is before the Court upon Defendant Walgreen Co.'s ("Walgreens") Motion to Dismiss, ECF No. [117], filed on November 16, 2023. Plaintiffs/Relators Elmer Mosley, Pharm. D., R. Ph., and Pharmaleta, LLC (collectively, "Relators"), filed a Response, ECF No. [126], to which Walgreens filed a Reply, ECF No. [129]. The Court has reviewed the record, the supporting and opposing submissions, the applicable law, and is otherwise fully advised. For the reasons that follow, Walgreens' Motion to Dismiss, ECF No. [117], is granted in part and denied in part.

## I. BACKGROUND

### A. Procedural Posture

Relator Elmer Mosley initially brought this *qui tam* action on behalf of the United States against Walgreens under the False Claims Act (FCA), 31 U.S.C. § 3729 et *seq.*, on February 20, 2018. ECF No. [1]. On July 18, 2022, the Government filed a Notice of Election to Decline Intervention. ECF No. [39]. On November 25, 2022, Mosley filed a First Amended Complaint, adding Pharmaleta, LLC as a Relator ("Pharmaleta"). ECF No. [43]. In the First Amended Complaint, Relators challenged two fraudulent schemes by Walgreens in violation of the FCA: (1)

a coupon scheme where, "[t]o outcompete other retail pharmacies, Walgreens knowingly accepted manufacturer coupons for pharmaceuticals that were clearly marked as ineligible for Medicare patients[,]" and (2) a Medication Therapy Management ("MTM") scheme where, "[t]o maximize reimbursement from Medicare without incurring necessary pharmacist labor costs, Walgreens knowingly allows and encourages its pharmacists to perform sham Medication Therapy Management or "MTM" services that are not in accordance with industry standards and CMS [(Centers for Medicare & Medicaid Services)] regulations." ECF No. [43] at 1-2.

On May 10, 2023, the Court granted Walgreens' Motion to Dismiss Relators' First Amended Complaint, ECF No. [63]. *See* ECF No. [102]. The Court dismissed Relators' claims as to both the coupon and MTM schemes following a Report and Recommendation ("R&R") by Magistrate Judge Bruce Reinhart, ECF Nos. [86], [102].[1] Neither Relators nor Defendant objected to the portion of the R&R dismissing the MTM scheme — the only scheme relevant to the Court's current order — which this Court accordingly adopted without conducting a *de novo* analysis.[2] ECF No. [102] at 5. The Court dismissed the two claims brought pursuant to the MTM scheme in the First Amended Complaint on three grounds:

(1) "First, the Amended Complaint fails to allege that Walgreens' provision of MTM services amounted to a fraudulent scheme because the Relators do not allege that Walgreens' compliance with CMS's regulations was a prerequisite for payment of a

---

[1] The Court adopted the R&R's recommendation, *see* ECF No. [86], to dismiss Counts III and IV of the First Amended Complaint as to the MTM scheme. ECF No. [102] at 5. The Court departed from the R&R and mandated the dismissal of Counts I and II of the First Amended Complaint as to the coupon scheme. *Id*. at 5-11.

[2] "If a party fails to object to any portion of the magistrate judge's report, those portions are reviewed for clear error." *Macort v. Prem, Inc*., 208 F. App'x 781, 784 (11th Cir. 2006) (quoting *Johnson v. Zema Sys. Corp*., 170 F.3d 734, 739 (7th Cir. 1999). The portions of the report and recommendation to which an objection is made are reviewed de novo only if those objections "pinpoint the specific findings that the party disagrees with." *United States v. Schultz*, 565 F.3d 1353, 1360 (11th Cir. 2009); *see also* Fed. R. Civ. P. 72(b)(3).

claim." ECF No. [86] at 28 (citing *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 468 (6th Cir. 2011)). The regulations and industry standards, as well as the CMS Prescription Drug Benefit Manual, included in or appended to the First Amended Complaint only regulated Part D Sponsors, not pharmacies such as Walgreens, which provide the MTM services. ECF No. [86] at 28. This was insufficient to state a FAC claim.

(2) "Second, although the Amended Complaint characterizes the MTM service Walgreens provided as 'worthless,' this conclusory designation is purely speculative and is not supported by the factual allegations pled." ECF No. [86] at 29. "Relators only allege deficiencies with regard to the Medical Action Plan, which was only one of three documents the Part D Sponsor is expected to deliver to the beneficiary following his or her consultation session with the pharmacist." *Id.* at 29. This was insufficient to state a FAC claim.

(3) "Finally, the Amended Complaint is devoid of any allegation that Walgreens or any of the other entities in the MTM service supply chain (i.e., the vendor or Part D Sponsor) submitted any claims for payment to the government." *Id.* at 29. Instead, Walgreens is three levels removed from the payment of funds to the government. *Id.* This was insufficient to state a FAC claim.

ECF No. [102] at 5.

Relators now bring this Second Amended Complaint, filed on October 19, 2023, pertaining only to the MTM scheme. *See* ECF No. [114]. Relators describe the scheme as follows:

> To maximize reimbursement from Medicare without incurring necessary pharmacist labor costs, Walgreens knowingly allows and encourages its pharmacists to perform sham Medication Therapy Management or "MTM" services that are not in accordance with industry standards and CMS regulations. While these services are supposed to provide Medicare beneficiaries with important counseling regarding their medications, Walgreens performs these services in such

a sham manner that they are "worthless" and thus result in false claims for payment to the Government. Relators refer to this scheme throughout the Second Amended Complaint as the MTM Scheme.

*Id.* at 1-2.

Relators brings two claims against Walgreens under the False Claims Act ("FCA") pursuant to the MTM Scheme: (1) a violation of 31 U.S.C. § 3729(a)(1)(A) by presenting and/or causing to be presented to the Government or its intermediaries false or fraudulent claims for payment or approval (Count I); and (2) a violation of 31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, or causing to be made or used, false records and statements material to get false or fraudulent claims paid or approved by the Government (Count II). ECF No. [114] at 37-38.

## B.  Second Amended Complaint

Relators allege the following:

Dr. Mosley is a corporate insider at Walgreens. ECF No. [114] ¶ 13. A licensed pharmacist in Florida, he has worked as pharmacy manager in Florida, *Id.* at ¶¶ 7-8, and as a District Manager for Walgreens in the Northwestern United States and in Tennessee. *Id.* at ¶¶ 9-10. He has also trained pharmacists or pharmacy and store managers in Tennessee, Arkansas, Mississippi, Illinois, Georgia and Alabama. *Id.* at ¶¶ 10-11. Pharmaleta is an Ohio limited liability company. Pharmaleta's sole member is Jennifer Swihart ("Swihart"). Swihart formerly worked as a pharmacist for Walgreens from 1998 to 2022 in 56 Walgreens stores throughout Ohio and had knowledge of the MTM Scheme in Ohio. *Id.* at ¶ 16-17.

The context for the alleged false claims in this case is as follows: in 2003, Congress established a drug benefit program for Medicare enrollees known as "Medicare Part D" to allow coverage by Medicare of outpatient prescription drugs. *Id.* at ¶ 28. Medicare Part D is based on a private-market model where CMS contracts with private entities — typically insurance companies — known as Part D Plan "Sponsors" ("Part D Sponsors") to administer prescription drug plans.

*Id.* at ¶ 29. To participate in the Part D program, a potential Part D sponsor must submit bids and other supplemental information for each Part D plan it intends to offer in the subsequent calendar year. ECF No. [114] at ¶ 30 (citing 42 C.F.R. § 423.265(b)(1), (c)). Each bid must reflect the "applicant's estimate of its average monthly revenue requirements to provide qualified prescription drug coverage[,]" including costs, such as administrative costs, for which the plan is responsible in providing basic and supplemental benefits. 42 C.F.R. § 423.265(c). ECF No. [114] at ¶ 30.

Throughout the year, CMS makes prospective monthly payments to Part D Sponsors for three subsidies based on the Sponsors' approved bids: (1) the direct subsidy designed to cover the Sponsor's cost of providing the benefits (i.e., costs of prescription drugs); (2) the low-income cost-sharing subsidy; and (3) the reinsurance subsidy. *Id.* at ¶ 31. After the close of the plan year, CMS is responsible for reconciling the prospective payments with the Part D Sponsor's cost of providing the benefits (referred to as "actual allowable costs") to calculate final payments and risk-sharing amounts. *Id.* at ¶ 35. CMS determines the Sponsor's actual allowable costs by relying upon data elements submitted by Sponsors. *Id.* CMS considers MTM services provided to targeted beneficiaries to be an "administrative cost." *Id.* at ¶ 71. "Administrative costs" means costs incurred by a Part D sponsor in complying with the requirements of Part D for a coverage year and are not drug costs incurred to purchase or reimburse the purchase of Part D drugs. *Id.* at ¶ 30.

While it is possible for MTM providers to be reimbursed directly for MTM services by billing the Part D Sponsor using MTM Current Procedural, the majority of carriers participating in Medicare Part D as Part D Sponsors contract with vendors, known as "downstream vendors" or "MTM vendors," to facilitate the provision of services and distribution of payment. *Id.* at ¶ 61. Two such vendors, Mirixa Corporation and Outcomes — now both merged under Outcomes' parent corporation, Cardinal Health — have entered into client agreements with Part D Sponsors

to perform MTM services. Vendors contract with pharmacies, including Walgreens, to provide MTM services to beneficiaries by entering into MTM Network Participation Agreements, which allow pharmacies to document and receive payment for the MTM services it provides to Medicare beneficiaries. *Id.* at ¶ 63. Prior to Mirixa's merger with Outcomes, a pharmacist working at Walgreens could access Mirixa and Outcomes from a computer terminal in the pharmacy. *Id.* at ¶ 64. Using either vendor's platform, the pharmacist can complete the paperwork necessary to perform MTM services. *Id.* When Walgreens provides an MTM service to a Medicare beneficiary, Walgreens bills, through the use of the vendors' software, the Part D sponsor who pays the claim out of the monthly payment received from CMS. *Id.* at ¶ 74. Therefore, Relators allege that when Walgreens submits a claim for payment to a Part D Sponsor, it indirectly submits a claim for payment to the Government. *Id.*

CMS has developed a set of regulations to govern how Part D Sponsors provide MTMs. *Id.* at ¶ 48. *See* 42 C.F.R. § 423.153(d). These regulations state that MTM programs "must offer a minimum level of medication therapy management services" and divide MTMs into two types: Comprehensive Medication Reviews or "CMRs" (annual reviews), and Targeted Medication Reviews or "TMRs" (quarterly reviews). *Id*. As to CMRs, Part D Sponsors must offer an annual review "with written summaries" that "[m]ust include an interactive, person-to-person, or telehealth consultation performed by a pharmacist or other qualified provider" and "[m]ay result in a recommended medication action plan [("MAPs")]." *Id*. at § 423.153(d)(1)(vii)(B); ECF No. [114] ¶ 49. According to the Prescription Drug Benefit Manual issued by CMS, "[a]t a minimum, Part D Sponsors are expected to offer MTM services that include the following:"

1. Offer a comprehensive medication review (CMR) by a pharmacist or other qualified provider at least annually to all targeted beneficiaries enrolled in the MTM program. A CMR is a review of a beneficiary's medications, including prescription, over-the-counter (OTC) medications, herbal therapies and dietary

supplements, that is intended to aid in assessing medication therapy and optimizing patient outcomes. While initial preparations to assess medication use and identify medication-related problems before the patient interaction may be conducted 'behind the scenes', they are only a piece of the overall comprehensive medication review. CMS recognizes the importance of offering an interactive, person-to-person consultation with the beneficiary for a complete assessment of the beneficiary's needs to improve medication use or outcomes. This includes three components:

    a. Review of medications to assess medication use and identify medication-related problems. This may be conducted person-to-person or 'behind the scenes' by a qualified provider and/or using computerized, clinical algorithms.

    b. Offering to provide to each targeted beneficiary enrolled in the MTM program an interactive, person-to-person consultation performed by a qualified provider. This real-time interaction may be face-to-face or through other interactive methods such as the telephone. This interaction may include further assessment of the beneficiary's medication history and use (could enable sponsors to collect information from the beneficiary, such as OTC medications or supplements, that is outside of the claims data they have access to), health status, clinical information, adverse events, or other issues that could affect medication use or outcomes.

    c. Implementation of a systematic process to summarize the interactive consultation and provide an individualized written "take-away" to the beneficiary such as a personal medication record, reconciled medication list, action plan, recommendations for monitoring, education, or self-management, etc.

ECF No. [114-2] at 12-13.  Medicare Part D Medication Therapy Management Program Standardized Format publication explains that "[t]he format for the written summary given to beneficiaries after a CMR includes three documents": a CMR Cover Letter, a medication action plan ("MAP"), and a Personal Medication List. ECF Nos. [114] ¶ 53, [114-3] at 5. Moreover, it explains that "[t]he Format provides a template for the written summary after a CMR. The Format cannot be modified, but the specific content to populate the Format must be tailored to the beneficiary and customized for the Part D plan and MTM program." ECF No. [114-3] at 5.

Relators allege that Walgreens did not administer proper MTM services, and instead fraudulently billed Part D Sponsors for sham MTM services. They allege that Walgreens operated the MTM Scheme as follows, *id.* at ¶ 42:

a. Part D Sponsors subcontract with Walgreens pharmacists to perform MTM services for its Medicare Part D beneficiaries who fill their prescriptions at Walgreens stores. *Id.*

b. Walgreens managers instruct Walgreens pharmacists to perform MTM services for Medicare Part D beneficiaries in a manner that would make it impossible for the pharmacist to provide the service in accordance with CMS regulations and industry standards. *Id.*

c. Walgreens pharmacists then perform MTM services for Medicare Part D beneficiaries in a manner that is not in accordance with industry standards or CMS regulations to such a degree that, if known, the Government would not pay for such MTM services. *Id.*

d. As a direct result, the Government suffered on a nationwide scale not only by paying for sham MTM services performed by Walgreens pharmacists, but also by paying increased prescription drug costs overall due to Walgreens pharmacists abandoning their role as cost managers for the Medicare Part D program. *Id.*

On November 16, 2023, Walgreens filed a Motion to Dismiss the Second Amended Complaint ("Motion to Dismiss"), ECF No. [117]. Walgreens contends that the Second Amended Complaint is still defective, Relators' continued reliance on industry standards fails, Relators have failed to allege that the MTM services provided by Walgreens were worthless, and Relators have failed to allege scienter, materiality, and a national scheme. Finally, Walgreens contends that Pharmaleta's claims should be dismissed under the public disclosure bar.

## II.   LEGAL STANDARD

### A.   Motion To Dismiss

"On a Rule 12(b)(6) motion to dismiss, '[t]he moving party bears the burden to show that the complaint should be dismissed.'" *Sprint Sols., Inc. v. Fils–Amie*, 44 F. Supp. 3d 1224, 1228 (S.D. Fla. 2014) (quoting *Mendez–Arriola v. White Wilson Med. Ctr. PA*, No. 09–495, 2010 WL 3385356, at *3 (N.D. Fla. Aug. 25, 2010)). A pleading must contain "a short and plain statement

of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While a complaint "does not need detailed factual allegations," it must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (explaining that Rule 8(a)(2)'s pleading standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation"). A complaint may not rest on "'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

"To survive a motion to dismiss a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id*. (quoting *Twombly*, 550 U.S. at 557). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. As a general rule, when reviewing a motion to dismiss, a Court must accept the plaintiff's allegations as true and evaluate all plausible inferences derived from those facts in favor of the plaintiff. *See Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012). Although the Court is required to accept all of the factual allegations as true, this tenet is inapplicable to legal conclusions. *Iqbal*, 556 U.S. at 678. In considering a Rule 12(b) motion to dismiss, the court is limited to the facts contained in the complaint and attached exhibits. *See Thaeter v. Palm Beach Cty. Sheriff's Office*, 449 F.3d 1342, 1352 (11th Cir. 2006).

### B.   False Claims Act

The False Claims Act enables private citizens to recover damages on behalf of the United States by filing a *qui tam* action against a person who:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;…

31 U.S.C. § 3729(a)(1)(A)-(B).

Claims brought under § 3729(a)(1)(A) are called presentment claims and claims brought

under section § 3729(a)(1)(B) are called false statement or document claims.

> To establish a presentment claim, a relator must prove three elements: (1) a false or
> fraudulent claim; (2) which was presented, or caused to be presented, for payment
> or approval; (3) with the knowledge that the claim was false. 31 U.S.C. §
> 3729(a)(1)(A). To prove a false statement or document claim, a relator must show
> that: (1) the defendant made (or caused to be made) a false statement, (2) the
> defendant knew it to be false, and (3) the statement was material to a false claim.
> *Id.* § 3729(a)(1)(B).

> *United States ex rel. Crocano v. Trividia Health Inc.*, 615 F. Supp. 3d 1296, 1303–04 (S.D.

Fla. 2022). For a false claim, a defendant is "liable to the United States Government for a civil

penalty of not less than $5,000 and not more than $10,000 … plus 3 times the amount of damages

which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a)(1). "If, as

here, the Government does not assert its statutory right to take over the case from the plaintiff,

called a relator, he can recover between 25 and 30 percent of any monies recovered from a

settlement or judgment plus reasonable expenses and attorneys' fees and costs." *U.S. ex rel.*

*Clausen v. Lab'y Corp. of Am.*, 290 F.3d 1301, 1308 (11th Cir. 2002); *see also* 31 U.S.C. § 3730(d).

Under the statute, the term "claim" means:

> (A)… any request or demand, whether under a contract or otherwise, for money or
> property and whether or not the United States has title to the money or property,
> that--
> > (i) is presented to an officer, employee, or agent of the United States; or
> > (ii) is made to a contractor, grantee, or other recipient, if the money or
> property is to be spent or used on the Government's behalf or to advance a
> Government program or interest, and if the United States Government--
> > > (I) provides or has provided any portion of the money or property
> > > requested or demanded; or
> > > (II) will reimburse such contractor, grantee, or other recipient for
> > > any portion of the money or property which is requested or demanded; and
> (B) does not include requests or demands for money or property that the
> Government has paid to an individual as compensation for Federal employment or
> as an income subsidy with no restrictions on that individual's use of the money or
> property;

31 U.S.C. § 37299(b)(2)(A)-(B). The terms "knowing" and "knowingly" mean:

(A)… that a person, with respect to information--
(i) has actual knowledge of the information;
(ii) acts in deliberate ignorance of the truth or falsity of the information; or
(iii) acts in reckless disregard of the truth or falsity of the information; and
(B) require no proof of specific intent to defraud;

*Id.* at § 3729(b)(1)(A)(B).

"The purpose of the Act… is to encourage private individuals who are aware of fraud being perpetrated against the government to bring such information forward." *Ragsdale v. Rubbermaid, Inc.*, 193 F.3d 1235, 1237 n. 1 (11th Cir.1999). "Liability under the False Claims Act arises from the submission of a fraudulent claim to the government, not the disregard of government regulations or failure to maintain proper internal procedures." *Corsello v. Lincare*, Inc., 428 F.3d 1008, 1012 (11th Cir.2005) (citation omitted). The Eleventh Circuit has explained that "complaints alleging violations of the False Claims Act are governed by Rule 9(b)." *Id.*

**C. Rule 9(b)**

Under Rule 9(b),

In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.

Fed. R. Civ. P. 9(b). "Failure to satisfy Rule 9(b) is a ground for dismissal of a complaint." *Corsello*, 428 F.3d at 1012. Because Relators' claims are premised on allegations of fraud under the FCA, they are subject to the heightened pleading requirements of Rule 9(b). *See, e.g.*, *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 195 n.6 (2016); *Corsello*, 428 F.3d at 1013. To satisfy this heightened-pleading standard in a False Claims action, the relator has to allege "facts as to time, place, and substance of the defendant's alleged fraud," particularly, "the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them." *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1051 (11th Cir. 2015) (citation omitted). In other words, a

plaintiff must state the "'who,' 'what,' 'when,' 'where,' and 'how,'" of their FCA claim. *Corsello*, 428 F.3d at 1014.

> Similarly,

> To satisfy the heightened pleading requirements of Rule 9(b), a false statement or document claim under section 3729(a)(1)(B) must be pled with particularity regarding the document and statement alleged to be false, who made or used it, when the statement was made, how the statement was false, and what the defendants obtained as a result.

> *Crocano*, 615 F. Supp. 3d at 1309 (quoting *United States ex rel. Pepio v. Prometheus Labs., Inc.*, 2020 WL 6203527, at *5 (M.D. Fla. Oct. 22, 2020)).

"The particularity rule serves an important purpose in fraud actions by alerting defendants to the 'precise misconduct with which they are charged' and protecting defendants 'against spurious charges of immoral and fraudulent behavior.'" *U.S. ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1359 (11th Cir. 2006) (citation omitted). Yet, Rule 9(b) "must not abrogate the concept of notice pleading." *Ziemba v. Cascade Int'l., Inc*., 256 F.3d 1194, 1202 (11th Cir. 2001). Thus, Rule 9(b)'s particularity requirement "must be read in conjunction with [Rule] 8's directives that a complaint need only provide a short and plain statement of the claim …." *Hill v. Morehouse Med. Assocs., Inc*., No. 02–14429, 2003 WL 22019936, at *3 (11th Cir. Aug. 15, 2003). In an FCA action, "Rule 8's pleading standard is supplemented but not supplanted by 9(b)." *Urquilla-Diaz*, 780 F.3d at 1051.

## III.  DISCUSSION

### A.  Flaws Identified by the R&R

Defendant argues that the Second Amended Complaint still contains three fatal flaws that existed in the First Amended Complaint dismissed by this Court and identified by the previous R&R: (1) Relators' continued inadequate reliance on industry standards fails, (2) Relators still fail to plausibly allege MTM services that were worthless, and (3) Relators still fail to allege plausibly

government payment. *See* R&R, ECF Ns. [86]; Defendant's Motion to Dismiss, ECF No. [117] at 5-18. This Court never reviewed the R&R pertaining to the MTM scheme *de novo*, as the portion of the R&R pertaining to the MTM scheme was unobjected to. *See Macort v. Prem, Inc*., 208 F. App'x 781, 784 (11th Cir. 2006). The Court analyzes those arguments about the deficiency of Relators' Complaint as applied to the Second Amended Complaint.

### i.   Industry Standards

Defendant argues that the first deficiency identified in the R&R remains in Relators' Second Amended Complaint: Relators fail to make any plausible allegation that compliance with certain CMS regulations and industry guidance was a prerequisite for payment of the claims at issue. ECF No. [117] at 10. Specifically, Defendant cites *Chesbrough v. VPA, P.C*., for its proposition that "Medicare does not require compliance with an industry standard as a prerequisite to payment. Thus, requesting payment for tests that allegedly did not comply with a particular standard of care does not amount to a 'fraudulent scheme' actionable under the FCA." 655 F.3d 461, 468 (6th Cir. 2011). ECF No. [117] at 10. Moreover, Defendant argues industry standards only regulate Part D Sponsors and not Walgreens, so non-compliance with industry standards does not establish a fraudulent scheme against Walgreens. *Id.* at 12. Relators respond that failure to comply with rules, regulations, or industry standards regarding the quality of service at issue may properly form the basis of their "worthless services" theory of harm, under which they assert that Walgreens was grossly negligent in complying with the regulatory standard of care and that it failed to comply with industry standards. ECF No. [126] at 4.

In their Second Amended Complaint, Relators mention Walgreens' failure to comply with CMS regulations and industry standards — such as those listed in industry publications, including *The Core Elements of an MTM Service Model and The Patient-Centered Medical Home: Integrating Comprehensive Medication Management to Optimize Patient Outcomes Resource*

13

*Guide* — for MTM services for three purposes.[3] First, Relators compare the "sham MTM services" that were delivered by pharmacists at Walgreens, ECF No. [114] at ¶¶ 92-93, to the industry and regulatory standards, *id.* at ¶¶ 75-80. The Second Amended Complaint uses industry and regulatory standards to detail what MTM services are supposed to look like, including the following: the time MTM services are supposed to take, *id.* at ¶¶ 82, 85, 86; MTMs are ideally supposed to include laboratory data and communication with the physician, *id.* at ¶¶ 80-88; pharmacists should focus on discussing plans with the beneficiary to resolve his or her medication problems, *id.* at ¶ 84; MTMs must be tailored to the patient and include "specific recommendations" for "managing problems identified during the CMR[,]" *id.* at ¶ 87; and the "[t]horough and accurate" documentation required for an MTM service, *id.* at ¶ 88-89. Relators contrast these to the MTM services performed at Walgreens, where pharmacists

> performed MTMs with little to no preparation work; conducted a perfunctory patient encounter that lasted a few minutes, if that—sometimes even springing CMRs on beneficiaries when presenting at the store counter or drive through to pick up a prescription; and 'followed up' by generating a cover letter and medication list automatically populated by the Mirixa or Outcomes software, and cutting and pasting a generic, non-individualized statement on the Medication Action Plan, if anything.

*Id.* at ¶ 92. Per Relators' allegations, this is despite the fact that Walgreens' MTM General Policies and Procedures align with industry standards. *Id.* at ¶ 90.

Second, Relators mention CMS regulations and industry standards of care when alleging Walgreens' pharmacists' knowledge that they are performing sham MTM services. *Id.* at ¶ 124 ("Walgreens' pharmacists know when they are performing sham MTM services because they are

---

[3] Relators acknowledge that these industry standards regulate Part D Sponsors and not Walgreens. *Id.* at ¶¶ 75-80 (stating CMS advises Part D Sponsors to refer to industry publications for "examples of industry standards of care for delivering MTMs and CMRs").

trained in MTM services industry standards and CMS regulations during their professional education.").

Third, Relators mention CMS regulations and industry standards to support the materiality requirement in Count II — that Walgreens violated 31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, or causing to be made or used, false records and statements material to get false or fraudulent claims paid or approved by the Government. Relators state that "Walgreens' pharmacists' failure to perform MTM services in accordance with these standards goes to the 'essence of the bargain' and is therefore material to the Government's decision to pay." ECF No. [114] at ¶ 127. Per the Second Amended Complaint, the "proper performance of MTM services is material to CMS's decision to fund such services because a Part D sponsor's participation in the Part D program in the first place is contingent on offering an approved MTM program that offers a minimum level of MTM services." *Id.* at ¶ 128.

The Court first asks whether the Relators were required to plead that CMS regulations and industry standards regulated Walgreens or were a prerequisite to Medicare reimbursement to sufficiently allege their two claims under the False Claims Act. Under the False Claims Act, one can bring claims against persons submitting false claims under several theories of liability, such as a "worthless services" theory (which is an allegation that the claim submitted was factually false) or a "false certification theory" (which is an allegation that the claim submitted was legally false). "A factually false claim misrepresents what goods or services were provided to the Government, and a legally false claim falsely certifies that the claimant has complied with a statute or regulation the compliance with which is a condition for Government payment." *United States ex rel. Jackson v. DePaul Health Sys.*, 454 F. Supp. 3d 481, 493 (E.D. Pa. 2020) (citation and alterations omitted); *see also Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1299

(11th Cir. 2021). Under a false certification theory, "a claimant's failure to comply with regulations can make claims submitted to the government 'fraudulent' within the meaning of the FCA.'" *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 467 (6th Cir. 2011). In other words, a "claimant makes a 'false certification,' meaning that they falsely claim to have met a prerequisite for Government payment." *United States v. Am. Health Found. Inc*., No. CV 22-02344, 2023 WL 2743563, at *10 (E.D. Pa. Mar. 31, 2023).[4]

Defendant argues that Relators' claim should be dismissed because its alleged noncompliance with CMS regulations and industry standards does not establish a fraudulent scheme. Defendant relies on *Chesbrough v. VPA, P.C.*, for the proposition that "Medicare does not require compliance with an industry standard as a prerequisite to payment. Thus, requesting payment for tests that allegedly did not comply with a particular standard of care does not amount to a 'fraudulent scheme' actionable under the FCA." 655 F.3d at 468. In *Chesbrough*, relators sued a radiology service business for providing studies that were of poor quality or defective, had either no diagnostic value or limited diagnostic value, and failed to meet industry standards. *Id.* at 465, 467. The Sixth Circuit held that relators failed to make out a false certification claim under the FCA because "they do not allege that [Defendant] was expressly required to comply with those standards as a prerequisite to payment of claims. They identify no specific Medicare or Medicaid regulation that mentions the standards." *Id.* at 468. This mattered because under the false certification theory:

> it is not the violation of a regulation itself that creates a cause of action under the FCA. Rather, noncompliance constitutes actionable fraud only when compliance is a prerequisite to obtaining payment. Thus, a relator cannot merely allege that a

---

[4] The false certification can be either express or implied. *United States v. Am. Health Found. Inc*., No. CV 22-02344, 2023 WL 2743563, at *10 (E.D. Pa. Mar. 31, 2023); *see also Universal Health Servs.*, 579 U.S. at 186 (stating conditions where the implied false certification theory can be a basis for liability).

defendant violated a standard—he or she must allege that compliance with the standard was required to obtain payment.

*Id*. at 468.

But *Chesbrough* does not help Defendant in this case. *Chesbrough* relies on a theory of liability under the FCA that is *distinct* from Relators' theory of liability here. *Chesbrough* required compliance with industry standards or with regulations under a false certification theory of liability. *Id.* at 468. In contrast, here, all parties agree that the Relators are proceeding under a worthless services theory. ECF No. [117] at 13 n. 4; ECF No. [126] at 3-10. There is no requirement to establish that industry standards are a prerequisite to government reimbursement in a "worthless services" suit to establish a fraudulent scheme, unlike under a false certification theory where relators "falsely claim to have met a prerequisite for Government payment." *United States v. Am. Health Found. Inc*., No. CV 22-02344, 2023 WL 2743563, at *10 (E.D. Pa. Mar. 31, 2023).

A "worthless services" and a "false certification" FCA claim are distinct. Indeed, "[a]n allegation that defendants violated the Act by submitting claims for worthless services is not predicated upon the false certification theory. Instead, a worthless services claim asserts that the knowing request of federal reimbursement for a procedure with no medical value violates the Act irrespective of any certification." *Mikes v. Straus*, 274 F.3d 687, 702 (2d Cir. 2001), *abrogated on other grounds by Universal Health Servs., Inc. v. United States*, 579 U.S. 176 (2016). [5] Though a claim might fail under a false certification theory of liability, it might still prevail under a worthless

---

[5] "In a worthless services claim, the performance of the service is so deficient that for all practical purposes it is the equivalent of no performance at all." *Mikes v. Straus*, 274 F.3d 687, 703 (2d Cir. 2001), *abrogated on other grounds by Universal Health Servs., Inc. v. United States*, 579 U.S. 176 (2016). "It is effectively derivative of an allegation that a claim is factually false because it seeks reimbursement for a service not provided." *Id.*

services theory. *See, e.g., U.S. ex rel. Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1053 (9th Cir. 2001); *Chesbrough*, 655 F.3d at 468.

Because Relators bring a "worthless services" case under the FCA, this Court accordingly declines to dismiss it for failing to comply with the requirements necessary for a false-certification claim, which is not at issue in this case. Generally, Relators can point to industry standard as comparative examples when bringing forth FCA claims. *See, e.g.*, *United States ex rel. USN4U, LLC v. Wolf Creek Fed. Servs., Inc.*, 34 F.4th 507, 515 (6th Cir. 2022) ("At the pleading stage, it is sufficient that USN4U set forth a factual basis for its allegations by pointing to plausible industry standards and alleging that Wolf Creek's labor estimates were dramatically higher than those standards" when trying to establish falsity in a fraudulent inducement claim under the FCA). Relators can also do so under a "worthless services" theory of liability, as industry guidance can help illustrate the worthlessness of the product or services but is not essential to the survival of the claim. Under the theory of "worthless services",

> a claim can be maintained against a defendant that fails to comply with regulations that are intended to ensure that the services provided to the government have value. Under this theory, a defendant may be liable for noncompliance with a regulation that aims to prevent "Medicare waste, fraud, and abuse, i.e. paying out on claims that should not be paid." *United States ex rel. Spay v. CVS Caremark Corp.*, 913 F. Supp. 2d 125, 158, 160, 166 (E.D. Pa. 2012). And a failure to comply with a regulation that informs the quality or the level of the service at issue can be the basis for a claim under a worthless services theory because "seriously deficient" service is akin to "a product that does not work." *United States ex rel. Scharber v. Golden Gate Nat'l Senior Care LLC*, 135 F. Supp. 3d 944, 965 (D. Minn. 2015).

*DePaul Health Sys.*, 454 F. Supp. 3d at 494-95; *see also, e.g.*, *United States ex rel. Ellis v. CVS Health Corp.*, 671 F. Supp. 3d 580, 584, 590 (E.D. Pa. 2023) (finding that claims submitted for reimbursement of medication that partially or completely lost its potency due to a flash freezing by CVS could proceed on a "worthless services" theory of liability where the medication guides for these three pharmaceuticals all advised that they should not be frozen). Relators' complaint

uses industry standards to explain what a worthwhile MTM service would look like, compared to the worthless MTM services alleged. Under a "worthless services" theory, Relators need not do more.

Accordingly, Defendant's argument that Relators' reliance on industry standards is inadequate because the industry standards do not regulate Walgreens and compliance is not a prerequisite to Medicare reimbursement is not fatal to Relators' FCA claim.

### ii. Allegation of Worthless MTM Services

The written summary given to beneficiaries after a CMR includes three documents: a CMR Cover Letter, a medication action plan ("MAP"), and a Personal Medication List. ECF Nos. [114] ¶ 53, [114-3] at 5. Defendant argues that Relators fail to establish their theory of liability because they merely allege services that were worth less, not entirely worthless — for instance, Defendant notes that the MTM services produced a helpful personalized medication list for patients. ECF No. [117] at 13, 18. Moreover, Defendant argue that even if the MAPS were defective, they were only one of three documents that had to be compiled after an effective MTM service. *Id.* at 18. In addition, Defendant asserts that CMS regulations do not even require a MAP to be completed in the first place, stating only that a CMR "may" result in a MAP. *Id.* at 14.

Relators respond that the seven representative MTM services attached to the Complaint violate the regulatory standard of care so that the MTM services provided were the equivalent of no medical service having been provided. ECF No. [126] at 2, 4. Relators argue that they plausibly allege two viable theories of why Walgreens' MTM services were worthless: (1) Walgreens was grossly negligent in complying with the regulatory standard of care, and (2) Walgreens failed to comply with industry standards. ECF No. [126] at 4. To the extent CMS issues an instruction regarding the necessary quality of MTM services, Walgreens must comply with it. *Id.* (quoting 42 C.F.R. § 423.505(i)(4)(iv)). Defendant replies that it showed diligence and care in connection with

its provision of MTM services, and the attached representative services show that the MTM services were of high quality, tailored to patients, and at worse rushed, which is insufficient to support a "worthless services" claim. ECF Nos. [117] at 15-17, [129] at 3-4.

In their Second Amended Complaint, Relators allege that instead of conducting in depth CMRs actually targeted to patients, "pharmacists simply offer the CMR and, if the patient agrees, they have a rudimentary conversation with the patient, followed by a generic, cut-and-paste Medication Action Plan that gives little advice other than 'take your medication as directed.'" ECF No. [114] ¶ 103. One Relator identifies a practice of "on the fly" MTMs that were "seconds-long, surprise consultation by documenting whatever generic information they could to try and make the MTM look legitimate" while other patients waited in line. *Id.* at ¶ 104. Relators alleged that the follow-ups to MTM appointments consisted of "generating a cover letter and medication list automatically populated by the Mirixa or Outcomes software, and cutting and pasting a generic, non-individualized statement on the Medication Action Plan, if anything." *Id.* at ¶ 92. Moreover, Relators identify one instance where a Walgreens pharmacist performed an MTM service at a Florida Walgreens on a beneficiary who had died several weeks earlier. *Id.* at ¶ 105.

Additionally, Relators attach to their Complaint the follow-up documents a pharmacist must send the patient after a MTM consultation, as mandated by CMS: CMR cover letters, medication action plans, and personal medication list for seven patients. *See* ECF No. [114-13], [114] ¶ 87. Four patient claims were submitted to the Outcomes vendor. The documents include the MTM claim for patient D.C., prepared on 8/14/2017. ECF No. [114-13] at 1-10. In what "We Talked About," the form states "We created a list of the medicines you are taking. We talked about why you use each medicine and the best way to take them." *Id.* at 3.  In "What I need to do[,]" the form states, "It is important to take your medicines as directed to get the most from them. Talk to

your pharmacist if there are changes to your medicines or if you have questions." *Id.* at 3-4. Relators allege that this language is the same boilerplate advice that Walgreens gives on every prescription bottle. ECF No. [114] ¶ 32. The boxes to input text for "my follow-up plan" and "questions I want to ask" are empty. *Id.* at 4. Also attached are the MTM claims for patients H.L. (in 2016), ECF No. [114-13] at 14-15, and M.K (in 2015), *id.* at 24-25, H.M. (in 2017), *id.* at 49-50. All are identical in content to that of patient D.C. and contain the same "boilerplate advice" and empty boxes. Each claim also includes a medication list for each patient, which includes medication names, how often to take them, as well as the disease it targets and who prescribes it. *Id.* at 5-8 (for D.C.), 16-21 (for H.L.), 26-31 (for M.K., listing a rash and itches by the patient), 51-56 (for H.M., listing that patient has no known drug allergies). The claims for D.C., H.L., M.K. and H.M. were all billed using the Outcomes platform to the Part D Sponsor for $50. *See* ECF No. [114] ¶¶ 109, 112, 115, 120.

Relators also attach three claims submitted to the Mirixa vendors. One form — provided by Mirixa, the vendor that since merged with Outcomes — is attached for patient J.C. that lists all the medication J.C. takes and when prescribed, *id.* at 32-34, an empty worksheet, *id.* at 36, an empty assessment and plans section¸ *id.* at 37, and an empty patient medication action plan, *id.* at 38. Additionally, it identifies that the patient may be non-adherent i.e., not take medications as prescribed as to one medication, as identified due to patient's failure to refill some current prescriptions, *id.* at 35. That portion of the form notes that "Patient agreed to modify behavior to take medication as directed." *Id.* at 35. A second Mirixa form for patient G.W. identifies that patient was non-adherent but that the pharmacist "filled medication to which the patient was non-adherent[,]" *id*. at 63. It also includes an empty worksheet and empty assessment and plans section, as well as an empty patient medication action plan. *Id.* at 66-68.

A third Mirixa form for patient A.B., *id.* at 70, appears more complete: it checks several boxes personalized to A.B., including "suggested engaging a caregiver's assistance in medication administration," *id.* at 72. It notes that "patient stated that her blood pressure and blood glucose is under control and she is no longer taking her medications." *Id*. at 73. In assessments and plans, it includes "Upon assessment of patient's profile, it was discovered that patient's medications were filled this February" and "The plan is to follow up with patient's medication, counsel and ensure patient are compliant." *Id.* at 74. In Medication Action plan, it lists "Medication adherence for optimum outcome" and "Need to refill medication 3 days for next refill." *Id.* at 75. Further pharmacist notes include that "Patient stated that her blood pressure and blood sugar are under control." *Id.* at 76.

Taking the allegations in the Complaint as true, Relators have plausibly alleged their two FCA claims under a worthless services theory. "A factually false claim requires proof that the service the government was billed for was not provided." *United States v. Am. Health Found. Inc.,* No. CV 22-02344, 2023 WL 2743563, at *11 (E.D. Pa. Mar. 31, 2023) (citation omitted). "This includes not only instances where services were literally not rendered, but also "worthless services" claims where "the service is so substandard as to be tantamount to no service at all." *Id.* (quoting *In re Genesis Health Ventures, Inc.*, 112 F. App'x. 140, 143 (3d Cir. 2004)). This theory of liability has been recognized as viable by several circuits, even if the Eleventh Circuit has not yet directly ruled on it. *CVS Health Corp*., 671 F. Supp. 3d at 589 (listing cases); *United States v. Houser*, 754 F.3d 1335, 1348 (11th Cir. 2014) (indirectly considering the FCA's "worthless services" theory in the context of a defendant's conviction under a federal health care fraud statute for providing "worthless services" when operating nursing homes). Under a worthless services theory, "more than mere regulatory noncompliance is required for liability to attach; the

noncompliance must be so great that effectively no services were provided." *DePaul Health Sys.*, 454 F. Supp. 3d at 495. "[A] defendant provides effectively no services when it provides services that are grossly negligent with respect to the regulatory standard of care." *Id.*

Though there is no clear line separating worthless and non-worthless services, courts have weighed in as to which facts are sufficient to make out a "worthless services" claim under the FCA on different postures. In *DePaul Health*, the Eastern District Court of Pennsylvania noted that "services provided without ordinary care will have some value to the government, but services provided without even slight care will have no value to the government." *DePaul Health Sys.*, 454 F. Supp. 3d at 496. Similarly, claims submitted for a "medically worthless" product could survive a motion to dismiss. For instance, the Eastern District Court of Pennsylvania found that claims submitted for reimbursement of medication that partially or completely lost its potency due to a flash freezing by CVS could proceed on a "worthless services" theory of liability where the "medication guides for these three pharmaceuticals all advise that they should not be frozen" *See, e.g., CVS Health Corp.*, 671 F. Supp. 3d at 584, 590.

This Court finds that by attaching action plans with no personalized recommendation and with boilerplate language, *see generally* ECF No. [114-13], Relators have plausibly stated a claim for "worthless services" under the FCA. Relators have alleged these claims with the required specificity under Rule 9(b), giving individual examples of MTM services at Walgreens and claims filed. Moreover, Relators plausibly allege noncompliance "so great that effectively no services were provided[,]" *DePaul Health Sys.*, 454 F. Supp. 3d at 495. The MAPs in the documentation following the MTM consultations of four patients are empty except for boilerplate language allegedly also present on every prescription bottle at Walgreens. ECF No. [114-13] at 3 (for D.C.),

14-15 (for H.L.), 24-25 (for M.K.), 49-50 (for H.M.) [6] ECF No. [114] ¶ 32. This is a telling omission, since the MAP is the only follow-up document provided by the pharmacist that reflects whether the encounter and assessment was individualized. ECF No. [114] ¶ 25.

Taking the facts in the Complaint as true and drawing inferences in favor of the Relators, empty MAPs could indicate that "no services were provided." *DePaul Health Sys.*, 454 F. Supp. 3d at 495. This is the case despite the fact that there were personalized medication lists: in this posture, the Court must take as true Relators' allegation that Walgreens "generat[ed] a cover letter and medication list automatically populated by the Mirixa or Outcomes software, and cutting and pasting a generic, non-individualized statement on the Medication Action Plan, if anything" so that the medication lists do not indicate that a proper CMR occurred. *Id.* at ¶ 92. Moreover, the Complaint further plausibly alleges that no services were provided in at least one instance, where the purported beneficiary from an MTM service given at Walgreens had died several weeks earlier, rendering the MTM consultation impossible. ECF No. [114] ¶ 105.

The Complaint and the attached exhibits plausibly set forth the possibility that the "required services… simply were not provided." *United States v. Houser*, 754 F.3d 1335, 1348 (11th Cir. 2014) (considering the FCA's "worthless services" theory in the context of a defendant's conviction under a federal health care fraud statute) (quoting *Chesbrough*, 655 F.3d at 461). The Court finds that Relators have adequately pled worthless services.

The Court is not persuaded by Defendant's reliance on *U.S. ex rel. Absher v. Momence Meadows Nursing Center*, in arguing that Relators only state services that are "worth less" and not "worthless" under *Absher* and so cannot prevail under its "worthless" services theory of liability

---

[6] In "What I need to do" the medication action plan forms state, "It is important to take your medicines as directed to get the most from them. Talk to your pharmacist if there are changes to your medicines or if you have questions." *See*, *e.g.*, ECF No. [114-13] at 3-4.

at this stage. *See U.S. ex rel. Absher v. Momence Meadows Nursing Ctr., Inc.*, 764 F.3d 699, 709 (7th Cir. 2014). In *Absher*, the district court had improperly instructed the jury that worthless services can be found even if some services were provided, as illustrated by the following example: "if Uncle Sam paid [Defendant] 200 bucks and they only got $120 worth of value, [then] [Defendant] defrauded them of $80 worth of services." *Id.* at 709. The Seventh Circuit found that this jury instruction was incorrect, as to prevail under a "worthless services" theory under the FCA, plaintiffs could not simply establish that the government received less than it bargained for: "[i]t is not enough to offer evidence that the defendant provided services that are worth some amount less than the services paid for. That is, a 'diminished value' of services theory does not satisfy this standard. Services that are 'worth less' are not 'worthless.'" *Id.* at 710, 710 n. 12.

This holding does not apply in the instant case. First, *Absher* merely considered the "worthless services" theory of liability as a subset of a false certification theory of liability, and not as a separate theory of liability, which is at issue here: the Seventh Circuit declined to rule on whether a "worthless services" theory can serve as a standalone theory of liability. In addition, the Seventh Circuit did not disturb the proposition that for a standalone "worthless services" theory of liability to prevail, the services provided have to be "truly *or effectively* worthless[,]" which is what Relators allege here. *Id.* at 710 (emphasis added). Finally, *Absher* reached the Seventh Circuit in a different posture than Relators' case: *Absher* went to the Seventh Circuit on appeal after the jury reached a verdict. The Seventh Circuit could therefore examine all the evidence presented to determine whether it supported the FCA claim.

In contrast, Relators' case comes to this Court on a motion to dismiss. On a motion to dismiss, the Court must take the factual allegations in the complaint as true and draw all inferences in favor of the Relators. *See Chaparro*, 693 F.3d at 1337; *see also United States v. NHC Healthcare*

*Corp.*, 115 F. Supp. 2d 1149, 1155 (W.D. Mo. 2000) (noting the difference between evaluating an FCA claim on a summary judgment posture and on a motion to dismiss). The Court cannot draw inferences in favor of the Defendant, as the Defendant invites the Court to do. *See* ECF No. [117] at 14-15. For instance, Defendant argues that the blank MAPs merely evidences that there were "no medication-related problems" for the patient at issue. ECF Nos. [14-13], [117] at 14. While that may very well be true, the Court must draw inferences in favor of Relators, and finds doing so plausibly supports Relators' claim of worthless services. Looking at the Complaint and attached exhibits and drawing inferences in favor of the Plaintiff, the blank MAPs could support a finding that MTM services were "worthless."

Additionally, Defendant argues that regulations do not mandate the creation of a medication action plan. Therefore, Defendant argues services with a defective MAP cannot be worthless, as a MAP is not even required. Defendant is correct, as regulations only recommend a medication action plan and do not mandate it:

> (1) The beneficiary's comprehensive medication review—
> (i) Must include an interactive, person-to-person, or telehealth consultation performed by a pharmacist or other qualified provider; and
> (ii) May result in a recommended medication action plan

42 C.F.R. § 423.153(d)(1)(vii)(B)(1).

But drawing inferences in favor of the Relators, as the Court must, the blank MAPs could also reveal that the mandatory "interactive, person-to-person, or telehealth consultation performed by a pharmacist or other qualified provider" did not properly occur such that the MTM were worthless. *See Chaparro*, 693 F.3d at 1337. Pasting boilerplate language in "What I need to do" does not provide a MTM written summary "tailored to the beneficiary and customized for the Part D plan and MTM program." ECF No. [114-3] at 5. Though a MAP is not mandatory,

> [a]t a minimum, Part D Sponsors are expected to offer MTM services that include a comprehensive medication review (CMR) …. While initial preparations to assess

medication use and identify medication-related problems before the patient interaction may be conducted 'behind the scenes', they are only a piece of the overall comprehensive medication review. CMS recognizes the importance of offering an interactive, person-to-person consultation with the beneficiary for a complete assessment of the beneficiary's needs to improve medication use or outcomes.

ECF No. [114-2] at 12-13. Also required is the "[i]mplementation of a systematic process to summarize the interactive consultation and provide an individualized written 'take-away' to the beneficiary such as a personal medication record, reconciled medication list, action plan, recommendations for monitoring, education, or self-management, etc." ECF No. [114-2] at 12-13. Drawing inferences in favor of Relators, those may not have occurred during CMRs delivered by Walgreens.

The Second Amended Complaint adequately sets forth a plausible claim that effectively no MTM services were rendered under a "worthless services" theory of liability. Defendant's Motion to Dismiss is denied on this point.

### iii. Government Payment

#### a. Under 31 U.S.C. § 3729(a)(1)(A)

Defendant argues that additional allegations as to how Walgreens gets paid for its MTM services through vendors upstream from Walgreens in Relators' Second Amended Complaint, SAC ¶¶ 61–74, are not enough to survive a Motion to Dismiss. ECF No. [117] at 19. Defendant asserts that Relators still do not allege that "a separate 'false claim' is ever even submitted to the government" by Walgreens or any other MTM service participant — nor can they. *Id.* Indeed, there is no separate Part D benefit for which the Government pays when approving plan bids, the Government does not even know the amount of MTM costs a Part D Sponsor anticipates and the payment scheme alleged is far too attenuated a connection to support a false claim for Government payment. *Id.* Finally, the Government does not pay for MTM services on the backend through the

reconciliation process. *Id.* at 20. Relators argue that the FCA's text does not limit claims only to requests submitted to the Government, and legislative history shows that Congress adopted a broad definition of claim in 2009 to clarify that payment requests need not be directly "presented" to the Government to qualify as "claims" under the FCA. ECF No. [126] at 11-12.

The payment system alleged in the Second Amended Complaint is as follows: the major vendors of MTM services for Part D Sponsors in the United States — such as Outcomes and Mirixa — contract with pharmacies such as Walgreens "to provide MTM services to beneficiaries by entering into MTM Network Participation Agreements, which allow pharmacies to document and receive payment for the MTM services it provides to Medicare beneficiaries," as well as to identify Medicare beneficiaries eligible for CMRs and TMRs at specific Walgreens pharmacies. ECF No. [114] ¶¶ 62-69. Once Walgreens performs a particular MTM service and completes the necessary paperwork through the vendor's platform, Walgreens submits a claim to the vendor for the MTM service. *Id.* at ¶ 68. The vendor pays Walgreens using funds provided by the Part D Sponsor, which funds have, in turn, been provided by CMS. *Id.* Per Outcomes' standard contract with MTM providers, the MTM Network Participation Agreement, Outcomes issues reimbursement on a monthly basis, with payment for valid claims being issued no more than 45 days following the end of each month. *Id.* CMS considers MTM services provided to targeted beneficiaries to be an "administrative cost" — i.e., a cost incurred by the Part D Sponsor to comply with the requirements of the Part D program that are not drug costs. *Id.* at ¶ 71. Indeed, CMS views MTM services as a clinical service that should be billed as professional health care claims rather than retail pharmacy drug claims. *Id.*

Under the False Claims Act, a claim is:

(A)… any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that--

    (i) is presented to an officer, employee, or agent of the United States; or

    (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government--

        (I) provides or has provided any portion of the money or property requested or demanded; or

        (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; and

(B) does not include requests or demands for money or property that the Government has paid to an individual as compensation for Federal employment or as an income subsidy with no restrictions on that individual's use of the money or property;

31 U.S.C. § 37299(b)(2)(A)-(B). In other words, "[a] 'claim' … includes direct requests to the Government for payment *as well as* reimbursement requests made to the recipients of federal funds under federal benefits programs." *Universal Health Servs.*, 579 U.S. at 182 (emphasis added).[7]

Under this statutory language, Relators have sufficiently alleged a claim under the False Claims Act. 31 U.S.C. § 37299(b)(2)(A)-(B). First, Relators have plausibly alleged that Walgreens' claim for MTM services "is made to a contractor, grantee, or other recipient[,]" namely Outcomes or Mirixa. *Id.* Relators quote from the MTM Network Participation Agreement to allege that "Outcomes serves as the payment processor between Client [Part D Sponsor] and

---

[7] Relators insist, without citing case law, that Relators must allege "submission to or payment by the Government of any specific claims for allegedly 'worthless' MTM services." ECF No. [117] at 19. Though case law insisting on the necessity of submission of claims directly to the Government does exist, the Court notes that these cases apply an older version of the False Claims Act, which required presentment of a claim "to an officer or employee of the United States Government or a member of the Armed Forces of the United States." 31 U.S.C.A. § 3729 (a)(1) (1994). The False Claims Act, amended in 2009, now asks only that a person knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval[.]" 31 U.S.C.A. § 3729(a)(1)(A) (2009). It then defines claim as that "presented to an officer, employee, or agent of the United States; or … to a contractor, grantee, or other recipient" when certain conditions are met. 31 U.S.C. § 3729(b)(2) (2009).

vendor/MTM Center [Walgreens] for the provision of MTM and that payment for MTM to Vendor/MTM Center [Walgreens] is expressly conditioned upon Outcomes' receipt of funds from the Client [Part D Sponsor]." ECF No. [114] at ¶ 69. Second, Relators have plausibly alleged that "the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest[:]" the administration of MTM programs by a pharmacist, or other qualified provider, to certain "targeted beneficiaries" as developed by 42 C.F.R. § 423.153(d)(1)(i)-(iii). *See* 31 U.S.C. § 37299(b)(2)(A). Third, Relators have plausibly alleged "the United States Government—(I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 37299(b)(2)(A). Here, "[t]he vendor pays Walgreens using funds provided by the Part D Sponsor, which funds have, in turn, been provided by CMS[,]" a government agency. ECF No. [114] at ¶ 68.

Relators have pled government payment of a claim under 31 U.S.C. § 37299(b)(2)(A)-(B) with sufficient specificity under Rule 9(b) by stating "the 'who,' 'what,' 'where,' 'when,' and 'how' of fraudulent submissions to the government." *Urquilla-Diaz*, 780 F.3d at 1052. Relators have alleged that (1) Walgreens pharmacists submit claims for reimbursement to vendors Outcomes or Mirixa, *id.* at ¶¶ 63-68; (2) the vendor pays Walgreen using funds provided by the Part D Sponsors, *id.* at ¶¶ 61, 62, (3) those funds were provided initially by CMS (the government) on a monthly basis as evidenced by Outcomes' standard contract with MTM providers and the MTM Network Participation Agreement, *id.* at ¶ 68; (4) Relators have attached specific claims from Walgreens pharmacists submitted to Outcomes for four patients and to Mirixa for three patients from a Walgreens in Miramar, Florida, each with specific dates, ECF No. [114-13] at 1-10, 14, 24, 49 (claims submitted to Outcomes); *id.* at 32-46, 61-69, 70-77 (claims submitted to

Mirixa). As such, they have pled with the requisite specificity a reimbursement scheme that falls under the FCA's definition of claim under 31 U.S.C. § 37299(b)(2)(A)-(B).

Defendant cites no law for the proposition that such a method of reimbursement is too attenuated, especially in light of 31 U.S.C. § 37299(b)(2)(A)-(B)'s definition of claim which brings claims "made to a contractor, grantee, or other recipient" within the fold of the FCA if a portion of the money was provided by the United States Government, as it is here. Defendant sets forth no reason why whether such a cost is classified as an administrative cost or a drug cost removes the claim from the scope of the statute, nor does the Court discern any. Indeed, it "is not necessary to show that the funds were provided specifically to pay defendants' claims. Rather, the FCA applies as long as any portion of the claim is or will be funded by U.S. money." *United States ex rel. Grubea v. Rosicki, Rosicki & Assocs., P.C.*, 318 F. Supp. 3d 680, 706 (S.D.N.Y. 2018).[8]

The Second Amended Complaint properly alleges government payment when it alleges that Walgreens presented claims to a recipient of money (Outcomes or Miriza), at least a portion of which was provided by the United States Government (CMS via the intermediary of Part D Sponsors) in compliance with 31 U.S.C. § 37299(b)(2)(A)-(B).

---

[8] Additionally, the Eleventh Circuit has allowed relators to proceed with claims without submitting a specific claim submitted to the government in some circumstances. *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 471 (6th Cir. 2011) (describing the "relaxed standard" of the Eleventh Circuit and district courts in this circuit as to identifying a specific claim submitted to the government "even though the relator is unable to produce an actual billing or invoice, he or she has pled facts which support a strong inference that a claim was submitted," and listing cases); *see also Hill v. Morehouse Med. Assocs., Inc.*, No. 02-14429, 2003 WL 22019936, at *3 (11th Cir. Aug. 15, 2003) ("Rule 9(b)'s heightened pleading standard may be applied less stringently, however, when specific factual information about the fraud is peculiarly within the defendant's knowledge or control" (citation and alterations omitted)). "In certain instances, relators are excused from identifying specific false claims, certifications, or referrals if the court can infer an 'indicia of reliability' from the relator's position or circumstances." *United States v. All Children's Health Sys., Inc.*, No. 8:11-CV-1687-T-27EAJ, 2013 WL 1651811, at *4 (M.D. Fla. Apr. 16, 2013).

### b. Violation of 31 U.S.C. § 3729(a)(1)(B)

Alternatively, Defendant argues that Relators have failed to adequately allege a violation of 31 U.S.C. § 3729(a)(1)(B). ECF No. [117] at 23-24. Defendant asserts Relators have failed to adequately allege that the Government paid claims that it did not owe in connection with the alleged MTM scheme. *Id.* The Court does not find that Relators have failed to plead government payment as to 31 U.S.C. § 3729(a)(1)(B). Defendant cites an in-circuit district court decision which found that "Relator has failed to allege with specificity any amounts the government paid that it did not owe and therefore fails to state a claim under subsection (a)(1)(B).". *U.S. v. All Children's Health Sys., Inc.*, 2013 WL 1651811, at *4 & n.4 (M.D. Fla. Apr. 16, 2013). However, that case does not apply here, as Relators have attached seven specific claims submitted to vendors for an amount of $50 each and detailed the elaborate payment system that leads to government reimbursement. *See* ECF No. [114-13]. As indicated above, Relators have sufficiently alleged government payment of their claims in their Second Amended Complaint, and accordingly did not fail to allege payment under 31 U.S.C. § 3729(a)(1)(B).

### iv. Rule 9(b)

"[T]o satisfy Rule 9(b)'s heightened-pleading requirements, the relator must allege the "actual presentment of a claim ... with particularity," *id*. at 1327, meaning particular facts about "the 'who,' 'what,' 'where,' 'when,' and 'how' of fraudulent submissions to the government," *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1052 (11th Cir. 2015). Here, the Court finds that Relators have adequately alleged the "who" of the fraud through detailing the payment between Walgreens, vendors Outcomes and Mirixa, and specific named pharmacists and a pharmacy in Miramar, Florida listed in attached claims, ECF No. [114-13]; the "what," by detailing the MTM services provided and their alleged deficiencies; the "where," by listing pharmacy names where MTMs services were administered and claims submitted, *id.*; the "when" by explaining when in

the month such reimbursements are made and including the dates for attached claims, *id.*; and the "how" by explaining the method of reimbursement and of MTM services administration.

Relators' allegations are more specific than other FCA cases in the Eleventh Circuit in which allegations were found to not meet Rule 9(b)'s heightened pleading standard: in *Clausen*, the relator failed to specifically allege a false claim when he failed to attach "any billing information to support his allegation that actual false claims were submitted for payment, such as the amount of any charges. Instead, he attached one blank claim form and alleged that certain tests would have been billed on this form with certain test and diagnostic codes filled in." *U.S. ex rel. Clausen v. Lab'y Corp. of Am.*, 290 F.3d 1301, 1306 (11th Cir. 2002). In *Corsello*, the relator failed to "explain why he believes fraudulent claims were ultimately submitted. Corsello's contention that he was 'aware' of billing practices was neither particular to any specific fraudulent claim against the government nor factually supported because Corsello conceded that he 'did not have access to company files outside his own offices.'" *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1013–14 (11th Cir. 2005). Similarly, this Court dismissed a complaint where relators did "not provide the dates [of] any claims [that] were submitted, the name of any individual or individuals who submitted the claims, or copies of a single bill or payment." *United States ex rel. Crocano v. Trividia Health Inc.*, 615 F. Supp. 3d 1296, 1307 (S.D. Fla. 2022). Finally, the Middle District Court of Georgia dismissed a case where the:

> Amended Complaint contains no information concerning who at PARMC or any other medical facility submitted any requests for payment to the Government; when or to whom those requests were made; for what services PARMC sought payment from the Government; what documentation was presented in support of those claims; or whether the Government rendered payment for those services.

> *United States v. Landmark Hosp. of Athens, LLC*, 676 F. Supp. 3d 1323, 1341 (M.D. Ga. 2023).

Here, in contrast, there is no such deficiency as Relators attached seven examples of claims to their Complaint with a payment amount, a date, patient initials, and a place — at least several of which support their contention of worthless services — and specifically detailed the billing system at issue.

Though Rule 9(b) requires pleading with particularity of "the circumstances constituting fraud," Fed. R. Civ. P. 9(b), it does not suspend the proposition that the Court must accept as true the "sufficient factual matter" in a complaint to determine if it "state[s] a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (citation omitted) (emphasis added); *see, e.g.*, *Chesbrough*, 655 F.3d at 467. Here, Relators have adequately pled the "who," "what," "when," "where" and "how" of payment of the "claim" relating to the fraudulent conduct, placing defendants on notice of the precise misconduct with which it is charged. *U.S. ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1359 (11th Cir. 2006) (citation omitted).

**B. Alternative Claims for Dismissal**

      **i. Scienter**

Defendant argues that Relators still fail to sufficiently allege scienter. ECF No. [117] at 21. Defendant contends that Relators merely allege that pharmacists knew the MTM services were a "sham" given their training, and that managers knew the MTM services were a "sham" because they pressured other pharmacists into them. *Id.* Relators respond that they sufficiently alleged scienter, because a relator may allege scienter generally to satisfy Rule 9(b). ECF No. [126] at 14 (citing *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1051 (11th Cir. 2015); *U.S. ex rel. Matheny v. Medco Health Solutions, Inc.*, 671 F.3d 1217, 1224 (11th Cir. 2012) ("At the pleading stage, 'knowledge, and other conditions of a person's mind may be alleged generally.'")). Moreover, they alleged that Walgreens has knowledge of the MTM scheme through its employees under *Grand Union Co. v. U.S.*, 696 F.2d 888, 891 (11th Cir. 1983). ECF No. [126] at 15-16.

Liability under the FCA arises only when a defendant acted "knowingly." *See* §§ 3729(a)(1)(A) & (a)(1)(B); *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1058 (11th Cir. 2015). The FCA defines the term "knowingly" to "mean that a person, with respect to information .... (i) has actual knowledge of the information; .... (ii) acts in deliberate ignorance of the truth or falsity of the information; or .... (iii) acts in reckless disregard of the truth or falsity of the information." § 3729(b)(1)(A). "Under the FCA, reckless disregard is tantamount to gross negligence." *Pinellas Hematology & Oncology*, 21 F.4th at 1303. "A defendant need not, however, have acted with the specific intent to defraud the United States." *Id.* at 1303 (quoting § 3729(b)(1)(B)).

But this scienter element need not be alleged with particularity at the pleading stage. Relators are correct that under Rule 9(b),

> In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.

Fed. R. Civ. P. 9(b). "[A] party alleging fraud 'must state with particularity the circumstances constituting fraud' but may allege scienter generally." *Urquilla-Diaz*, 780 F.3d at 1051. Relators have alleged scienter generally here by alleging (1) pharmacists are aware of the falsity of the services because they are trained in MTM services industry standards and CMS regulations and (2) Walgreens' mid-level and upper-level management have actual knowledge of the sham MTM services scheme because their express directives to Walgreens' managers and pharmacists cause the MTM services. ECF No. [114] at ¶¶ 124-26. Accordingly, the Court declines to dismiss Relators' Complaint based on a failure to allege scienter.

### ii. Materiality

Defendant argues that Relators still fail to allege materiality. ECF Nos. [117] at 22, [129] at 7-8. MTM services are a mere "administrative cost" — not a separate benefit to which Beneficiaries are entitled — and Part D Sponsors and/or their downstream MTM contractor, not

the Government, decide what MTM claims they will pay and dictate the requirements for payment. *Id.* In fact, CMS has no awareness of how Part D Sponsors conduct MTMs, as a Part D sponsor is only required to "provide CMS with information regarding the procedures and performance of its MTM[ program]." 42 C.F.R. § 423.153(d)(5), (6). ECF No. [117] at 22, [129] at 7-8. Relators respond that had the Government known that Walgreens' pharmacists' MTM reviews consistently lacked any medical value to the Part D beneficiary, such information certainly would have been capable of influencing CMS's payment to the Plan D sponsor, which funds would then be paid to Walgreens through the Part D sponsor's vendor. ECF No. [126] at 16. MTM services that lack any medical value are unequivocally "capable of influencing" Government payment and are, therefore, material. *Id.* at 17.

In their Second Amended Complaint, Relators allege that the proper performance of MTM services is material to CMS's decision to fund such services because a Part D sponsor's participation in the Part D program in the first place is contingent on offering an approved MTM program that offers a minimum level of MTM services. 42 C.F.R. § 423.152(a). ECF No. [114] at ¶ 128. Moreover, they allege it goes to the essence of the bargain because CMS pays for MTM services to ensure Part D beneficiaries use their medications safely and effectively, in the manner that best improved health outcomes, and with the least overall cost: both do not occur when sham MTM services with no medical value are administered. *Id.* at ¶ 129.

The FCA defines the term "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). "A claim may be material but not false, false but not material, or both material and false." *Pinellas Hematology & Oncology*, 21 F.4th at 1299. "The materiality element seeks to limit the scope of liability under the FCA to claims for which the government 'would have attached importance to

the violation in determining whether to pay the claim.'" *Id.* at 1300 (quoting *United States ex rel. Marsteller v. Tilton*, 880 F.3d 1302, 1313 (11th Cir. 2018)). Further, "the materiality analysis is holistic." *Id.* (quoting *United States ex rel. Bibby v. Mortg. Inv'rs Corp.*, 987 F.3d 1340, 1347 (11th Cir. 2021)). Some of the relevant factors are as follows:

> Some of the relevant, non-exhaustive factors include whether the matter is an express condition to payment; whether, to the extent the United States had actual knowledge of the misrepresentations, they had an effect on its behavior; and whether the misrepresentations went to the essence of the bargain.
>
> *Pinellas Hematology & Oncology,* 21 F.4th at 1300; *see also Universal Health Servs.,* 579

U.S. at 195. In addition, the Supreme Court has stated that:

> The materiality standard is demanding. The False Claims Act is not "an all-purpose antifraud statute," *Allison Engine,* 553 U.S., at 672, 128 S.Ct. 2123 or a vehicle for punishing garden-variety breaches of contract or regulatory violations. A misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment. Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance. Materiality, in addition, cannot be found where noncompliance is minor or insubstantial.
>
> *Universal Health Servs.*, 579 U.S. at 194 (citations omitted). As discussed by the Eleventh

Circuit in *Pinellas*, "the United States' decision to label a requirement as a condition of payment is relevant but not dispositive" to the determination of materiality. *Pinellas Hematology & Oncology,* 21 F.4th at 1300 (quoting *Universal Health Servs., Inc.*, 579 U.S. at 194). The "materiality inquiry asks whether a misrepresentation would or did influence the United States' decision to pay." *Id.*

At the motion to dismiss stage, Relators sufficiently allege that whether or not the MTM services occurred would "be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). A district court in the Eastern District of Pennsylvania found that:

> a "worthless services" theory of liability does not require relators to identify specific legal obligations or factual statements, because, as discussed above, such

a theory rests on the presumption that the government would not willingly pay claims for good and services when they are so substandard as to be tantamount to no service at all. Where a medication has been frozen, and its supplier expressly warns against using medication that has been frozen, it would seem self-evident that the government would properly decline to pay for such shipments. . . . the alleged noncompliance in the form of providing worthless services is substantial enough to establish materiality.

*CVS Health Corp.*, 671 F. Supp. 3d at 590-91. Here, Relators have alleged MTM services where noncompliance was "so great that effectively no services were provided[,]" *DePaul Health Sys.*, 454 F. Supp. 3d at 495. If no MTM services were effectively performed, this would go to the "essence of the bargain with the government" and it would be self-evident the government would decline to pay for such services. *Pinellas Hematology & Oncology,* 21 F.4th at 1300.

Moreover, Relators have plausibly pled that CMS would not pay a Part D sponsor — and so not pay Walgreens — for "worthless" MTM services. Having set up a MTM Program (MTMP) is a requirement for a Part D Sponsor. "Each Part D sponsor must have established, for covered Part D drugs furnished through a Part D plan, a drug utilization management program, quality assurance measures and systems, and an MTMP as described in paragraphs (b), (c), and (d) of this section." 42 C.F.R. § 423.153(a). Moreover,

A Part D sponsor must have established a MTMP that—

(i)     Is designed to ensure that covered Part D drugs prescribed to targeted beneficiaries described in paragraph (d)(2) of this section are appropriately used to optimize therapeutic outcomes through improved medication use;
(ii)    Is designed to reduce the risk of adverse events, including adverse drug interactions, for targeted beneficiaries described in paragraph (d)(2) of this section[.]

*See* 42 C.F.R. § 423.153(d)(1)(i)-(ii).

As Relators persuasively argue, should there effectively be no MTM services administered, then those two goals would not be achieved. Accordingly, it is plausible that a Part D sponsor would not be paid by CMS if it only offered worthless MTM services. Accordingly, the false

claims at issue could have "a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). Relators have plausibly alleged materiality at this stage.

### iii. National Scheme

Defendant argues that even if the Court finds that Relators have alleged viable FCA claims, it should dismiss any claims outside of Florida and Ohio because Relators fail to adequately allege a nationwide scheme, but instead allege worthless MTM services occurring only in a single store in Florida. ECF No. [117] at 23. Relators argue that they have alleged a nationwide scheme, as Mirixa and Outcomes software that Walgreens pharmacists used to document MTM services was used nationwide, the industry standards are nationwide, the pressure exercised by Walgreens on district managers was nationwide, as were improper instructions encouraging pharmacists to perform surprise CMRs. ECF No. [126] at 18. Moreover, Relators allege conduct in Florida and Ohio, ECF No. [126] at 19.

On one end, several circuits and courts have held that "allegations of specific claims in one state or region satisfy Rule 9(b) requirements by establishing a nationwide inference of fraud." *U.S. ex rel. Spay v. CVS Caremark Corp.*, 913 F. Supp. 2d 125, 174 (E.D. Pa. 2012) (listing cases); *see also United States ex rel. Bibby v. Wells Fargo Bank, N.A.*, 165 F. Supp. 3d 1340, 1347 (N.D. Ga. 2015) (listing cases). An in-circuit district court in the Northern District of Georgia similarly noted that a "reasonable inference to draw here is that if the alleged violations of a national VA fee ban were occurring in seven states—including four of the ten most populous states in the nation in Texas, Florida, Georgia, and North Carolina—such conduct is likely to have occurred nationwide." *Wells Fargo Bank*, 165 F. Supp. 3d at 1348. In *Wells Fargo Bank*, the inference that the claims were nationwide was also appropriate because the Complaint had made:

plain that it alleges a nationwide scheme, with nationwide impact" by being "replete with references to a scheme to defraud the "nation['s]" and "country's" veterans…, discuss[ing] "national data" about the reasonableness of title fees…, and the "nationwide" default rate for IRRRL loans[,] … plead[ing] an exemplar false claim that resulted in an actual payment by the VA . . . . [a]nd … alleg[ing] damages in terms that are national in scope.

*Id*.

Though "representative examples [must] be pleaded with a high level of particularity when the alleged fraud is widespread[,]" courts have also explained there "must also be sufficient facts to support a reasonable inference that the fraud was, in fact, widespread." *United States ex rel. Buth v. Walmart Inc.*, No. 18-CV-840, 2021 WL 424160, at *4 (E.D. Wis. Feb. 8, 2021). Plaintiff does not have to plead with particularity claims in every state. Indeed, "Plaintiff cannot be expected to plead with particularity each and every false claim nationwide without the benefit of at least some discovery, as such information rests solely within Defendants' control." *Spay*, 913 F. Supp. 2d at 177.

Instead, what matters more is whether such a nationwide scheme is plausible, based on the particular claims, conduct, and information alleged. In *Wells Fargo Bank*, the conduct in seven states was enough to plausibly infer a nationwide scheme. In the District Court in the Eastern District of Pennsylvania, "the sheer number of claims identified by Plaintiff in at least three states and Puerto Rico suggests, without need for speculation, that Defendants' reporting practices likely occurred at Defendants' other facilities throughout the country." *Spay*, 913 F. Supp. 2d at 177. In contrast, the District Court in the Eastern District of Texas found that relators had not sufficiently pled a nationwide scheme where "Relators provide no facts about their experiences at those locations [(TeamHealth hospitals in Colorado and the Virgin Islands)] to support a plausible claim of nationwide fraud" where they only broadly alleged that policies were "national" and

"standardized." *United States v. Team Fin., L.L.C.,* No. 2:16-CV-00432-JRG, 2019 WL 3943958, at *7 (E.D. Tex. Aug. 21, 2019)

Here, Relators here allege a nationwide scheme. They attach claims from a Walgreens in Miramar, Florida. ECF No. [114-13]. Relators allege that they witnessed the administration of sham MTM services through personal observation in two states, Florida and Ohio. ECF No. [114] ¶ 94. Relator Mosley has worked in a managerial or training capacity in numerous states across the country, by working as a pharmacy manager in Florida, *id.* at ¶¶ 7-8, and as a District Manager for Walgreens in the Northwestern United States and in Tennessee. *Id.* at ¶¶ 9-10. He has also trained pharmacists or pharmacy and store managers in Tennessee, Arkansas, Mississippi, Illinois, Georgia and Alabama. *Id.* at ¶¶ 10-11. Moreover, Relators have alleged that Walgreens identifies clients for MTM services using national vendors. ECF No. [114] ¶¶ 65-66. The false claims are then submitted for reimbursement to Part D Sponsors using these national vendors. Relators also allege that Walgreens uses a "quota system that was applied uniformly nationwide." *Id.* at ¶ 96. Taken together, the Second Amended Complaint has plausibly alleged a nationwide scheme.

Unlike in *Team Fin.*, the allegations are sufficient to meet Rule 9(b)'s "where" requirement. Relators have specifically stated which experiences with MTM services at the locations in Florida and Ohio make the scheme plausible. They have then given examples of the national vendor system and Walgreens quota system that could plausibly lead to the inference that Defendants have engaged in a nationwide scheme. Reading the Second Amended Complaint, there is "no reason to think that this commercial conduct was confined just to one region of the country." *Wells Fargo Bank,* 165 F. Supp. 3d at 1348. Accordingly, the Court declines to dismiss Relators' Complaint for failure to state a nationwide scheme with sufficient specificity.

### C.  Dismissing Pharmaleta's Claims Under the Public Disclosure Bar

Last, Defendant argues that the public disclosures in this very case — the unsealed Original Complaint and the First Amended Complaint — bar Pharmaleta's MTM claims. ECF No. [117] at 24. Defendant asserts Pharmaleta is not an "original source" of the claims, given that there is no allegation that Pharmaleta or Swihart disclosed or provided any information pertaining to the alleged MTM scheme to the Government at any point. *Id.* Because of this, claims brought by Pharmaleta and Paragraph 104 of the Second Amended Complaint (the sole allegation from Pharmaleta pertaining to the alleged MTM scheme) should be stricken. *Id.* Relators argue that even if Pharmaleta's claims on the MTM scheme are subject to the public disclosure bar, nothing prohibits Dr. Mosley from alleging information that he acquired through an independent investigation — including his conversations with Pharmaleta. ECF No. [126] at 19-20.

The law on the Public Disclosure Bar is as follows: under the False Claims Act,

> The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed—
> **(i)** in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;
> …. unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A). Original source means:

> …an individual who either (i) prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has [3] knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.

31 U.S.C. § 3730(e)(4)(B). When applying the statute,

> Courts typically employ a three-part inquiry to determine whether the public disclosure bar applies: (1) Before the filing of the qui tam complaint, had the plaintiff's allegations been publicly disclosed? (2) If so, are the plaintiff's allegations substantially the same as those described in the public disclosure? (3) If

yes, is the complaint nonetheless allowed because the relator is an original source of the information?

*Crocano*, 615 F. Supp. 3d at 1304 (quoting *United States ex rel. Osheroff v. Humana, Inc.*, 776 F.3d 805, 812 (11th Cir. 2015) (citing *Cooper v. Blue Cross Blue Shield of Fla., Inc.*, 19 F.3d 562, 565 n.4 (11th Cir. 1994))). "[T]he public disclosure bar applies also to the joinder of parties to an existing action" and not just to the filing of a separate action. *United States ex rel. George v. Fresenius Med. Care Holdings, Inc.*, No. 2:12-CV-00877-AKK, 2015 WL 12819145, at *1 (N.D. Ala. Nov. 2, 2015). However, where the relator is an original source of the information and "[w]here only one element of the fraudulent transaction is in the public domain (e.g., X), the qui tam plaintiff may mount a case by coming forward with either the additional elements necessary to state a case of fraud (e.g., Y) or allegations of fraud itself (e.g., Z)." *Mortgage Investors Corp.*, 987 F.3d at 1353-54.

First, Pharmaleta's allegations were publicly disclosed by the filing of Relator Mosley' Complaint on February 20, 2018, ECF No. [1]. Second, the allegations of sham MTM services are substantially similar to those originally alleged by Relator Mosley. The FCA requires courts to dismiss claims that are "substantially the same" as allegations or transactions that have been publicly disclosed. 31 U.S.C. § 3730(e)(4) (2010). Third, Pharmaleta does not meet the last requirement necessary to overcome the public disclosure bar as it does not qualify as an original source under 31 U.S.C. § 3730(e)(4)(B). There is no allegation that Pharmaleta "voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based" or "voluntarily provided the information to the Government before filing an action under this section" *Id. See* ECF No. [114] ¶¶ 16-19. Relators do not attempt to argue that Pharmaleta is an original source here, and instead argue that nothing prohibits Relator Mosley from alleging information acquired through conversations with Pharmaleta. The Court agrees with Defendant

Case No. 18-cv-80200-BLOOM/Torres

that nothing in the alleged Complaint permits Pharmaleta to qualify as an original source, so the Second Amended Complaint has to be dismissed as to Pharmaleta due to the public disclosure bar.

However, despite dismissing Pharmaleta, the Court sees no reason to dismiss the Complaint as to Mosley, the original Relator. *See U.S. ex rel. Fry v. Guidant Corp.*, No. CIV.A. 3:03-0842, 2006 WL 1102397, at *8 n. 9 (M.D. Tenn. Apr. 25, 2006) ("[T]he defendants have not pointed to, nor has the court found, any [] restriction on original relator Fry's ability to plead, as support for his allegations of fraud, facts independently discovered through his investigative communications with [subsequent relator] McDonald."). There is no reason to strike paragraph 104 of the Complaint, which alleges facts learned by Pharmaleta and since shared with Mosley.

Pharmaleta's claims are accordingly dismissed with prejudice under the public disclosure bar. Relator Mosley's claims survive.

**CONCLUSION**

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Defendant's Motion to Dismiss, ECF No. [117], is **DENIED** as to Relator Mosley**.**

2. Defendant's Motion to Dismiss, ECF No. [117], is **GRANTED** as to Relator Pharmaleta.

3. Defendant shall file an Answer to the Second Amended Complaint **by June 19, 2024.**

**DONE AND ORDERED** in Chambers at Miami, Florida, on June 4, 2024.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record

44